# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | |
|---|---|
| PATRICK R. SMITH and BRANDON S. HOLM, individually and on behalf of all others similarly situated, <br><br>　　　Plaintiffs, <br><br>v. <br><br>WILLIAM P. BARR, in his official capacity as the Attorney General of the United States; MICHAEL CARVAJAL, in his official capacity as the Director of the Federal Bureau of Prisons; and T. J. WATSON, in his official capacity as Complex Warden for the Terre Haute Federal Correctional Complex, <br><br>　　　Defendants. | No. 2:20-cv-630- JMS-DLP |

## DECLARATION OF DR. JOE GOLDENSON

I, Dr. Joe Goldenson, declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

**Background**

1. I am a medical physician with 33 years of experience in correctional health care. For 28 years, I worked for Jail Health Services of the San Francisco Department of Public Health. For 22 of those years, I served as the Director and Medical Director. In that role, I provided direct clinical services; managed public health activities in the San Francisco County jail, including the management of HIV, tuberculosis, Hepatitis C, and other infectious diseases in the facility; planned and coordinated the jail's response to H1N1; and administered the correctional health enterprise, including its budget, human resources services, and medical, mental health, dental, and pharmacy services.

2. I served as a member of the Board of Directors of the National Commission on Correctional Health Care for eight years and was past President of the California chapter of the American Correctional Health Services Association. In 2014, I received the Armond Start Award of Excellence from the Society of Correctional Physicians, which recognizes its recipient as a representative of the highest ideals in correctional medicine.

1

3.     For 35 years, I held an academic appointment as an Assistant Clinical Professor at the University of California, San Francisco.

4.     I have worked extensively as a correctional health medical expert and court monitor. I have served as a medical expert for the United States District Court for the Northern District of California for 25 years. I am currently retained by that Court as a medical expert in *Plata v. Newsom*, Case No. 3:01-cv-01351 (N.D. Cal.), to evaluate medical care provided to inmate patients in the California Department of Correctional Rehabilitation. I have also served as a medical expert/monitor at Cook County Jail in Chicago and Los Angeles County Jail, at other jails in the states of Washington, Texas, and Florida, and at prisons in Illinois, Ohio, and Wisconsin.

5.     My CV is attached as **Exhibit 1**.

6.     I am not being compensated for my time reviewing materials and preparing this report.

7.     As a researcher of prisoner health care and infectious diseases, I have studied the scientific literature about COVID-19, including the literature regarding symptoms, testing, infection rates and transmission. In addition, I have studied and am familiar with the public health guidance regarding prevention and containment of COVID-19, including U.S. Centers for Disease Control and Prevention's ("CDC") Guidance for Population in Jails and the CDC's Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings.

**COVID-19**

8.     COVID-19 is a serious disease that reached pandemic status in March 2020. As of November 19, 2020, there are at least 56,561,918 confirmed cases of COVID-19 worldwide, including 11,573,758 cases in the United States.[1] At least 1,354,780 people have died, including 251,029 in the United States.[2] As of November 19, 2020 there were 275,503 confirmed cases of COVID-19 in Indiana and 5,084 reported deaths.[3] Vigo County, where Terre Haute is located, has had 5,087 confirmed cases and 69 deaths.[4] Because these numbers include only laboratory confirmed cases, they likely understate the actual number of cases and deaths. Cases continue to rise in states across the United States.[5] An average of 162,816 cases per day have been reported in

---

[1] Johns Hopkins University COVID-19 Data Center, https://coronavirus.jhu.edu/ (last visited November 19, 2020); Centers for Disease Control and Prevention, COVID Data Tracker, https://www.cdc.gov/covid-data-tracker/#cases (last visited November 19, 2020).

[2] *Id.*

[3] *Id.*

[4] Johns Hopkins University Coronavirus Resource Center, COVID-19 United States Cases by County, https://coronavirus.jhu.edu/us-map (last visited November 19, 2020).

[5] New York Times, The Coronavirus Outbreak: Live Updates, https://www.nytimes.com/news-event/coronavirus (last visited November 19, 2020).

the last week, which represents an increase of 77 percent from the average two weeks ago. As of November 19, cases were rising in almost every state in the country. 23 states hit single-day case records the first week of November.[6]

9. COVID-19 is a highly contagious respiratory illness. It is transmitted between persons in close proximity (within about six feet) by airborne droplets released by infected individuals when they cough or sneeze.[7] The droplets can survive in the air for up to three hours. In October 2020, CDC revised its COVID-19 guidelines to include that the coronavirus can be spread through aerosols, which "can linger in the air for minutes to hours" and travel farther than six feet. CDC concluded, "There is evidence that under certain conditions, people with COVID-19 seem to have infected others who were more than 6 feet away. These transmissions occurred within enclosed spaces that had inadequate ventilation.[8] It may also be possible for an individual to become infected by touching a surface or object that has the virus on it and then touching his or her own mouth, nose, or possibly eyes. Infected droplets can survive on surfaces for variable lengths of time, ranging from up to four hours on copper, to 24 hours on cardboard, to two to three days on plastic or stainless steel.

