UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

PATRICK R. SMITH and                      )
BRANDON S. HOLM, individually and         )
on behalf of all others similarly situated, )
                                          )
            Plaintiffs,                   )
                                          )
      v.                                  )          Cause No. 2:20-cv-00630-JMS-DLP
                                          )
WILLIAM P. BARR, in his official          )
capacity as the Attorney General of the   )
United States, *et al.*,                  )
                                          )
            Defendants.                    )

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiffs, two inmates at FCI Terre Haute, seek a remedy that is *doubly* extraordinary –

not only do they seek to halt all federal executions, but they do so even though they themselves

are not sentenced to death at all.  And they seek this remedy based not on any alleged defects in

the executions themselves or the criminal proceedings leading up to them.  Indeed, the two

inmates scheduled for execution next week have exhausted years of challenges to their

convictions and sentences, along with bringing challenges to the execution protocol the federal

government has adopted.  Instead, plaintiffs here contend that temporarily bringing

approximately one hundred people to the Terre Haute compound to conduct the executions in a

separate building, walled off from plaintiffs' institution, significantly increases their risk of

COVID-19 such that it amounts to a violation of *their* Eighth Amendment rights.

Plaintiffs have failed to demonstrate entitlement to the extraordinary relief they seek.  As

an initial matter, plaintiffs lack standing to bring this suit.  Their alleged injury—an increase in

risk of contracting COVID-19—is not only speculative, but is not fairly traceable to the carrying

out of *other* inmates' lawful death sentences.  This is especially so given the precautions taken

by the Bureau of Prisons (BOP) with respect to COVID-19 generally and its actions walling off

the execution team, to the greatest extent possible, from FCC Terre Haute inmates and staff.

Moreover, plaintiffs have not asked this Court to require BOP to take particular additional safety

measures, actions which might redress any risk, if it existed.  Indeed, the Seventh Circuit

recently rejected a bid by victims' families who were planning to attend an execution to halt it

because of their fear of contracting COVID-19.  *See Peterson* v. *Barr*, 965 F.3d 549, 553 (7th

Cir. 2020), *application for stay denied*, *Peterson v. Barr*, __ S. Ct. __, 2020 WL 3964236

(Mem.) (July 14, 2020).  Plaintiffs' even weaker bid to halt to all federal executions should

therefore be rejected, and the suit dismissed.

    Even assuming Article III were satisfied, plaintiffs have failed to demonstrate that they

are likely to succeed on the merits of their Eighth Amendment claim. The Eighth Amendment

bars only "the unnecessary and wanton infliction of pain."  *Farmer v. Brennan*, 511 U.S. 825,

834 (1994).  It therefore requires a showing that the risk inflicted on an inmate is, objectively,

one that civilized society would not tolerate and a showing that the government is acting with

deliberate indifference, which the Seventh Circuit has made clear must "approach[] a total

unconcern for the prisoner's welfare," *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012).

BOP's assiduous efforts to mitigate the risks of COVID-19, both generally and with respect to

executions, preclude plaintiffs from making either showing, particularly given the Supreme

Court's repeated admonitions that courts applying the Eighth Amendment must give due regard

to the need for prison officials to balance competing objectives.  The objective that plaintiffs

seek to preempt here—the imposition of duly imposed sentences of death for extraordinarily

heinous crimes—is among the weightiest conceivable.

Because plaintiffs have not demonstrated that they are likely to succeed on the merits of their claims, this Court should deny injunctive relief.  If the Court were to proceed to the remaining injunctive relief factors, however, the result would be the same.  Plaintiffs have failed to demonstrate any likely irreparable harm from the executions—executions that do not directly affect them.  And any alleged harm from an increased risk of COVID-19, however attenuated and marginal, could not possibly outweigh the long-recognized weighty public interest in carrying out lawful death sentences.  *Cf. Peterson v. Barr*, 965 F.3d at 553 (rejecting request by victims' family members to enjoin BOP from carrying out execution during the COVID-19 epidemic which allegedly impaired their right to attend as witnesses).

## BACKGROUND

BOP, under the supervision of the United States Marshals Service, is responsible for implementing federal death sentences.  Exhibit 1, Dec. 4, 2020 Declaration of T.J. Watson ("Watson Dec.") (ECF No. 27-1) ¶ 3; s*ee* 18 U.S.C. § 3596(a); 28 C.F.R. Part 26.  The regulations governing federal executions authorize the BOP Director to designate the "date and time" at which "a sentence of death shall be executed."  28 C.F.R. § 26.3(a).  Currently, executions of the following inmates are scheduled: Brandon Bernard[1] on December 10, 2020; Alfred Bourgeois[2] on December 11, 2020; Lisa Montgomery on January 12, 2021; Cory Johnson

---

[1] On October 16, 2020, Bernard was provided a notice informing him that a date has been set for the implementation of his death sentence.

[2] Alfred Bourgeois was originally scheduled to be executed on January 13, 2020, but legal impediments prevented the government from proceeding at that time.  On November 20, 2020, Bourgeois received a notice informing him of his current execution date.

on January 14, 2021; and Dustin Higgs on January 15, 2021.  Watson Dec. ¶ 4.  These inmates

have exhausted years of challenges to their convictions and sentences.

This case pertains to upcoming executions at the Federal Correctional Complex (FCC)

Terre Haute.  FCC Terre Haute is situated on approximately 1145 acres and comprises three

separate prisons in three separate buildings: the United States Penitentiary (USP), which is a high

security prison; the Federal Correctional Institution (FCI), which is a medium security prison, at

which both plaintiffs reside, *see* Watson Dec. ¶ 7; Attachments; and the Federal Prison Camp

(FPC), Watson Dec. ¶ 6.  The grounds contain several other buildings, including a dedicated

execution facility that is entirely separate from the prison facilities.  *Id.*  The execution facility is

approximately one hundred feet from the FCI, and it is physically separated by perimeter fencing

and razor wire.  *Id.*  Staff at the execution facility cannot approach anyone on FCI grounds

because of the perimeter fencing.  *Id.*  The execution facility is approximately the equivalent of

several city blocks from the FPC and even further away from the USP.  *Id.*

Since the beginning of the COVID-19 pandemic in March 2020, BOP and FCC Terre

Haute have implemented numerous, rigorous safeguards and precautions.  Watson Dec. ¶ 8.  In

doing so, BOP follows the guidance and directives of the World Health Organization, the

Centers for Disease Control (CDC), the Office of Personnel Management, the Department of

Justice, and the Office of the Vice President.  *Id.*  Agency-wide modified operations in response

to COVID-19 were announced by BOP on March 13, 2020.  *Id.*; *see*

https://www.bop.gov/resources/news/20200313_covid-19.jsp.[3]  These evolving modifications

currently include the following measures, among others:

---

[3]  While these modifications were initially scheduled to last for 30 days, they have been extended
a number of times.  *See* https://www.bop.gov/resources/news/pdfs/20200414_press_release_
action_plan_6.pdf; https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp;
https://www.bop.gov/foia/docs//COVIDPhase8June30.pdf; https://www.bop.gov/foia/docs//

- Temperature checks and COVID-19 screening are being conducted for staff, contractors, and other visitors, with those who register a temperature of 100.4° Fahrenheit or higher denied access to the grounds;

- As much as possible, staff are being assigned to the same posts and are not rotating;

- Inmate movement is limited to prevent congregating and to maximize social distancing.  Essential inmate work details, such as Food Service, continue to operate with appropriate screening (i.e. temperature checks and reporting symptoms). Inmate movement in small numbers is authorized for use of the Commissary, Laundry, Showers, Telephone, to include legal calls, and for access to TRULINCs (email) mental health or medical care;

- Prior to entering the institution, or in Receiving and Discharge, all new intakes to an institution, including voluntary surrenders, BOP-to-BOP transfers, or transfers from outside the BOP system are screened by medical staff for COVID-19.  This process includes a symptom screen, a temperature check, and an approved viral PCR test (either an Abbott ID NOW point-of-care [POC] test or a commercial PCR test) performed on a sample obtained from a nasopharyngeal, mid-turbinate, or anterior nares swab. Inmates who arrive symptomatic AND/OR test positive will be placed in MEDICAL ISOLATION. Inmates who arrive asymptomatic AND test negative will be placed in QUARANTINE.  *See* https://www.bop.gov/coronavirus/covid19_status.jsp.