10. Signs and symptoms of COVID-19 may appear two to 14 days after exposure and may include fever, cough, shortness of breath or difficulty breathing, chills, fatigue, muscle pain, headache, sore throat, new loss of taste or smell, congestion or runny nose, nausea or vomiting, or diarrhea.[9] In severe cases, COVID-19 can require hospitalization and lead to respiratory failure or death. While more than 80% of the cases are mild, overall some 20% of cases will have severe disease requiring medical intervention and support.

11. Patients who suffer from serious disease may progress to Acute Respiratory Distress Syndrome (ARDS), which is a type of respiratory failure. Many patients suffering from ARDS will require mechanical ventilation. ARDS has a 30 percent mortality rate overall, and a higher mortality rate in people with other medical conditions.

12. Certain populations are particularly vulnerable to severe cases of COVID-19. The case fatality rate and need for advanced medical intervention and support increase significantly with advancing age in people aged over 50 and for people of any age with certain underlying medical conditions (the "medically vulnerable"). The CDC has identified people with the following medical conditions as high risk for severe illness (hospitalization, intensive care, ventilatory support or death) from COVID-19:

- Type 2 diabetes mellitus

---

[6] *Id.*

[7] Centers for Disease Control and Prevention, Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings (updated Nov. 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/.

[8] Centers for Disease Control and Prevention, How COVID-19 Spreads, (updated October 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

[9] Centers for Disease Control and Prevention, Symptoms of Coronavirus (updated May 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html.

- Chronic obstructive pulmonary disease
- Serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies
- Sickle cell disease
- Chronic kidney disease
- Immunocompromised state (weakened immune system) from solid organ transplant
- Obesity (body mass index (BMI) of 30 or higher)

13. The CDC notes that people with the following conditions might also be at risk for severe illness from COVID-19:

- Asthma (moderate to severe)
- Cerebrovascular disease (affects blood vessels and blood supply to the brain)
- Cystic fibrosis
- Hypertension or high blood pressure
- Immunocompromised state (weakened immune system) from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines
- Neurologic conditions, such as dementia
- Liver disease
- Pregnancy
- Pulmonary fibrosis (having damaged or scarred lung tissues)
- Smoking
- Thalassemia (a type of blood disorder)
- Type 1 diabetes mellitus[10]

14. The CDC also notes the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.[11] For example, as depicted in Chart 1, a CDC graphic from June 2020, 84.6 patients per 100,000 patients age 40-49 years are hospitalized due to COVID-19. That rate increases to 136.1 patients per 100,000 for patients age 50-64 years; to 198.7 per 100,000 for patients age 65-74 years; and to 329.3 per 100,000 for patients age 75-84 years.[12]

---

[10] Centers for Disease Control and Prevention, People of Any Age with Underlying Medical Conditions (updated Nov. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.

[11] Centers for Disease Control and Prevention, Older Adults (updated September 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[12] *Id.*

Chart 1



15.     The risk of death from COVID-19 also increases with age. As shown in Chart 2, another CDC graphic, patients age 40-49 account for 2.9% of all COVID-19 deaths. Beginning at age 50, the risk of death increases dramatically. Patients age 50-64 account for 15% of COVID-19 deaths; patients aged 65-74 account for 20.6% of deaths; patients aged 75-84 account for 26.1% of deaths.[13] The increasing death toll for older adults does not correlate with overall percentage of the population. Rather, the death rate from COVID-19 increases significantly with age, despite the fact that those age groups constitute an increasingly smaller percentage of the overall population. This trend is depicted in Chart 3, below, compiled from CDC data[14] and population estimates from the U.S. Census Bureau.[15]

---

[13] Centers for Disease Control and Prevention, Demographic Trends of COVID-19 cases and deaths in the US reported to CDC (updated November 20, 2020), https://www.cdc.gov/covid-data-tracker/index.html#demographics.

[14] *Id*.

[15] United States Census Bureau, 2019 Population Estimates by Age, Sex, Race and Hispanic Origin (June 25, 2020), https://www.census.gov/newsroom/press-kits/2020/population-estimates-detailed.html.

5

Chart 2



Chart 3



16. A significant number of infected individuals do not exhibit symptoms, however, and asymptomatic individuals—either before the onset of symptoms or because no symptoms will ever manifest—can nevertheless transmit the disease to others. According to the CDC, up to 25 percent of people infected with COVID-19 will remain asymptomatic.[16] Similarly, infected individuals may experience only mild symptoms. These asymptomatic and mildly symptomatic individuals can, and do, transmit the virus, contributing to its rapid spread. Because of the high risk of transmission by asymptomatic individuals, CDC recommends everyone wear a mask when they leave their homes.

17. At this time there is no vaccine that has been authorized or approved to prevent COVID-19 and there is no known cure.[17] While it appears a vaccine or multiple vaccines may be approved in the near future, they will not be widely available for many months, there will be challenges in their distribution, and their ultimate efficacy remains to be seen.