Watson Dec. ¶ 8.

Implementing these BOP directives, FCC Terre Haute requires that all staff, inmates, and visitors wear masks inside the institution.  Watson Dec. ¶ 9.  Masks are provided if a visitor does not have one, and all visitors can be provided full personal protective equipment (PPE), including face shields, gowns, and gloves, if they desire.  *Id.*  Social distancing is practiced where possible, consistent with CDC guidelines.  *Id.*

FCC Terre Haute's management educates staff regarding the importance of staying home if they are feeling ill and requires staff to report any COVID-19 exposure (known or suspected),

---

COVIDphase9_08052020.pdf; and https://www.bop.gov/coronavirus/covid19_status.jsp.

as well as any positive COVID-19 test.  Watson Dec. ¶ 10.  If a staff member tests positive for COVID-19, he or she is required to stay home in compliance with current CDC guidelines.  *Id.*

Moreover, FCC Terre Haute has taken steps to minimize exposure risk.  For example, staff are not permitted to move between the separate facilities and buildings at FCC Terre Haute unless necessary; and although facilities staff and medical staff may need to move from facility to facility, they are required to wear a mask at all times and maintain social distancing to the extent possible.  *Id.*; Watson Dec. ¶ 9.  Inmate movement within the individual institutions is also limited to small groups and only for services like commissary, showers, telephone, email, and medical appointments, and subject to appropriate screening measures.  *Id.* ¶ 11.[4]  Showers, phones, and surfaces are cleaned between each use and throughout the day.  *Id.*  Outside their cells, inmates are required to wear masks and to maintain social distance. *Id.* ¶ 12.

FCC Terre Haute engages in an extensive testing program. The institution has multiple rapid Abbott test machines and uses them to immediately test symptomatic inmates in order to isolate and quarantine them more quickly.  Watson Dec. ¶ 12.  Rapid testing has been used to test symptomatic inmates, along with asymptomatic inmates who have had close contact with an inmate who tested positive for COVID-19.  *Id.*  If an inmate tests positive, the rest of the inmates on that range (row of cells) are generally tested, and, if appropriate, entire units are locked down (required to remain in their cells) and tested.  *Id.*  FCC Terre Haute staff are advised and encouraged to obtain a test if they had a known exposure or experience symptoms and are not permitted to return to work until they are symptom-free.  *Id.* ¶ 23; *see also id.* ¶ 10 (stating that a staff member with a positive test must "stay home in compliance with current CDC guidelines").

---

[4] A full explanation of BOP inmate movement, both within institutions as well as between institutions, along with the logistics of inmate activities is available on the BOP's website.  *Id.; see* https://www.bop.gov/coronavirus/covid19_status.jsp.

To aid in their efforts to combat the COVID-19 epidemic, BOP and FCC Terre Haute maintain data on the number of positive cases and testing. Watson Dec. ¶ 13; *see* https://www.bop.gov/coronavirus/. As of December 4, 2020, the website lists 175 FCI and FCP inmates and staff as current positive cases, along with 24 USP inmates and 3 staff. Watson Dec. ¶ 13. Historical data regarding the number of positive inmate and staff cases can be found at https://oig.justice.gov/coronavirus. Watson Dec. ¶ 14. The historical chart for FCI Terre Haute as of December 4 is available *infra* II.B.1.

FCC Terre Haute has also taken numerous steps to prevent transmission of COVID-19 between individuals involved in an execution and the general prison population. Although it is difficult to predict with certainty for any particular execution, BOP estimates that approximately 50 to 125 individuals, including the BOP's execution team, state and local law enforcement, and various witnesses, and demonstrators will travel to FCC Terre Haute. Watson Dec. ¶ 16. Non-BOP personnel such as media, witnesses, legal counsel, and Ministers of Record are not permitted to enter the FCI, or to interact with any FCC Terre Haute inmate other than the condemned inmate. *Id.* ¶ 19. Any visits with the condemned inmate take place outside the presence of other inmates, either in the SCU, which is located at the USP, or the execution facility. *Id.* During such visits, visitors are required to wear masks and to the extent possible remain socially distanced. *Id.* Moreover, all individuals arriving at FCC Terre Haute will be temperature checked and screened, *id.*, and denied entry if they register a temperature of 100.4 degrees Fahrenheit or higher, *id.* ¶ 8.

BOP has also put in place measures to ensure that the execution team remains almost entirely separate from the prison facilities and their inmates and staff. That team comprises

approximately 40 BOP employees from locations other than FCC Terre Haute.[5]  Watson Dec.

¶ 17.  Although it is not possible for the team to quarantine before participating in the execution,

as they generally arrive only a few days prior to a scheduled execution and must complete

various time-sensitive tasks upon their arrival, the risk is minimized by maintaining separation

between the execution team and the inmates and staff who work at FCC Terre Haute to the

greatest extent possible.  *Id.*  The execution team is primarily engaged in duties in and around the

execution facility, and inmate interactions are limited to the inmate housed at the execution

facility.  *Id.*

Although there have been occasional needs in the past for a member of the execution

team to enter the FCI, USP, or FPC, this practice is minimized to the greatest extent possible.

Watson Dec. ¶ 17.   Of course, members of the execution team must pass through security check

points, be screened for COVID-19, and perform other administrative tasks that involve FCC

Terre Haute staff, and FCC Terre Haute staff may be assigned to such duties.  *See id.* ¶ 22.  Such

interactions are infrequent and usually quite brief, and during all such interactions, BOP staff are

required to wear masks and to the extent possible remain socially distanced.  *Id.* ¶¶ 17, 22.  In

addition, in the days leading up to an execution, the FCC Terre Haute inmate population is

locked down, thereby minimizing the interaction between inmates, as well as the interaction

between inmates and staff.  *Id.* ¶ 15.

Although execution witness rooms are small, full PPE is available to all members of the

execution team while at FCC Terre Haute, including fit-tested N-95 masks, gloves, gowns, and

face shields, and all team members must remain masked.  Watson Dec. ¶ 20.  Other individuals

---

[5] In past executions, a number of security and support personnel such as Special Operations
Response Teams (SORT) and Disturbance Control Teams (DCT) also travelled to FCC Terre
Haute from other BOP institutions.  Watson Dec. ¶ 18.  However, such personnel are not
scheduled to travel to Terre Haute for upcoming executions.  *Id.*

who attend an execution, including attorneys, media, and witnesses, are required to wear masks and will be provided PPE if they request it.  *Id.*

Additionally, demonstrators may be present at an execution in a designated area on FCC Terre Haute grounds.  Watson Dec. ¶ 21.  However, no demonstrators have chosen to come into FCC Terre Haute grounds with respect to recent executions, instead electing to demonstrate in an area across the street from FCC Terre Haute.  *Id.*  If demonstrators were to come onto BOP property, they would be screened and temperature checked, as well as screened for security purposes, by FCC Terre Haute staff off-site, and then transported to the demonstration area by FCC Terre Haute staff.  *Id.*  That demonstration area is near the main public road and not near any of the prison buildings.  *Id.*

After an execution, BOP execution team members are afforded an opportunity to test for COVID-19.  Watson Dec. ¶ 23.  After past executions, approximately 5-7 members of the BOP execution team historically elected to be tested prior to returning to their home communities.  *Id.*

## ARGUMENT

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED

## I.     STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  It is "never awarded as of right," *Munaf v. Geren*, 553 U.S. 674, 690 (2008), and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).