18. Current preventive measures seek to slow the transmission of COVID-19 through a

---

[16] Apoorva Mandavilli, Infected but Feeling Fine: The Unwitting Coronavirus Spreaders, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[17] Centers for Disease Control and Prevention, 8 Things to Know about Vaccine Planning (updated October 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/index.html.

number of mechanisms.  The CDC has identified social distancing (keeping persons separated by at least six feet) as a cornerstone of reducing transmission of respiratory diseases such as COVID-19. In addition, frequent handwashing, respiratory hygiene (*e.g.*, covering mouth and nose when coughing or sneezing), and frequent cleansing of surfaces, while less effective than social distancing, are recommended.[18] While these are important and necessary actions to reduce the risk of infection and the spread of the virus, they are not fully preventive.

**COVID-19 in Detention Facilities Generally**

19. For multiple reasons, the risk of exposure to and transmission of infectious diseases, as well as the potential harm to those who become infected, is significantly higher in jails and prisons than in the community, putting inmates, staff, and others who must enter the facility at high risk of becoming ill with COVID-19.

20. Close living quarters and often overcrowded conditions in jails, prisons, and detention centers facilitate the rapid transmission of infectious diseases, particularly those transmitted by airborne droplets through sneezing or coughing, like COVID-19. In these congregate settings, large numbers of people are closely confined and forced to share bunkrooms, bathrooms, cafeterias, and other enclosed spaces. They are physically unable to practice social distancing. Within these facilities, space and resource limitations—and the resulting inability of inmates and employees to practice social distancing[19]—make it extremely difficult to effectively quell the explosive growth of a highly contagious virus. The CDC has recognized that correctional and detention facilities "present unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors."[20]

21. Frequent and thorough hand washing is one of the key recommendations to reduce transmission, but sufficient soap and/or hand sanitizer is often not available (for inmates and staff) to wash their hands frequently enough to prevent the risk of transmission in contravention of the CDC's *Interim Guidance.*[21]

22. Correctional facilities are commonly poorly ventilated, which facilitates the transmission of airborne illnesses, such as COVID-19. The CDC recommends generally after an infection in buildings that building operators open windows to allow fresh air to circulate.[22] This recommendation is not possible in prisons

23. Current CDC recommendations for reducing the transmission of COVID-19 in jails

---

[18] Centers for Disease Control and Prevention, How to Protect Yourself and Others 1–2 (Apr. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention-H.pdf.

[19] *Id*. at 2, 11.

[20] *Id*. at 2.

[21] *Id*.

[22] Centers for Disease Control and Prevention, Cleaning and Disinfecting Your Facility (Apr. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility-H.pdf.

include screening of all newly arriving arrestees, quarantining all newly arriving arrestees for 14 days and performing daily symptom screening and temperature checks while they are in quarantine, isolating any detainee with any symptoms consistent with COVID-19 or with fever who is currently housed in the facility, and providing masks to all inmates who are "confirmed or suspected COVID-19 cases, or showing symptoms of COVID-19."[23] In addition, the CDC generally recommends providing and wearing masks in congregate settings. Individuals should not be added to an existing quarantine cohort after the 14-day quarantine clock has started. Doing so would complicate the calculation of the cohort's quarantine period, and potentially introduce new sources of infection.[24] Nor should individuals who have been exposed but tested negative be quarantined with those who have tested positive. The CDC recommends that prisoners in quarantined be celled in single cells with solid walls and solid doors, with an empty cell between prisoners. If quarantined together, the cells should have bars instead of solid walls and doors and allow for distancing of six feet.

24. These recommendations are also difficult, if not impossible, to implement in prisons due to space constraints, lack of sufficient respiratory isolation rooms, and lack of necessary equipment and other resources.

25. Testing has been limited in many jails and prisons. Even when available, it can take days to obtain results. Moreover, someone who is tested shortly after being infected may test negative. As a result of this limited testing, the data regarding the spread of COVID-19 in correctional facilities is extremely limited and likely significantly undercounts the true spread of the virus. CDC Director Robert Redfield estimates that the number of people infected with COVID-19 in the community is likely 10 times higher than the number of patients who have been confirmed positive through testing.[25] It is likely that the rate of undiagnosed patients is even higher in prisons and jails, where testing rates are often much lower than in the community.

26. Non-test based verbal screens—i.e., asking a person for a subjective report of symptoms—cannot adequately screen for new, asymptomatic or pre-symptomatic infections. COVID-19 has a typical incubation period of 2 to 14 days, commonly five days, and transmission often occurs before presentation of symptoms. According to the Centers for Disease Control and Prevention, up to 25 percent of people infected with COVID-19 will remain asymptomatic.[26] Similarly, infected individuals may experience only mild symptoms. These newly infected, asymptomatic and mildly symptomatic individuals can, and do, transmit the virus, contributing to its rapid spread. As a result, such inadequate screening presents a critical problem. The possibility

---

[23] Centers for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Updated October 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#QuarantineCloseContacts.