To obtain a preliminary injunction, "a plaintiff must establish that [he] has some likelihood of success on the merits; that [he] has no adequate remedy at law; [and] that without relief [he] will suffer irreparable harm."  *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d

357, 364 (7th Cir. 2019) (citation and quotation marks omitted).  "If the plaintiff fails to meet

any of these threshold requirements, the court must deny the injunction."  *Id*. (citation and

quotation marks omitted); *accord Lankford v. Talbot*, No. 1:18-cv-03935-JMS-TAB, 2020 WL

2128580, at *1 (S.D. Ind. May 5, 2020) (quoting same).  Only after a plaintiff passes this

threshold must a court "weigh the harm that the plaintiff will suffer absent an injunction against

the harm to the defendant from an injunction, and consider whether an injunction is in the public

interest."  *GEFT Outdoors*, 922 F.3d at 364 (citation and quotation marks omitted).

The Seventh Circuit "'employs a sliding scale approach' for this balancing: if a plaintiff

is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely

a plaintiff is to win the more that balance would need to weigh in its favor."  *Id*. (citation and

quotation marks omitted).  A plaintiff "seeking preliminary relief [must] demonstrate that

irreparable injury is *likely*," not merely possible, "in the absence of an injunction."  *Winter*, 555

U.S. at 22.  As discussed below, plaintiffs have failed to make the requisite showing.

## II.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

### A.     Plaintiffs Lack Standing

As a threshold matter, plaintiffs' suit should be dismissed for lack of standing, as the

relief they request is an injunction barring *another inmate's* lawful execution and they have

failed to connect that execution with any concrete injury they will experience.  An "essential

and unchanging part of the case-or-controversy requirement" in the Constitution is that a

plaintiff must establish Article III standing to sue.  *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560

(1992).  Stated succinctly, plaintiffs must demonstrate "injury in fact, causation, and

redressability."  *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam).  The plaintiff bears

the burden of establishing each of the three elements.  *See Lujan*, 504 U.S. at 561.

Where—as here—the relief sought is wholly prospective, a plaintiff must demonstrate a risk of future injury that is both "real" and "immediate" and neither "conjectural" nor "hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Thus, plaintiffs must demonstrate the existence of a future "threatened injury [that is] 'certainly impending.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (quoting *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990)). Plaintiffs fail to meet their burden to establish, as a factual matter, a certainly impending future injury here.

### 1. Plaintiffs Have Failed to Allege Sufficient Injury In Fact

To satisfy the "injury in fact" requirement, plaintiffs must allege an imminent threat of concrete injury and demonstrate that the alleged injury "affect[s] [them] in a personal and individual way." *Fox v. Dakkota Integrated Sys., LLC*, --- F.3d ---, No. 20-2782, 2020 WL 6738112, at *4 (7th Cir. Nov. 17, 2020) (quoting *Lujan*, 504 U.S. at 560 n.1). While threatened injury can satisfy Article III standing requirements, the threat must be credible, non-speculative, and concrete. *See, e.g.*, *Clapper*, 568 U.S. at 409.

Plaintiffs speculate that individuals attending executions in the execution facility at Terre Haute may be infected with COVID-19, *see* Pl. Memo. at 3, and may therefore spread COVID-19 to others at FCC Terre Haute. But this speculation fails to carry plaintiffs' burden to demonstrate "certainly impending" injury-in-fact to plaintiffs. *See Clapper*, 568 U.S. at 401. As explained in BOP's declaration, all visitors to Terre Haute must undergo a temperature check and COVID-19 screening upon arrival and will be denied entry if their temperature is 100.4 degrees Fahrenheit or higher, *see* Watson Dec. ¶¶ 8, 22, and all visitors and staff must wear masks and where possible practice social distancing, *id.* ¶¶ 9, 19, 22. Moreover, visitors can be provided full personal protective equipment if requested;

interactions between the execution team and Terre Haute staff are brief and infrequent; all staff are required to wear masks and remain socially distanced where possible during all such interactions, *see id.* ¶¶ 9, 17.

To support their alleged injury in fact, plaintiffs rely on a speculative chain of causation, each step of which the BOP declaration refutes. As explained, BOP screens those arriving at FCC Terre Haute for COVID-19. Watson Dec. ¶ 8. Non-BOP-execution-staff visitors are barred from entering the FCI, USP, or FCP, and their interactions with FCC Terre Haute staff are limited to checkpoints, screening and similar interactions. *Id.* ¶ 17. The execution team is similarly walled off from the general prison population and staff to the maximum extent possible—the execution team does not enter FCI, USP, or FCC to the greatest extent possible and minimizes execution-related visits to those facilities, generally does not interact with any inmates other than the inmate housed at the execution facility, and does not carry out duties specific to FCC Terre Haute while on the grounds. *Id.* And all visitors to the facility are required to wear masks at all times and engage in social distancing to the extent possible, thereby further minimizing the risk of spread. *Id.* ¶ 9. Thus, plaintiffs have failed to demonstrate that, even if an individual attending the execution had COVID-19, it would be transmitted to inmates in the FCI and they would contract COVID-19 and become symptomatic. Their chain of events is far too attenuated and speculative to constitute "concrete" and "actual or imminent" injury. Moreover, "in American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda RS v. Richard D.*, 410 U.S. 614-619 (1973).

### 2. Plaintiffs' Risk of Contracting COVID-19 Is Not Fairly Traceable To The Actions Of Defendants

"[A] federal court [can] act only to redress injury that fairly can be traced to the

challenged action of the defendant, and not injury that results from the independent action of some third party." *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42 (1976). Importantly, plaintiffs seek in this litigation not increased protections to minimize risk from COVID-19 spread, but the halting of all federal executions. However, it is "substantially more difficult" to obtain relief "when the plaintiff is not himself the object of the government action or inaction he challenges." *Lujan*, 504 U.S. at 562.[6] The government action challenged here is targeted at other inmates; plaintiffs bear a heavy burden in demonstrating that they have standing to challenge it based on the incidental effects of that government action.

Plaintiffs cannot meet that burden. The unfortunate risk that inmates will become infected exists regardless of whether executions take place at Terre Haute. As plaintiffs observe, COVID infections are prevalent throughout "Vigo County, and across the country," *see* Pl. Memo. at 4; *see also id.* at 7 ("more than 13 million people in the United States have tested positive" and Indiana "has recently see 'single-day records of reported cases'"). Indeed, the "recent surges in positive cases . . . are being seen nationwide and in Indiana." *Id.* at 20. Plaintiffs further assert that all prisons "have proven to be hotspots for COVID-19 outbreaks." *Id.* at 8. And, on plaintiffs' telling, the sources of infection are multifold. *See id.* at 3 n.4 (alleging that spread is caused by inmates "coming in and out of the [Terre Haute] facility"). In the midst of a nationwide surge in the infection rate, and given the particular challenges that all prisons and communal living facilities face, the risk exists that Terre Haute staff and inmates may become infected regardless of whether executions take place, despite BOP's diligent efforts.

---

[6] *See*, *e.g.*, *AID v. AOSI*, 140 S. Ct. 2082, 2087 (2020) (corporation cannot raise a First Amendment claim about restrictions on the speech of the corporation's legally separate subsidiary); *Kerry v. Din*, 135 S. Ct. 2128, 2134–36 (2015) (plurality opinion) (U.S. citizen cannot raise a due-process claim about the denial of a visa to an alien spouse); *cf. Peterson v. Barr*, 965 F.3d 549, 553 (7th Cir. 2020).

In view of the rigorous safety measures BOP has implemented to protect inmates, Watson Dec. ¶¶ 8-12, 15-17, 19-23, and the fact that executions take place in a building that is separated by a fence and razor wire from plaintiffs' facility, *id.* ¶ 6, with minimal interaction among execution staff and regular staff, *id.* ¶¶ 17, 22, it cannot be reasonably concluded that plaintiffs' risk of becoming infected with COVID-19 is fairly traceable to the executions. *See also infra* II.B.1.