[24] *Id.*

[25] Lena H. Sun & Joel Achenbach, CDC chief says coronavirus cases may be 10 times higher than reported, Washington Post (June 25, 2020), https://www.washingtonpost.com/health/2020/06/25/coronavirus-cases-10-times-larger/.

[26] Apoorva Mandavilli, Infected but Feeling Fine: The Unwitting Coronavirus Spreaders, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

9

of asymptomatic transmission means that monitoring staff and incarcerated people for symptoms and fever is inadequate to identify all who may be infected and to prevent transmission. Because of the problems with screening procedures, the risk of false negative tests, the unavailability of test kits and the delays in obtaining test results, one necessary means to prevent the introduction of COVID-19 into the jails by someone who is arrested is to quarantine all arrestees for 14 days and monitor them daily for symptoms and fever before they are deemed safe to introduce into the general population of the jail.

27. In correctional facilities, groups of persons are often moved from space to space, for example, from a dormitory to a cafeteria or visiting room.  Inmates often come from different housing units, congregate and come in close contact while standing in lines for medication, commissary, fresh laundry, or telephones. These group movements, which often cluster large numbers of people together in small spaces, increase the risk of transmission between incarcerated persons and throughout the facility. It is common for individuals in a given housing unit to routinely be subjected to such group movements multiple times each day. Additionally, detention facilities often rely on incarcerated people to perform work that supports the operation of the facility, such as food service, laundry, and cleaning. To perform these work assignments, they typically travel from their housing units to other parts of the facility.

28. Correctional officers and other facility staff routinely have direct physical contact with incarcerated people, especially when handcuffing or removing handcuffs from prisoners who are entering or exiting the facility, or who are being escorted from one part of the facility to another. Staff members also move around within the facility, which creates opportunities for transmission both among staff in different parts of the facility and transmission to and from incarcerated people in different parts of the facility. Correctional officers must also come into close contact with visitors at facilities, in order to process them through security, conduct security searches, and escort them to their destination within the facility. This creates further opportunities for transmission between staff and visitors.

29. Correctional facilities largely lack the robust medical care infrastructure that would be necessary to deal with a COVID-19 outbreak. If a significant number of people become sick with COVID-19 the institution's health care facilities will be unable to respond appropriately to those people and those who need medical care for other reasons. And, when an incarcerated patient's needs are too acute for a correctional facility to provide adequate treatment, the patient must be transported to and treated at a community hospital. Once COVID-19 spreads throughout the correctional facility, the burden of caring for many of these sick individuals will shift to local community medical facilities.

30. When an outbreak strikes a correctional facility, correction and medical staff will become ill. They will not show up to work. These vacancies can result in facilities becoming dangerously understaffed, which compromises medical care. Healthcare staff who provide treatment are unavailable. Correctional staff also play a vital role in delivering medical services, by escorting prisoners, responding to and alerting medical of medical emergencies, and providing security to health care staff while they provide services. Their absence also compromises treatment.

31. If infected, inmates are at greater risk for harm from COVID-19 than those in the general community. This is due to a number of factors including the fact that people in prisons

have high rates of chronic illnesses, such as diabetes, heart disease, chronic lung disease, and immunosuppressive illnesses such as HIV disease that increase the risk from COVID-19, often have had poor or absent prior health care, and often have made unhealthy lifestyle choices, including alcohol and drug use. For these reasons, it is well accepted within the medical community that prison inmates are physiologically 10 years older than their chronological age.

32. Because of the conditions typically found in jails and prisons, carceral settings often have particularly serious incidence of communicable disease. For example, during the H1N1-strain flu outbreak in 2009 (known as the "swine flu"), jails and prisons experienced a disproportionately high number of cases.[27] Until recently the Cook County Jail in Chicago was believed to be the largest-known source of U.S. COVID virus infections.[28] As of April 13, more than 500 people had been infected at the facility, and the numbers continue to climb.[29] In one prison in Ohio, 78% of the approximately 2,500 prisoners tested positive.[30] The State of Ohio tested its prisoners en masse for COVID-19 so this number includes large numbers of inmates who were asymptomatic and would otherwise not have been tested. This underscores the risk of the spread of COVID-19 by asymptomatic individuals. In addition, 109 staff had tested positive for COVID-19.[31]

33. During an infectious disease outbreak, a containment strategy requires people who have known or suspected illness be isolated and that caregivers have access to personal protective equipment to protect themselves and to prevent the further transmission of the disease. During an outbreak, jails and prisons are under-resourced in being able to provide medically appropriate housing for persons with known or suspected infectious illness and are often underequipped to provide sufficient personal protective equipment, increasing the risk of a widespread outbreak.

34. In sum, current CDC recommendations for social distancing, frequent hand washing, frequent cleansing of surfaces, symptom screening, temperature checks and isolation to prevent infection and the spread of the virus are extremely difficult, if not impossible, to implement in carceral settings. As a result, the risk of COVID transmission is far greater than in non-custodial institutions. Given the rapid spread of COVID-19, it is likely impossible to achieve and sustain these measures sufficiently to mitigate the risk of transmission for medically vulnerable inmates,

---

[27] David M. Reutter, Swine Flu Widespread in Prisons and Jails, but Deaths are Few, Prison Legal News (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu- widespread-in-prisons-and-jails-but-deathsare-few/.