### 3.   Plaintiffs' Alleged Harms Cannot Be Redressed By The Relief Sought

Plaintiffs must also demonstrate that the requested relief will remedy their injury. *See E. Ky. Welfare Rights Org.,* 426 U.S. at 43. Here, the relief plaintiffs seek is disconnected from the claims they assert. If plaintiffs were interested in stopping the spread of COVID-19 in prisons, they would seek an injunction requiring particular safety protocols, and that is the outer limit of relief that Article III would even possibly permit. *See Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (any remedy ordered by a federal court "must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established").

Plaintiffs instead seek to enjoin the executions themselves—a remedy that is both overinclusive (because it stops executions even if they can be carried out in a safe way) and underinclusive (because it fails to address COVID-19 risks that arise from sources other than executions). *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (noting that equitable principles require that any relief "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs"). Plaintiffs have standing only to request relief that will redress their alleged harms, *i.e.*, the risk of COVID-19 infection, and lack standing to seek a postponement of executions whose effects on plaintiffs are speculative at best. *Cf. Bucklew v. Precythe*, 139 S. Ct. 1112, 1134 (2019) ("Last-minute" impediments to scheduled executions "should be the extreme exception," and "'the last-minute nature of an application'

14

that 'could have been brought' earlier, or" a litigant's "'attempt at manipulation,'" could justify

allowing an execution to proceed) (citation omitted).  That conclusion is especially so given the

disconnect between the executions and risk of COVID-19 spread in the facilities, *see supra*.[7]

### B.      The Eighth Amendment Claim Must Fail

Even if they had standing, plaintiffs would be unlikely to succeed on their novel Eighth

Amendment claim, that carrying out a capital sentence on another prisoner at another facility

amounts to cruel and unusual punishment of plaintiffs because it allegedly increases the risk that

plaintiffs will contract and be injured by COVID-19.  To succeed on their claim that this alleged

condition of their confinement will violate the Eighth Amendment, plaintiffs must show two

things.  First, they must show "a deprivation that is, from an objective standpoint, sufficiently

serious that it results 'in the denial of the minimal civilized measure of life's necessities.'"  *Gray*

*v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (quoting *Farmer*, 511 U.S. at 834).  That

"requires more than a scientific and statistical inquiry into the seriousness of the potential harm

and the likelihood that such injury to health will actually be caused"; it requires a showing that

"society considers the risk that the prisoner complains of to be so grave that it violates

contemporary standards of decency to expose *anyone* unwillingly to such a risk."  *Helling v.*

*McKinney*, 509 U.S. 25, 36 (1993).  Second, they must show that "prison officials are

deliberately indifferent to this state of affairs."  *Gray*, 826 F.3d at 1005 (quoting *Farmer*, 511

U.S. at 834).  They cannot satisfy either standard, which is no surprise, as numerous federal

---

[7] And to the extent plaintiffs have brought this suit to prevent "'super-spreader' events that endanger innocent third-parties in and out of prison," *see* Pl. Memo. at 4, they lack standing to represent "the public at large."  *Lujan*, 504 U.S. at 573–74 ("[A] plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.").

courts across the country have repeatedly rejected claims—Eighth Amendment and otherwise—from inmates claiming that BOP's COVID-mitigation efforts were legally insufficient.[8]

### 1. Plaintiffs Cannot Show That the Executions Would Deprive Inmates at Nearby Facilities of the Minimal Civilized Measure of Life's Necessities

On the first requirement of a deliberate-indifference claim, plaintiffs fail to show that the carrying out of scheduled executions at a facility separate from the one in which they are incarcerated will expose either of them to "conditions posing a substantial risk of serious harm," *Farmer*, 511 U.S. at 834, "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk," *Helling*, 509 U.S. at 36. Plaintiffs cannot meet this burden merely by showing that they are already at risk—even a "substantial risk," *Farmer*, 511 U.S. at 834—for COVID infection, and that COVID infection is a "serious harm"; this lawsuit does not challenge their confinement generally or the protocols in place to prevent COVID transmission at the FCI. Instead, plaintiffs are challenging only a single condition of their confinement—the

---

[8] *Wilson v. Williams*, 961 F.3d 829, 841 (6th Cir. 2020) (BOP had responded reasonably to the risk posed by COVID-19 and therefore had not been deliberately indifferent to the inmates' Eighth Amendment rights"); *Hallinan v. Scarantino*, No. 5:20-HC-2088-FL, slip op. 29 (E.D.N.C. June 11, 2020) [ECF No. 62] (same); *Wragg v. Ortiz*, No. 20-cv-5496, slip op. 64-65 (D.N.J. May 27, 2020) [ECF No. 40] (same); *Chunn v. Edge*, 465 F. Supp. 3d 168, 202 (E.D.N.Y. 2020) (same)**;** *Bowman v. Sawyer*, No. 1:19-cv-1411, slip op. 4 (D. Colo. May 27, 2020) [ECF No. 78] (public interest did not favor granting inmate's request for preliminary injunction barring the addition of new inmates to the facility to prevent overcrowding in light of COVID-19); *Grinis v. Spaulding*, No. 20-cv-10738, slip op. 4-5 (D. Mass. May 8, 2020) [ECF No. 45] (finding no deliberative indifference to the health risks of inmates due to COVID-19); *Jones v. Bergami*, No. 20-cv-132, slip op. 3-4, 6 (W.D. Tex. May 21, 2020) [ECF No. 2] (noting BOP's measures to reduce risk of COVID-19 transmission and holding that the court should not manage BOP's response to the pandemic); *Livas v. Myers*, No. 20-cv-422, slip op. 17 (W.D. La. April 22, 2020) [ECF No. 30] (declining to superintend BOP's operation of the prison by granting *inmate's request for lesser form of detention in light of COVID-19); Cf.* Valentine v. Collier, 956 F.3d 797, 802 (5th Cir. 2020) (plaintiffs were unlikely to establish deliberate indifference when prison officials were taking measures "informed by guidance from the CDC and medical professionals").

scheduled executions of *other* inmates, at *another* facility, which plaintiffs believe will have the incidental effect of increasing their own chances of contracting COVID.  For the executions to create a sufficient injury to plaintiffs to support an Eighth Amendment claim, plaintiffs must show that the alleged increase in their risk of contracting COVID is a "substantial risk." *Id.*

Plaintiffs fail to establish that conducting executions at the execution facility will "substantial[ly]" increase the risk that they, inmates at the separate FCI Terre Haute facility, will contract and be injured by COVID—much less that it will increase the risk to an extent "so grave" that in "today's society" it would "violate[] contemporary standards of decency to expose anyone unwillingly to [it]."  *Helling*, 509 U.S. at 36.  Health risks associated with COVID-19 persist throughout the United States, confronting not only inmates, but also essential workers and many others outside prisons.  As explained, BOP has taken numerous and increasing measures, in reliance on CDC guidance for mitigating the risks of serious injury in correctional facilities, to protect inmates at Terre Haute.  *See* Watson Dec. ¶ 8; CDC, Guidance for Correctional and Detention Facilities (Dec. 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (CDC Guidance). The Seventh Circuit recently emphasized that, in assessing whether a particular aspect of a prison's COVID response poses an objectively unreasonable risk for purposes of a Fourteenth Amendment claim by pretrial detainees, a court must take into account "the totality of the measures the [government has] taken to combat the spread of COVID-19." *Mays v. Dart*, 974 F.3d 810, 820 (7th Cir. 2020).  Particularly in light of the many precautions BOP has taken, plaintiffs cannot prove that carrying out the scheduled executions under existing protocols will expose plaintiffs to a risk substantially in excess of those they already face.