[28] Timothy Williams and Danielle Ivory, Chicago's Jail is Top U.S. Hot Spot as Virus Spreads Behind Bars, N.Y. Times (Apr. 8, 2020), https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html.

[29] Cheryl Corley, The COVID-19 Struggle In Chicago's Cook County Jail, NPR (Apr. 13, 2020) https://www.npr.org/2020/04/13/833440047/the-covid-19-struggle-in-chicagos-cook-county-jail.

[30] Ohio Department of Rehabilitation & Correction, COVID-19 Inmate Testing (updated Apr. 20, 2020), https://drc.ohio.gov/Portals/0/DRC%20COVID-19%20Information%2004-20-2020%20%201304.pdf.

[31] Bill Chappell and Paige Pfleger, 73% Of Inmates At An Ohio Prison Test Positive For Coronavirus, NPR (Apr. 20, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus.

staff, or visitors.

**Conditions in Prisons Pose Significant Risk of Transmission of COVID-19 To and From the Community Outside the Prisons**

35. The conditions in prisons pose very significant risk of transmission of communicable diseases like COVID-19 not only to inmates, employees and volunteers in the prisons, but also to the community as a whole. It has long been known that jails, prisons, and detention centers can be hotbeds of disease transmission, and that due to the frequent ingress and egress of employees at these facilities, an outbreak within a jail, prison, or detention center can quickly spread to surrounding communities. In addition, staff may contract communicable diseases in the community and then introduce those diseases into the facility. While prisons are often thought of as closed environments, this is not the case. A large number of custody, medical, and other support staff and contractors who have direct contact with prisoners enter and leave the facility throughout the day. Prisons admit and release prisoners on a regular basis. Since there is no effective way to screen for newly infected or asymptomatic individuals, they can unknowingly transmit COVID-19 to the inmate population.

36. When there is an outbreak in a prison, staff can become infected and bring the virus home to their families and community. For example, the tuberculosis epidemic that broke out in New York City in the early 1990s began in jails and was spread to the community by jail employees who became infected and then returned home.

37. COVID-19 has devastated correctional facilities and its surrounding communities. At Rikers Island in New York, between the mornings of Wednesday, April 1 and Thursday, April 2, the number of COVID-19 positive incarcerated individuals and staff members grew by 47 and 57 people, respectively, upping the jail's total numbers of confirmed cases to 231 among the incarcerated population and 223 among staff.[32] The first known case of COVID-19 at Rikers was confirmed on Wednesday, March 18,[33] illustrating just how quickly this disease can and will overwhelm detention facilities. By November 17, 197,659 cases of coronavirus have been reported among prisoners.[34] A rising number of individuals in prisons continue to test positive for COVID-19.

**Conditions at FCI and USP Terre Haute and Risks for Visitation**

38. The Bureau of Prisons (BOP) describes the Terre Haute Federal Correctional Complex (FCC) as comprised of two facilities, USP Terre Haute, a High Security Detention Facility with 1,306 male prisoners and FCI Terre Haute, a Medium Security Federal Correctional

---

[32] As Testing Expands, Confirmed Cases of Coronavirus in N.Y.C. Near 2,000, N.Y. Times (updated Mar. 19, 2020), https://www.nytimes.com/2020/03/18/nyregion/coronavirus-new-york-update.html.

[33] The Marshall Project, A State-by-State Look at Coronavirus in Prisons (Updated November 20, 2020), https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons.

[34] *Id.*

12

Institution (978 prisoners) with an adjacent Minimum Security Satellite Camp (256 prisoners).[35] Death row prisoners are housed in USP Terre Haute, in the Maximum Security Facility. According to the BOP, FCC Terre Haute is Care Level 3 medical complex with prisoners with significant medical and psychiatric issues. A weapons range, training center, execution complex and staff housing are all on located in the complex.[36]

39. The BOP employees several hundreds of staff at FCC Terre Haute.[37]

40. In April, Terre Haute FCC became the BOP's regional intake center, resulting in the transfer of inmates who were in the custody of the US Marshals from facilities around the region.[38]

41. The first case of COVID-19 in Terre Haute was publicly reported on May 16, 2020.[39] Since then, at least three prisoners at Terre Haute have died from the virus.[40]

42. The BOP reports that as of November 20, 62 inmates (3 housed in USP Terre Haute and 59 in FCI Terre Haute) and 13 staff have tested positive for, and currently have, COVID-19.[41] The results of 61 additional tests are pending.[42] As of November 20, the BOP reports that 311 inmates (84 housed in USP Terre Haute and 227 in FCI Terre Haute) is the total number that have ever tested positive for COVID-19.[43]

43. According to BOP's Implementing Modified Operations, intended to mitigate the spread of COVID-19, health screening of staff, contractors, and other visitors is being performed at all BOP locations.[44] That screening includes "temperature checks and COVID-19 screening," but

---

[35] Federal Bureau of Prisons, FCI Terre Haute, https://www.bop.gov/locations/institutions/tha/.