Plaintiffs observe that executions cause people to travel and congregate and interact with

members of the public and with one another, and they theorize that an execution could become a "super-spreader event," but they cite no evidence that the scheduled executions pose that risk, much less that either plaintiff faces a "sufficiently substantial" risk to trigger Eighth Amendment scrutiny. *Farmer*, 511 U.S. at 834 n.3; *see also Helling*, 509 U.S. at 36 (to determine whether prison officials violated inmate's Eighth Amendment rights by allowing his cellmate to expose him to secondhand smoke, must examine both "the seriousness of the potential harm and the likelihood that such injury to health will actually be caused"). As described below, BOP is working assiduously to mitigate the risks to inmates from the COVID pandemic, both as a general matter and with respect to executions in particular. *See infra* II.B.2. Plaintiffs cannot grind the wheels of prison administration to a halt based on a speculative and evidence-free contention that any movement of people through a prison facility during the COVID pandemic supports an Eighth Amendment claim simply because BOP can only mitigate, and cannot entirely eliminate, the risks.

Plaintiffs' other purported evidence of increased risk fares no better. In suggesting that future executions will increase the rate of COVID infection, plaintiffs appear to contend that past executions have caused "spikes in COVID cases at FCC Terre Haute" and "in Vigo County." Pl. Memo. at 18; *see also* ECF No. 13-1 ¶ 60 (Goldenson declaration). The purported expert declaration of Joe Goldenson asserts, based on a graph taken from Vigo County's Facebook page, that infections increased after previous executions took place. A declaration by ACLU attorney Cassandra Stubbs is to similar effect. *See* ECF No. 13-27. But plaintiffs provide no evidence that those increases—unfortunately shared in common by so much of the country— were caused by the executions. Goldenson—a physician who does not purport to be an epidemiologist or statistician—has not even attempted to demonstrate that the graph he obtained

from Facebook shows causation.

And indeed, the available evidence is to the contrary.  The DOJ Office of the Inspector General maintains a COVID positivity tracker dashboard that permits any user to view a graph of the number of active COVID cases at a particular facility over time.  Watson Dec. ¶ 14.  Executions were conducted at Terre Haute on July 14, 16, and 17, 2020; August 26 and 28, 2020; September 22 and 24, 2020; and November 19, 2020.  *See* https://www.bop.gov/about/history/federal_executions.jsp.  Rather than showing a "spike" after executions, the chart for FCI Terre Haute shows that the number of inmates reported infected with COVID remained low after the July executions and *decreased* after the two September executions, and then began rising again only in November, long after the most recent executions but still well in advance of the November 19 execution.  While there was an increase in detected COVID cases at Terre Haute in late August and September, the absence of any similar effect after other executions belies a causal link to the August 2020 executions.  The evidence therefore indicates that the presence of individuals at the Terre Haute *execution* facility does not pose a substantial risk of infecting inmates at *other* facilities within FCC Terre Haute.  The chart from the Office of the Inspector General is reproduced below from the version online the afternoon of December 4.



Goldenson's other assertions are simply irrelevant to whether the scheduled executions

will increase plaintiffs' risk of contracting COVID.  His assertions about the conditions in often-unspecified "jails, prisons, and detention centers," ECF No. 13-1 ¶ 20, are not focused on the protocols in place for the executions at issue here; they instead appear designed to serve an argument that incarceration in prison is itself excessively dangerous during the COVID pandemic, a proposition for which he has submitted declarations in numerous other cases but that plaintiffs have not urged here.[9]  Goldenson's complaints do not bear on whether the scheduled executions, which take place at an entirely separate facility from plaintiffs', will materially increase plaintiffs' chances of contracting COVID.  Indeed, Goldenson's repeated declarations across the country and in this litigation that COVID is a recurring problem for correctional facilities undermine his claim that the COVID cases at FCC Terre Haute are attributable to its unique status as the site of federal executions.

In their brief, plaintiffs perform a similar analysis to Goldenson's on another bar graph, this one showing just COVID positivity in Vigo County. ECF No. 14 at 18–19.  This graph likewise offers no support for a causal relationship, showing the same deficiencies as Goldenson's.  Plaintiffs do not demonstrate that Vigo County's infection rate after executions rose more or in different patterns than other Indiana counties.

Especially illuminating of the failure to show increased risk is the declaration of Yusuf Ahmed Nur, ECF No. 13-29, who attended the execution on November 19.  He then tested positive for COVID on a test that was administered on November 27.  Plaintiffs state that he "almost certainly contracted the disease in connection" with the earlier execution, Pl. Memo. at 16, but Nur's declaration supports no such conclusion.  Instead, he lists numerous activities he

---

[9] *See, e.g.*, *Wragg v. Ortiz*, 462 F. Supp. 3d 476 (D.N.J. 2020); *Hallinan v. Scarantino*, 466 F. Supp. 3d 587 (E.D.N.C. 2020); *Lucero-Gonzalez v. Kline*, 464 F. Supp. 3d 1078 (D. Ariz. 2020); *United States v. Garcia*, 460 F. Supp. 3d 403 (S.D.N.Y. 2020).

undertook involving other individuals after the execution and before his November 27 positive test: he visited a funeral home with the deceased inmate's three sons (ECF No. 13-29 ¶ 22) where he also interacted with the funeral home director (*id.*), he spent an unspecified amount of time working in a small room filled with several dead bodies (*id.* ¶ 23), he interacted an unspecified number of times with his three children of unspecified age whose own movements and potential exposures are undetailed (*id.* ¶ 30), and he went into public an unspecified number of times under unspecified circumstances (*id.*). And, even if Nur had contracted COVID in connection with the execution,[10] plaintiffs have not shown that an execution in a separate facility substantially increases the risk that Terre Haute inmates will contract COVID. If anything, if Nur was COVID-positive or in contact with a COVID-positive person during the execution, the lack of any data showing an infection spike at FCI Terre Haute following the November 19 execution would show that inmates at FCI Terre Haute are not at a substantially increased risk of contracting COVID even if a COVID-positive person attends the execution.

Finally, the caselaw cited by plaintiffs does not establish that the objective prong of the deliberate-indifference standard is always satisfied in cases involving COVID. In *Wilson v. Williams*, the Sixth Circuit was faced with a claim that merely being confined at Elkton Federal Correctional Institution and its satellite facility led a medically vulnerable subclass to have a high risk of exposure to COVID that entitled them to release or transfer. 961 F.3d 829, 832–33 (6th Cir. 2020). The Sixth Circuit held that the objective prong was satisfied, because plaintiffs provided evidence that the conditions of confinement at those facilities—including the dormitory-style housing— meant that they were "incarcerated under conditions posing a

---

[10] It is defendants' understanding that two officials briefly removed their masks before the execution to make a statement so that it could be communicated clearly.

substantial risk of serious harm." *Id.* at 840 (quoting *Farmer*, 511 U.S. at 834).  Here, plaintiffs are making a different claim that one particular aspect of their confinement—that they are confined in a facility near a different facility where the executions will take place—is itself increasing the risk of COVID.  It is undisputed that COVID is a serious disease, but plaintiffs still must show that the challenged condition of confinement—the holding of executions—poses a substantial risk that they will suffer that serious disease.

In sum, plaintiffs have failed to carry their burden.  To show a likelihood of success on their Eighth Amendment claim, they must prove that the executions of *other* individuals at a *separate* facility are a condition of *plaintiffs'* confinement that poses a substantial risk to plaintiffs. But they have offered only speculation that the temporary presence of additional personnel and members of the public at a separate facility from plaintiffs' will somehow cause a chain reaction of COVID infections that may eventually wind its way to plaintiffs.  That prediction of increased risk is too low and attenuated from plaintiffs, particularly in light of the many precautions BOP is taking with respect to both executions and prison operations more generally, to support an Eighth Amendment claim.