[36] Prison Rape Elimination Act (PREA) Audit Report Adult Prisons & Jails, https://www.bop.gov/locations/institutions/thp/PREA_thp.pdf (last visited November 21, 2020), p.6.

[37] In 2019, the BOP employed 708 staff with potential direct contact with FCC prisoners. Prison Rape Elimination Act (PREA) Audit Report Adult Prisons & Jails, https://www.bop.gov/locations/institutions/thp/PREA_thp.pdf (last visited November 21, 2020); *Id.* at 3.

[38] WHTI-TV 10, New Inmates Arrived at Terre Haute's Federal Penitentiary As Part of Plan to Make it Intake Center for the Region (April 22, 2020), https://www.wthitv.com/content/news/New-inmates-arrived-at-Terre-Hautes-federal-penitentiary-as-part-of-plan-to-make-it-intake-center-for-the-region-569837071.html.

[39] Lisa Trigg, Case of COVID-19 Infection Reported at Federal Prison in Terre Haute, Tribute-Star (May 18, 2020), https://www.tribstar.com/news/case-of-covid-19-infection-reported-at-federal-prison-in-terre-haute/.

[40] Federal Bureau of Prisons, COVID-19 Cases, www.bop.gov/coronavirus/ (last visited November 20, 2020).

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] Federal Bureau of Prisons, BOP Implementing Modified Operations (updated October 8, 2020), https://www.bop.gov/coronavirus/covid19_status.jsp.

13

does not elaborate on what "COVID-19 screening" entails.[45] The screening, at a minimum, should inquire about the broad range of COVID-19 symptoms that patients may experience. Further, temperature checks and non-test based verbal screens such as this cannot adequately screen for new, asymptomatic or pre-symptomatic infections. Infected staff are a key vector for introducing COVID-19 into a correctional facility. Such screening does not mitigate the risk of asymptomatic or pre-symptomatic staff introducing the virus to the facility.

44. According to the BOP website for FCC Terre Haute, the facility has implemented modified visiting procedures as of October 20, 2020.[46] In addition, the BOP appears to be utilizing a screening form that has not been updated since March 13, 2020 and includes only three questions regarding international travel, contact with a COVID-19 positive individual, and a subjective report of symptoms.[47] As noted above, temperature checks and non-test based verbal screens such as this cannot adequately screen for new, asymptomatic or pre-symptomatic infections. In addition, this screening form appears to rely on outdated information. It only asks about three symptoms: fever or chills, cough, and shortness of breath. But as noted above, the CDC expanded its list of typical COVID-19 symptoms to include not only fever, cough, and shortness of breath, but also fatigue, muscle pain, headache, sore throat, new loss of taste or smell, congestion or runny nose, nausea or vomiting, or diarrhea.[48] The CDC updated this information in May; any screening forms in use should have been subsequently updated. Given our quickly evolving understanding of COVID-19, it is imperative to update safety measures according to updated knowledge about the virus. BOP does not appear to have done this.

45. These intended measures alone are not adequate. As noted above, necessary precautions include ensuring the ability to social distance, frequent cleaning and disinfecting of objects and surfaces, requiring staff and inmates to wear masks if within six feet of others, and adequate ventilation.

46. In addition to these inadequate measures, both USP and FCI within the FCC Terre Haute complex exceed their rated capacity, making social distancing and adequate quarantining for symptomatic and positive inmates an impossibility. Rated capacity is the number of beds or inmates assigned by a rating official to institutions within a jurisdiction.[49]

47. In the May 2019 Audit of FCC Terre Haute, it was determined that USP has a rated capacity of 910, FCI has a rated capacity of 560, and the satellite camp has a rated capacity of 324

---

[45] *Id.*

[46] *Id.*

[47] Federal Bureau of Prisons, USP Terre Haute, https://www.bop.gov/locations/institutions/thp/ (last visited November 19, 2020) and Federal Bureau of Prisons, FCI Terre Haute, https://www.bop.gov/locations/institutions/tha/ https://www.bop.gov/locations/institutions/thp/ (last visited November 20, 2020).

[48] Centers for Disease Control and Prevention, Symptoms of Coronavirus (updated May 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html

[49] Office of Justice Programs, Bureau of Justice Statistics, Terms & Definitions: Corrections, https://www.bjs.gov/index.cfm?ty=tdtp&tid=1 (last visited November 21, 2020).

14

inmates.[50] Current data shows that USP and FCI far exceed their rated capacity. Specifically, despite a rated capacity of 910, USP current houses 1,269 male inmates.[51] Similarly, FCI currently houses 875 inmates, which exceeds their rated capacity by 315.[52]

48. Rated capacity statistics were not designed to account for a pandemic that requires social distancing. Thus, under normal conditions, an excess of the rated capacity is concerning due to general complications with overcrowding, such as lack of proper facilities to accommodate everyone. However, during the COVID-19 pandemic, such an excess can lead to the rapid spread of a deadly virus and excessive death among the inmate population.