### 2.    Defendants Are Not Acting With Deliberate Indifference

Even if plaintiffs could show that carrying out an execution in the separate execution facility so increased their risk of contracting COVID as to violate contemporary standards of decency, they cannot show that defendants are acting with deliberate indifference to that risk. Deliberate indifference imposes a "high hurdle," requiring a showing "approaching a total unconcern for the prisoner's welfare."  *Rosario*, 670 F.3d at 821.  "[T]he conduct must be reckless in the criminal sense"; negligence and even gross negligence do not suffice.  *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008). More generally, prison officials' conduct is judged

based on "the constraints facing the official," *Wilson v. Seiter*, 501 U.S. 294, 303 (1991), and

managing a prison while combating a novel virus requires officials to balance competing

interests. *See id.* (explaining that the deliberate-indifference test applies in medical contexts

because "the State's responsibility to attend to the medical needs of prisoners does not ordinarily

clash with other equally important governmental responsibilities"). One of those interests is the

Government's strong interest in carrying out its capital sentences. *See infra* IV.

The Supreme Court has repeatedly affirmed that the Eighth Amendment does not

authorize courts to superintend prison officials' decisions about how to balance competing

interests within the constraints of the prison setting.  Prison officials act with deliberate

indifference in violation of the Eighth Amendment only if they "know[] of and disregard[] an

excessive risk to inmate health or safety," a standard that "incorporates due regard for [officials']

unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer*,

511 U.S. at 837, 845 (quotation marks omitted).  As the Seventh Circuit has recently

emphasized, "[c]orrectional administrators must have 'substantial discretion to devise reasonable

solutions to the problems they face,'" and courts must give "considerable deference . . . to the

judgment of prison administrators" about how to balance competing objectives.  *Mays*, 974 F.3d

at 820–21 (quoting *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S.

318, 326 (2012)); *see also Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011) (noting that the

Eighth Amendment "leav[es] ample room for professional judgment, constraints presented by the

institutional setting, and the need to give latitude to administrators who have to make difficult

trade-offs as to risks and resources").  The Supreme Court has accordingly emphasized that

courts must use "caution" in issuing injunctions in the prison context and may not "enmesh[]"

themselves "in the minutiae of prison operations."  *Farmer*, 511 U.S. at 846-47.

Likewise, the Supreme Court has made clear during this pandemic that the responsibility for responding to COVID-19 belongs primarily to the political branches. *See*, *e.g., Valentine v. Collier*, No. 19A1034 (denying application to vacate stay in prison COVID-19 case); *Valentine v. Collier*, No. 20A70 (same); *South Bay Pentecostal Church v. Newsom*, No. 19A1044 (Roberts, C.J., concurring in denial of application for injunctive relief) ("Our constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States to guard and protect. … When those officials 'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.' … Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people."). Courts should be exceedingly cautious in taking upon themselves the duty to orchestrate the nation's responses to the COVID pandemic.

As discussed, plaintiffs are challenging the decision to proceed with federal executions, claiming that that particular decision is a condition of confinement that violates the Eighth Amendment. They must therefore show that defendants are deliberately ignoring the risk posed by proceeding with executions. But precautions taken by BOP to reduce the spread of COVID, both at FCC Terre Haute generally and in administering executions in particular, show that—far from acting with "total unconcern for . . . prisoner[s'] welfare," *Rosario*, 670 F.3d at 821—the Bureau is working assiduously to mitigate the risks of COVID within the inmate population.

BOP's precautions surrounding executions reflect a concerted effort to prevent the spread of COVID. Consistent with BOP's more general practices, members of the execution team, BOP staff, and visitors and other members of the public undergo temperature checks and COVID screening before entering FCC Terre Haute, and they must wear masks at all times, including

24

during an execution.  Watson Dec. ¶¶ 8, 9, 16, 20, 22.  While demonstrators have not previously chosen to enter FCC Terre Haute grounds, they would likewise have to undergo COVID screening if they did so.  *Id.* ¶ 21.

"To the greatest extent possible," the execution team does not enter the FCI (where Plaintiffs are housed), the USP, or the FPC, and the execution team generally does not interact with any inmate other than the inmate housed at the execution facility.  Watson Dec. ¶ 17.  It may occasionally be necessary for a member of the execution team to enter the FCI, USP, or FPC, "but such occurrences are rare and will be minimized."  *Id.*  And while members of the execution team may have some interaction with FCC Terre Haute personnel—for example, when they are going through security checkpoints, receiving the inmate, receiving witnesses, or discussing operations logistics and equipment—the interactions are usually brief and infrequent, and masks and (if possible) social distancing are required.  *Id.*; *see also id.* ¶ 22 (explaining that the same is true of interactions with members of the public).  Non-BOP personnel such as media, witnesses, legal counsel, and Ministers of Record may not enter the FCI (where plaintiffs reside) or interact with any inmate other than the condemned inmate, and visits with the condemned inmate take place outside the presence of other inmates.  *Id.* ¶ 19.  Masks are again required at all times, as is social distancing if possible.  *Id.* After the execution takes place, members of the Execution Team have an opportunity to be tested for COVID. Watson Dec. ¶ 23.[11]

FCC Terre Haute staff are advised and encouraged to obtain a test if they had a known exposure or experience symptoms, and they may not return to work until they are symptom-free.

---

[11] Counsel has been advised that some execution team members have tested positive since the date of the last execution. Counsel has further been advised that the team members who tested positive are following CDC guidelines in determining whether and when to return to Terre Haute.

*Id.*; *see also id.* ¶ 10 (explaining that staff members who test positive must stay home in compliance with current CDC guidelines). If a staff member tests positive for COVID, BOP will immediately conduct contact tracing. For example, for the positive-test case disclosed in *Hartkemeyer v. Barr*, No. 2:20-cv-00336-JMS-JLP, BOP conducted contact tracing using both video and the staff member's personal recollection. Watson Dec. ¶ 24. No additional cases of COVID-19 were discovered as a result of that contact tracing. *Id.*

In addition to the measures specifically relating to executions, the Watson Declaration also shows the concerted effort BOP is taking to limit COVID transmission more generally within FCC Terre Haute. For example, staff, contractors, and visitors are screened for COVID on entry to FCC Terre Haute and are denied entry if their temperature is 100.4 degrees Fahrenheit or more. Watson Dec. ¶ 8. As much as possible, staff are kept assigned to the same posts, and inmate movement and congregations has been curtailed to maximize social distancing. *Id.* ¶¶ 8, 11. All staff, inmates, and visitors are required to wear masks inside the institution; visitors can obtain PPE on request; and social distancing is practiced where possible, consistent with CDC guidelines. *Id.* ¶ 9. Newly admitted inmates are screened and tested for COVID and are placed either into isolation or into quarantine before they are introduced to the inmate population. *Id.* ¶ 8. FCC Terre Haute has multiple rapid Abbott test machines, which it uses to test symptomatic inmates and asymptomatic inmates who had close contact with an inmate who tested positive; if one inmate tests positive, BOP will typically test the rest of the inmates on his row of cells and may, if appropriate, lock down and test an entire unit. *Id.* ¶ 12. Staff have been educated about the importance of staying home if they are feeling ill and are required to report any known or suspected COVID-19 exposure as well as any positive COVID-19 test. *Id.* ¶ 10. If a staff member tests positive for COVID-19, he or she must stay home in compliance with

26

current CDC guidelines.  *Id.*

These measures reflect the opposite of deliberate indifference to the risk of COVID transmission. BOP's diligent efforts to reduce the spread of COVID reflect persistent and focused work to protect inmates, not "the unnecessary and wanton infliction of pain," *Farmer*, 511 U.S. at 834, or "a total unconcern for the prisoner's welfare."  *Rosario*, 670 F.3d at 821. And those efforts make clear that conditions at FCI Terre Haute, even when executions are taking place at the separate execution facility, do not violate the Eighth Amendment.  *Helling*, 509 U.S. at 36.