49. With the current population in USP and FCI, it is likely that individuals are forced to live in spaces without adequate social distancing (at least six feet apart). In addition, there is likely a lack of adequate space for individuals who are symptomatic or have contracted COVID-19 to quarantine in isolation or even with social distancing measures pursuant to the CDC's guidelines.[53] This lack of distancing compounded with the inadequate measures noted above, breed an environment for COVID-19 to thrive.

50. The rated capacity number is a jail-wide statistic, which fails to reflect the crowded conditions in individual housing units. USP has six housing units constructed in a "bow-tie design", with two floors, and FCI has ten housing units.[54] The number of inmates compared to each rated capacity of FCI and USP only depicts a general overcrowding in the complexes. It does not reflect the crowded conditions in each housing unit, such as the possibility of two or three individuals sharing a single cell. With complexes exceeding the rated capacity, it is inevitable each individual housing unit suffers from crowded conditions that fail to abide by social distancing measures.

51. Overall, the rated capacity of complexes is directed to guide correctional institutions during normal conditions and does not account for distancing measures required in a pandemic. Under the current conditions of COVID-19, the overcrowding of USP and FCI forces a lack of social distancing and inadequate space for quarantining symptomatic and positive inmates. An exceeded rated capacity is concerning during normal times; now, it is a deadly condition.

**Special Risks Posed by Executions and Rising Infection Levels**

---

[50] Prison Rape Elimination Act (PREA) Audit Report Adult Prisons & Jails, https://www.bop.gov/locations/institutions/thp/PREA_thp.pdf (last visited November 21, 2020).

[51] Federal Bureau of Prisons, USP Terre Haute, https://www.bop.gov/locations/institutions/thp/ (last visited November 21, 2020).

[52] Federal Bureau of Prisons, FCI Terre Haute, https://www.bop.gov/locations/institutions/tha/ (last visited November 21, 2020).

[53] Centers for Disease Control and Prevention, Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Updated October 21, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#QuarantineCloseContacts.

[54] Prison Rape Elimination Act (PREA) Audit Report Adult Prisons & Jails, https://www.bop.gov/locations/institutions/thp/PREA_thp.pdf (last visited November 21, 2020).

52. The risk of COVID-19 spread for BOP prisoners detained at FCC Terre Haute is heightened by the BOP's decision to hold federal executions at the Terre Haute facility. I previously submitted declarations regarding the COVID-related risks created by these executions for witnesses attending the executions, in the following case: *Hartkemeyer v. Barr*, No. 2:20-cv-00336-JMS-DLP (S.D. Ind.). My prior declarations described these significant factors, in addition to the general risks described above posed by COVID-19 in prisons:

   a. **A large number of BOP FCC Terre Haute staff from across the prison complex are involved in carrying out the executions**. I relied upon information from BOP counsel Rick Winter reporting that 200 FCC Terre Haute staff would provide specialized security and support for the execution, pulled away from their regular duties. *Hartkemeyer v. Barr*, ECF 6-25, ¶ 57.

   b. **A large number of out of state witnesses and other BOP personnel will travel to Terre Haute for the executions**. I noted that the BOP regulations specify the attendance of a large number of witnesses for the execution, delineating 24 witnesses exclusive of the custodial staff, the Warden, Marsha, and Department of Justice Attorneys. *Hartkemeyer v. Barr*, ECF 6-25, ¶ 50. In addition to the 200 security and support staff from across FCC Terre Haute, Mr. Winter described approximately 40 BOP staff members who would participate on the execution team, along with 50-person specialized security teams who would travel to Terre Haute from unidentified parts of the country and other BOP facilities. *Id.*, ¶ 57. I described the increased risks associated with flying and other travel. *Id.* ¶ 56.

   c. **Many of these out of state individuals and BOP staff will congregate together in the small execution facility with poor ventilation and no room for social distancing**. *Hartkemeyer v. Barr*, ECF 6-26, ¶¶ 52-53.

53. I noted that the large-scale execution plans posed the risk of becoming a "super-spreader event," an indoor event with many people resulting in clusters of infection. *Hartkemeyer v. Barr*, ECF 6-26 ¶ 59.

54. The federal government has executed eight men in 2020, all during the pendency of the COVID-19 pandemic. Shortly before the first of these executions, BOP attorney Rick Winter filed a declaration noting that one of the FCI Terre Haute staff members involved in the execution preparations subsequently tested positive for COVID-19, after attending multiple training meetings for the execution preparations and working in USP Terre Haute approximately one week before the execution was scheduled to be carried out. This staff member had worked without wearing a mask. I filed a supplemental declaration describing this as confirmation of "the worst case scenario: a known exposure from an infected staff person who had been in contact with other staff involved in carrying out the executions and who has been in the housing unit with the individuals scheduled for execution." *Hartkemeyer v. Barr*, ECF 80-1, ¶ 8.