There is no support for plaintiffs' apparent contention that a federal sentence can be carried out only if the Government successfully eliminates all risk that might be created by that sentence. Indeed, the Supreme Court itself has repeatedly held that even the capital inmate himself does not have an Eighth Amendment right to "the avoidance of all risk of pain in carrying out executions." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019) (quoting *Baze v. Rees*, 553 U.S. 35, 47 (2008)).  As the courts have made repeatedly clear, the Eighth Amendment does not require the elimination of all risky or injurious conditions of confinement.  *See, e.g.*, *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) ("The Eighth Amendment demands that officials ensure 'reasonable safety,' not that they protect against all risks."); *see also Hope v. Warden York Cty. Prison*, 972 F.3d 310, 330 (3d Cir. 2020) ("Nor does a failure to eliminate all risk establish that the Government was deliberately indifferent to their serious medical needs.").  The Eighth Amendment does not require that officials "take perfect action." *Rosario*, 670 F.3d at 822.  Plaintiffs' attempt to wholly bar a legitimate form of punishment, duly imposed here on individuals other than plaintiffs for horrific crimes, without regard to the penological objectives served by those sentences and for the duration of the COVID-19

27

pandemic, is extraordinary and finds no support in precedent.  Indeed, even if plaintiffs were correct that executions imposed unacceptable risks on them, the remedy would be to adopt additional safety protocols designed to ameliorate those risks—not to halt all federal executions until the pandemic has ended, an extraordinarily overbroad remedy.

There is also no merit to plaintiffs' suggestion that defendants are "ignoring the CDC's recommendations" by allowing people associated with the executions to enter FCC Terre Haute. As explained, BOP has undertaken a rigorous effort to stem the tide of COVID infections, and that approach is informed by the recommendations of the CDC and other authorities.  Watson Dec. ¶ 8.  While the CDC recommends that prison administrators discourage "non-essential vendors, volunteers, and tours" from visiting their facilities, the guidelines continue to permit even social visitation.  CDC Guidance; *see also* Centers for Disease Control and Prevention, FAQs for Correctional and Detention Facilities (Dec. 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html (CDC FAQs) (recommending that administrators merely "consider suspending contact visits" if there is local COVID spread, and allowing "non-contact visitation" even if the facility has confirmed COVID cases).  The carrying out of federal executions is not a "visitation program," nor have plaintiffs shown that any "non-essential vendors, volunteers, or tours" are involved in federal executions.  The CDC guidance further recommends that administrators take various steps—such as requiring visitors to wear masks and performing screening and temperature checks on entry— that align with BOP's practices at FCC Terre Haute.  *Id.*; Watson Dec. ¶ 8.  Finally, the CDC recommendation to "suspend group gatherings" if an inmate in a facility may have COVID, *see* CDC FAQs, plainly does not refer to federal executions, which are not a "group gathering" of inmates but the carrying out of a lawful sentence by the government.

The CDC recommendations also acknowledge the need for flexibility in the context of correctional facilities, noting that the CDC's guidance "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." CDC Guidance. Other courts have correctly relied on that point in rejecting Eighth Amendment challenges premised on alleged noncompliance with the recommendations. *See Swain v. Junior*, 961 F.3d 1276, 1288 (11th Cir. 2020) (relying on that language to reject an Eighth Amendment challenge based on allegedly inadequate social distancing); *see also Roman v. Wolf*, 977 F.3d 935, 946 (9th Cir. 2020) (holding that an injunction ordering compliance with CDC COVID guidelines was improper because, among other things, the recommendations themselves acknowledge the need to adapt them to particular circumstances).

Furthermore, as the Seventh Circuit has recognized, "[t]he CDC Guidelines—like other administrative guidance—do not themselves set a constitutional standard." *Mays*, 974 F.3d at 823. Even if FCC Terre Haute's practices for carrying out the executions did not include some practices that the CDC would recommend, the burden would still be on plaintiffs to prove that the failure to follow that CDC recommendation shows deliberate indifference to a substantial risk to plaintiffs and is conduct that is "reckless in the criminal sense." *Lee*, 533 F.3d at 509. As the Watson declaration establishes, BOP is working diligently on many fronts to protect inmates, staff members, and the public as it carries out its duty to effectuate lawfully imposed punishment, and those diligent efforts easily clear any constitutional standard.

In addition to addressing plaintiffs' generalized claim that the Constitution prohibits defendants from carrying out executions for the duration of the COVID pandemic, defendants have also been asked by this Court to answer several questions regarding "actions … the BOP [is] taking to comply with CDC guidelines."

- Are out-of-state BOP Execution Team members quarantining upon their arrival to Indiana?

Members of the BOP Execution Team who arrive from out-of-state do not quarantine on their arrival in Indiana, "as they generally arrive only a few days prior to a scheduled execution and must complete various time-sensitive tasks upon their arrival." Watson Dec. ¶ 8. The CDC guidelines for correctional institutions do not recommend quarantining staff who have traveled from another state.[12] The CDC recommends that institutions "consider quarantining all new intakes for 14 days before they enter the facility's general population," *see* CDC Guidelines, but the CDC makes no such recommendation for staff. For staff, the CDC guidelines recommend doing "verbal screening and temperature checks," *id.*, which BOP conducts on staff, contractors, and visitors. Watson Dec. ¶ 8. And plaintiffs have identified no evidence to suggest that members of the BOP Execution Team coming from outside of Indiana are more likely, on average, to bring a COVID infection with them compared to staff who live within the state.

- Are BOP Execution Team members being tested for COVID-19? With what frequency?

All staff arriving at FCC Terre Haute, including members of the Execution Team, undergo temperature checks and COVID screening before entering FCC Terre Haute. Watson Dec. ¶¶ 8, 16. Members of the Execution Team are not required to be tested for COVID, although they are given the opportunity to be tested. *Id.* ¶ 23.

- Are BOP Execution Team members segregated from other BOP staff?

Members of the Execution Team are not formally segregated from other BOP staff, but the two groups are limited in their interactions. To the greatest extent possible, the Execution

---

[12] Likewise, Indiana does not have travel restrictions in place as part of its response to COVID. Ind. Dept. of Transp., COVID-19 Response FAQs, https://www.in.gov/indot/4040.htm (visited Dec. 5, 2020).

Team does not enter FCI, USP, or FPC while at FCC Terre Haute, being primarily engaged in duties in and around the execution facility.  Watson Dec. ¶ 17.  Execution Team members and FCC staffers will interact incident to their role in the operation of the execution, although those interactions are usually brief and infrequent.  *Id.*  All participants in all such interactions are required to wear masks at all times and, to the extent possible, remain socially distanced.  *Id.*

Beyond their mistaken reliance on CDC guidance, plaintiffs go further afield in their invocation of the Governor of Indiana's emergency restrictions.  They contend that, because the Governor has restricted "events"—such as "concerts," "festivals," "carnivals," and "parades"[13]— in "orange" counties like Vigo County to fifty people or fewer, defendants are unjustifiably "[i]gnoring … the recommendations of local authorities."  Pl. Memo. at 25.  Of course, the Governor's directive to the people of Indiana on concerts and parades does not address the federal government's carrying out of federal executions in federal correctional facilities.  Thus, there is no recommendation to consider.  The interests underlying an execution for a heinous federal crime are quite different from those underlying a concert, festival, carnival, or parade, and plaintiffs cannot establish that defendants violate *their* Eighth Amendment rights by proceeding with an execution, under carefully controlled circumstances, of other inmates at another facility to vindicate the penological interests underlying duly imposed sentences.

Plaintiffs have failed to carry their burden of showing that defendants are acting with deliberate indifference to any risk of COVID transmission.  The evidence in this case shows that BOP is diligently taking steps to prevent the transmission of COVID at FCC Terre Haute, including during executions.  Because Plaintiffs cannot establish a likelihood of success on the

---

[13] Executive Order 20-48, State of Indiana 8 (Nov. 13, 2020), https://www.in.gov/gov/files/Executive_Order_20-48_Color-Coded_County_Assessments.pdf.

merits, "the court must deny the injunction." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019).