55. I described the kind of careful quarantine practices that would be required in order to reduce the risk of exposure from this outbreak: the Government needed to identify the individuals who were exposed in any of the indoor settings and place all of those individuals on a

16

14-day quarantine. *Hartkemeyer v. Barr*, ECF 80-1, ¶ 9. The Government would then need to track through testing the exposed individuals. If any of those exposed, quarantined individuals had a positive test, the Government would need trace in turn the contacts of those individuals. *Id.*, ¶ 10.

56. I also noted that it was a significant issue of concern that the FCI Terre Haute individual who tested positive for COVID-19 did not always wear a mask while at the prison, increasing the likelihood of spread to others. *Hartkemeyer v. Barr*, ECF 80-1, ¶ 12. I observed that this was contrary to the BOP's sworn statement that all BOP staff are required to wear face masks and that the BOP needed to evaluate its enforcement policies to assess why this basic requirement was not followed. *Id*.

57. The BOP has more recently disclosed documents describing staff infections, quarantine and isolation practices, and its COVID-19 testing at Terre Haute. These materials are additional cause for concern.[55]

58. The records show that the July infected staff member "wore mask while speaking with inmate, but not with staff in SHU and SCU."[56] The records further suggest that the failure of the COVID-positive staff member at Terre Haute to wear a mask was not an isolated event. Several BOP staff members likewise were either not wearing masks or not wearing masks properly around COVID-positive Terre Haute staff.[57] Multiple BOP staff described not wearing masks in the office, station and breakroom.[58]

59. The BOP's Staff Positive Case Forms illustrate the potential for spread to prisoners through staff. For example, one staff member who later tested positive was in contact with "120 inmates approx."[59] Another Staff Positive Case Form shows that the daily routine of a staff member who later tested included passing out food trays to prisoners.[60] One staff member worked in both the USP and FCI facilities before testing positive.[61]

60. The numbers of COVID-19 infections at FCC Terre Haute have increased dramatically in the wake of the executions. The Vigo County Health Department published a chart of the COVID-19 positive cases for Terre Haute FCI prisoners and Vigo County:[62]

---

[55] ACLU, BOP Data Show Federal Executions Likely Caused COVID-19 Spike (Sept. 21, 2020) https://www.aclu.org/press-releases/bop-data-show-federal-executions-likely-caused-covid-19-spike.

[56] Stubbs Decl., Ex. E-1 at 1.

[57] *Id*. at 1-9.

[58] *Id.* at 3-5, 9.

[59] *Id.* at 7.

[60] *Id.* at 8.

[61] *Id.* at 9.

[62] *See* Vigo County Health Dep't, Vigo County and Federal Correction Inmates COVID Positives, Facebook (Nov. 13, 2020), https://www.facebook.com/vigocountyhd/photos/pcb.488596658477 6927/488596258144 3994/?type=3&theater.



61.     Before the first execution on July 14, 2020, the publicly reported numbers by BOP showed a cumulative total of 11 or 12 prisoner infections since March. The federal government carried out executions on July 14, 2020, July 16, 2020, and July 17, 2020, bringing together different constellations of individuals for each of these executions.[63] By August 17, 2020, one month later, the cumulative total had risen to 21 cases, with three active cases reported at USP Terre Haute and no active cases reported at FCI Terre Haute.[64]

62.     The federal government then carried out two additional executions at the end of August, one on August 26, 2020 and one two days later on August 28, 2020. This time there was a much larger and more immediate rise in COVID-19 cases following the executions. By August 31, 2020, 102 prisoners, 57 at USP Terre Haute and 45 at FCI Terre Haute, had confirmed COVID-19 infections.[65] The federal government then carried out additional executions on September 22 and 24, 2020. As of November 22, 311 inmates, 84 at USP Terre Haute and 227 at FCI Terre Haute, had ever tested positive or COVID-19. On November 23, 82 prisoners and 14 BOP staff had confirmed current COVID-19 infections.[66]

## Conclusion

63.     For the reasons above, it is my professional opinion that inmates at FCC Terre Haute are at a heightened risk of contracting COVID-19 as a result of the nature of conducting

---

[63] The U.S. Department of Justice, Executions Scheduled for Four Federal Inmates Convicted of Murdering Children (July 15, 2020), https://www.justice.gov/opa/pr/executions-scheduled-four-federal-inmates-convicted-murdering-children; BOP, Historical Information, Federal Executions, 2020s, https://www.bop.gov/about/history/federal_executions.jsp (last visited November 22, 2020).

[64] Stubbs Decl. ¶ 5.

[65] *Id.*

[66] BOP, COVID-19 Update (updated November 20, 2020), https://www.bop.gov/coronavirus/.

18

executions at the facility, which involves bringing people from outside the community onto the facility before and during executions; the sharing of staff members from the FCI and USP complexes to participate in the executions; and the failure to follow CDC-recommended guidelines at FCC Terre Haute for inhibiting the spread of COVID-19. The same is true of staff members at FCC Terre Haute and their families and members of the broader Terre Haute community, all of which groups would likely have a higher risk of contracting COVID-19 than they would if the executions were postponed, with the attendant risk of serious illness and death for some number of the members of those groups.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 24, 2020 in Alameda County, California.

Dr. Joe Goldenson