## III.   PLAINTIFFS FAIL TO SHOW IRREPARABLE INJURY

Because plaintiffs have failed to establish a likelihood of success on the merits, the Court need not proceed further to consider the remaining preliminary injunction factors. *See GEFT Outdoors*, 922 F.3d at 367–68 (noting that if a plaintiff cannot show a likelihood of success on the merits of his claim, "there [is] no need for the district court to conduct further analysis of the 'threshold phase' for preliminary injunctive relief, or to move to the 'balancing phase'"); *accord Lankford v. Talbot Dr.*, No. 1:18-cv-03935, 2020 WL 2128580, at *1 (May 5, 2020) (quoting same). This approach is consistent with the Supreme Court's application of the preliminary injunction standard in Eighth Amendment method-of-execution challenges, where an inmate's failure to establish a likelihood of success alone warrants denial of the inmate's motion to preliminarily enjoin his execution. *See Glossip v. Gross*, 576 U.S. 863, 877–78 (2015).

Even if the Court were to proceed, however, it should find that plaintiffs have failed to show the requisite irreparable harm that is necessary to justify an injunction. Plaintiffs speculate that absent injunctive relief, they "could likely contract COVID-19." Pl. Memo. at 21. As explained above, the speculative chain of events on which this conjecture is based does not support the conclusion that executions are "likely" to result in plaintiffs' becoming infected. *See supra* II.A.1. The mere "possibility" of viral exposure does not "demonstrate that irreparable injury is *likely* in the absence of an injunction," *Winter*, 555 U.S. at 22, especially given the virus-related precautions BOP has taken and offered plaintiffs. *See* Watson Dec. ¶¶ 8-12, 15-17, 19-23. All of the precautions minimize the likelihood of plaintiffs' contracting COVID-19 as a result of executions that take place at Terre Haute and minimize any risk of irreparable harm.

And plaintiffs' assertion of harm is diminished by their own delay until November 30 in seeking relief.  The executions to take place on December 10 and 11 were scheduled on October 16 and November 20, respectively.  Watson Dec. ¶ 4 n.2, n.3.  Eight executions have taken place since July.  There is no reason that plaintiffs could not much sooner have made their extraordinary request that executions be halted.

## IV. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST A PRELIMINARY INJUNCTION HALTING ALL FEDERAL EXECUTIONS

Because plaintiffs' arguments are not likely to succeed on the merits and because they have failed to show irreparable harm, this Court need not consider the remaining injunction factors.  *See GEFT Outdoors*, 922 F.3d at 364.  Should the Court proceed further, however, the equities weigh heavily against issuing an injunction.  *See Winter*, 555 U.S. at 32.

Plaintiffs cannot dispute the Government's overwhelming interest in the timely enforcement of criminal sentences imposed by unanimous federal juries after fair trials and upheld through extensive appellate and post-conviction proceedings in federal courts.  *See Bucklew*, 139 S. Ct. at 1133.  The American people have chosen to make capital punishment available in the federal system.  *Id.* at 1123.  If that decision is to be given meaningful effect, sentences must be enforced.  Although plaintiffs argue that there is no undue harm in "delaying further executions until the pandemic is under control," Pl. Memo. at 21, such an indefinite delay is inconsistent with the Supreme Court's teaching that "[b]oth the [government] and the victims of crime have an important interest in the timely enforcement of a [death] sentence," *Bucklew*, 139 S. Ct. at 1133 (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)); *see also Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (explaining that once post-conviction proceedings "have run their course . . . finality acquires an added moral dimension").  "Only with an assurance of

real finality can the [Government] execute its moral judgment in a case," and "[o]nly with real finality can the victims of crime move forward knowing the moral judgment will be carried out." *Id.* at 556. Unduly delaying executions can also frustrate the death penalty by undermining its retributive and deterrent functions. *See Bucklew*, 139 S. Ct. at 1134; *id*. at 1144 (Breyer, J., dissenting).

Indeed, the Supreme Court has routinely denied stay-of-execution applications even by condemned inmates while their challenges to execution protocols were pending. *See Storey v. Lombardi*, 135 S. Ct. 1198 (2015) (mem.) (denying stay-of-execution applications by Missouri inmates while challenges to Missouri's single-drug pentobarbital protocol were pending), and *Warner v. Gross*, 135 S. Ct. 824 (2015) (mem.) (same, involving a challenge to Oklahoma's execution protocol). It defies belief that these plaintiffs' asserted harm (which hinges not on anything related to the executions, but rather a speculative increase in risk from COVID-19) merits a suspension of all executions for an indefinite period until the COVID-19 crisis subsides, when the Supreme Court has rejected similar requests from inmates themselves.

Moreover, whatever harms flow to plaintiffs from an alleged increase in COVID-19, they do not outweigh the government's interest in carrying out scheduled executions after lengthy post-conviction review periods. *Cf. In re Federal Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 129 (D.C. Cir. 2020) (Katsas, J., concurring) (noting that federal courts "should not assist" attempts "to delay lawful executions indefinitely"); *LeCroy v. U.S.*, 975 F.3d 1192, 1196 (11th Cir. 2020) (finding that courts are not vested "with a free-floating, standardless reservoir of authority to postpone an already-scheduled execution, free and clear of the traditional stay standard"); *U.S. v. Lee*, No. 4:97-cr-00243-LPR-2, 2020 WL 3921174, at *5 (E.D. Ark. July 10, 2020) (leaving to the Executive Branch the judgment about whether to move

ahead with executions during the COVID-19 crisis).  That interest is particularly acute given the scheduling and operational difficulties surrounding executions.  *See, e.g.,* Exhibit 2, Declaration of Kevin Pistro (ECF No. 27-2) ¶ 8.  Indeed, even where an inmate himself directly challenges the method of execution, the Supreme Court has warned that courts must "police carefully against attempts to use such challenges as tools to interpose unjustified delay," *Bucklew*, 139 S. Ct. at 1134, which can even "undermine [capital punishment's] jurisprudential rationale by reducing its deterrent effect and retributive value," *id.* at 1144 (Breyer, J., dissenting) (alternation in original) (quotation marks omitted).  *Cf. Peterson*, 965 F.3d at 553 (rejecting plaintiffs' attempt to enjoin BOP from carrying out execution because BOP "has the unconstrained discretion to choose a date for the execution").

Finally, the Government's interest in implementing the sentences of the inmates to be executed is "magnified by the heinous nature" of their offenses.  *See, e.g., Execution Protocol Cases*, 955 F.3d at 127 (Katsas, J., concurring).  The condemned inmates at issue here were duly convicted and sentenced to capital punishment.  The sentences of those inmates have been upheld throughout their many years of direct and post-conviction review, and despite plaintiffs' attempt to relitigate those convictions here, *see* Pl. Memo. at 5 n.7, 6 n.8, this Court is not the proper forum to do so.  Plaintiffs' contention that their interest in postponing the executions outweighs the Government's interest in finally implementing the lawful capital sentences the inmates incurred finds no support in equity.  For all these reasons, the balance of equities tips against granting a preliminary injunction.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for a preliminary injunction should be denied.

Dated: Dec. 5, 2020

Respectfully submitted,

JOHN C. CHILDRESS
Acting United States Attorney

Shelese Woods
Assistant United States Attorney

Brigham J. Bowen
Assistant Director

  /s/ Jordan L. Von Bokern
Lisa A. Olson
Jordan L. Von Bokern
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20001
(202) 305-7919
Lisa.olson@usdoj.gov
Jordan.L.Von.Bokern2@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2020, the foregoing was filed electronically through ECF/CM.  On this same date, electronic service will be made to all counsel of record through the Court's ECF/CM system.

/s/ *Jordan L. Von Bokern*
Jordan L. Von Bokern
Trial Attorney