## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

_____
                                          )

PATRICK R. SMITH and BRANDON S. HOLM,    )
individually and on behalf of all others similarly    )
situated,    )
    )
        Plaintiffs,    )
    )
v.    )        No. 2:20-cv-630-JMS-DLP
    )
WILLIAM P. BARR, in his official capacity as the    )
Attorney General of the United States; MICHAEL    )
CARVAJAL, in his official capacity as the Director    )
of the Federal Bureau of Prisons; and T. J. WATSON, in    )
his official capacity as Complex Warden for the Terre    )
Haute Federal Correctional Complex,    )
    )
        Defendants.    )
_____)

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR
## EMERGENCY MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

According to the Defendants, the Plaintiffs have no standing to pursue their Eighth Amendment claim, and they are unlikely to prevail on that claim, because there is a low risk that holding executions at FCC Terre Haute will result in anyone testing positive for COVID-19.  There is a low risk, Defendants say, because of the BOP's "assiduous efforts" and "rigorous safeguards" to prevent COVID-19 transmission, in general and in connection with executions.  *See* Defs.' Opp. to Pls.' Motion for a Preliminary Injunction at 2, 4 (12/5/20) [Filing No. 28] ("Def. Opp.").  Any suggestion that executions result in more COVID-19 cases is said to be "speculative," *id*. at 2, and there is purportedly no connection between "the executions and risk of COVID-19 spread in the facilities," *id*. at 15.

Then we get to this concession, buried in a footnote late in the Defendants' opposition brief: "Counsel has been advised that some **execution team members have tested positive since the date of the last execution**." Def. Opp. 25 n.11 (emphasis added).

We are not told how many execution team members tested positive ("some"), nor did Defendants choose to have Warden Watson or anyone else address the issue is a sworn declaration. But the fact that *any* execution team members tested positive after the most recent execution provides further, compelling evidence of the significant risk that conducting the scheduled executions will spread COVID-19 within FCC Terre Haute (and beyond). The risk is not "speculative." And that risk amply supports Plaintiffs' standing as well as the merits of their Eighth Amendment claim.

There are also other important concessions in the Defendants' papers, including their responses to the questions the Court directed them to answer (Order Directing Briefing, Dkt. 26):

- The Execution Team "is comprised of approximately 40 BOP employees," all of whom come from outside of FCC Terre Haute. Watson Decl. ¶ 17 [Filing No. 28-1 at 6-7].

- All told, "approximately 50 to 125 individuals ... will travel to FCC Terre Haute" for each execution, including the "BOP's Execution Team, state and local law enforcement, ... various witnesses, and demonstrators...." Watson Decl. ¶ 16 [Filing No. 28-1 at 6].

- "Members of the BOP Execution Team who arrive from out-of-state do not quarantine on their arrival in Indiana." Def. Opp. 30. They arrive a few days before a scheduled execution and begin their tasks immediately "'upon their arrival.'" *Id*.

- "Members of the BOP Execution Team are not required to be tested for COVID...." *Id*.

- Historically, only "5-7 members of the BOP execution team" have "elected to be tested" after an execution. *Id*. at 9. (If all members were tested, the number of known positive cases after the most recent execution presumably would be higher than the positive cases noted but not quantified in Defendants' brief.)

- "Members of the Execution Team are not formally segregated from other BOP staff." *Id*. at 30.

- "Some members of the execution team have interaction with FCC Terre Haute personnel incident to their role in the operation of the execution.  For example, the execution team may interact when going through security check points, receiving the inmate, receiving witnesses, and meeting with Terre Haute personnel to discuss operations logistics and equipment." Watson Decl. ¶ 17 [Filing No. 28-1 at 6].

- "[A]pproximately 70 or more FCC Terre Haute staff have functions related to execution events," including "staff that work at the USP, FCI and FPC."  Watson Decl. ¶ 22 [Filing No. 28-1 at 8].

- These "FCC staff will have some interaction with both the public and the BOP personnel attending the execution."  *Id.*

- Members of the Execution Team sometimes "enter the FCI (where Plaintiffs are housed), USP, or FSP while at FCC Terre Haute."  Watson Decl. ¶ 17 [Filing No. 28-1 at 6-7]. They "generally" do not "interact with any inmate," but sometimes they do.  *Id.*

- FCC Terre Haute staff members "move between the separate facilities and buildings," Watson Decl. ¶ 10 [Filing No. 28-1 at 4]; they purportedly do so, however, only when "necessary," *id.* (which is not much of a limitation, as reflected by the example provided by the Warden: "for example, if one institution is in need of additional staff due to staff being on leave on a given day, or otherwise requires assistance of additional staff.").

- "Some positions [within FCC Terre Haute] also by their nature involve working at multiple institutions, including custody staff, facilities staff, as well as medical, dental, and psychology staff."  Watson Decl. ¶ 10 [Filing No. 28-1 at 4].

- As of December 4 -- *i.e.*, roughly two weeks after the execution of Orlando Hall -- the BOP website "lists **25 USP inmates and 3 staff as current positive cases**;" as of that same date, the BOP website "lists **175 FCI inmates and 20 FCI staff as current positive cases**." Watson Decl. ¶ 13 (emphasis added).  Plaintiffs Patrick Smith and Brandon Holm reside in FCI Terre Haute.  *Id*. at ¶ 7 [Filing No. 28-1 at 3].

- "If an inmate tests positive" for COVID-19,  then "*generally* the rest of the inmates on that range (row of cells) are tested."  Watson Decl. ¶ 12 (emphasis added) [Filing No. 28-1 at 5].

These concessions are layered on top of the evidence that Plaintiffs presented with their opening brief, including evidence that Mr. Hall's spiritual advisor now has COVID-19 following his involvement in Mr. Hall's execution process, *see* Pl. Mem. 16-18 [Filing No. 14], and evidence regarding increases in the number of COVID-19 cases at FCC Terre Haute and in the broader community following past executions, *id.* at 18-20.  Defendants' efforts to dismiss this evidence are not persuasive.

Defendants argue that Mr. Nur might not have contracted COVID-19 while on the FCC Terre Haute grounds.  Def. Opp. 20-21.  Even if accurate, that is irrelevant to whether holding executions in the midst of a raging global pandemic will increase the risk of spreading COVID-19.  The nature of a pandemic is that you often cannot determine where or when you contracted the disease, but you know that it happened at some point in a multi-person chain of interactions.  Mr. Nur might have contracted COVID-19 while riding in a van with BOP security escorts to or from Terre Haute to the prison grounds, or while spending five hours in a windowless waiting room, or while witnessing the execution in a room with two executioners who did not wear masks at any point in the execution process.[1]  The most likely explanation is that he got it on the prison grounds or while interacting with prison staff going to and from the prison. What matters, however, is that he contracted COVID-19 because of his involvement in the execution process (and would not have done so but for that involvement), which means that others involved in the process were positive at the time and that others have become positive since--for example, the execution team members obliquely referenced by the Defendants, or the inmates or staff from FCC Terre Haute who tested positive after the execution as referenced above.

Defendants also argue that even if Mr. Nur "contracted COVID in connection with the execution," there is no evidence of "an infection spike at FCC Terre Haute following the November

---

[1] With no supporting declaration (even though Warden Watson might have been in the execution chamber), Defendants state that it is their "understanding that two officials briefly removed their masks before the execution [of Orlando Hall] to make a statement so that it could be communicated clearly."  Def. Opp. 21 n.10.  If this assertion refers to the two executioners described by Mr. Nur, it is refuted by his sworn declaration.  He categorically denies that either executioner wore a mask at any point during the execution. [Filing No. 13-29 at 5-6, ¶ 15; Second Decl. of Yusuf Ahmed Nur at ¶ 6 [Filing No. 29-6 at 2]].

19 execution," which purportedly shows that "inmates at Terre Haute are not at a substantially increased risk of contracting COVID even if a COVID-positive person attends the execution." Def. Opp. 21. This argument, however, is based on the false premise that there was no spike in COVID cases at FCC Terre Haute following Mr. Hall's execution. There has been. The number of positive inmate cases at FCC Terre Haute has increased from **88** as of November 27 to at least **202** as of December 4, and the number of positive staff cases has increased from **16** as of November 27 to at least **21** as of December 4. *Compare* Pl. Mem. 10 (November 27 numbers) *with* https://www.bop.gov/coronavirus/index.jsp (12/5/20) (December 4 numbers) (Warden Watson puts the current number of positive cases at FCC Terre Haute at 200 inmates and 23 staff. *See* Watson Decl. ¶ 13 [Filing No. 28-1 at 5]).

The Defendants' suggestion that there was "an increase in detected COVID cases at Terre Haute in late August and September," following the executions held on August 26 and 28, but not "after other executions" (Def. Opp. 19), is also wrong. While the increase after the August executions was certainly significant, there have been increases after other executions as well. *See* Pl. Mem. 18-20; Goldenson Decl. ¶¶ 60-63 [Filing No. 13-1 at 18-19]. This includes the November 19 execution of Mr. Hall, as discussed above and as shown further in the Vigo County Health Department's most recent cumulative chart of weekly positive COVID cases in Vigo County. *See* Second Decl. of Shelby Rampolo [Filing No. 29-1 at 1, ¶ 3] and Ex. A-1 [Filing No. 29-2] (latest cumulative chart posted by the Department, showing the total number of weekly COVID positive cases in Vigo County and the number of COVID positive cases for "Federal Correction Inmates" for those same weeks).

It is also worth noting what the Defendants do ***not*** say in their opposition papers. They reference positive COVID-19 cases among members of the BOP Execution Team but do not discuss whether there have been positive cases among any of the FCC Terre Haute staff who returned to their jobs and resumed their interactions with inmates following Mr. Hall's execution. They do not dispute that a COVID-19 spread within FCC Terre Haute will lead to increased COVID cases in the Terre Haute community and beyond. They do not take issue with a single

- 5 -

statement in the declarations submitted on behalf of Mr. Smith, Mr. Holm, or inmate James Davis, all of whom described conditions within FCC Terre Haute that are drastically at odds with the much-touted "policies," "requirements" and "precautions" described in Defendants' opposition papers; or with the instances in which their own documents confirm that COVID-prevention "requirements" are not followed in practice. [Filing Nos. 13-15, 13-21, 13-26].  They do not dispute the statement by a prison staff member that disease spreads like "wildfire" when it gets into FCC Terre Haute.  Pl. Mem. 3 n.4.  They do not dispute that two of the three prison facilities within FCC Terre Haute hold far more inmates than their rated capacities, or that this overcrowding puts Plaintiffs and other inmates at even greater risk of contracting COVID-19.  *Id*. at 13.

Perhaps most telling of all, Defendants do not explain why it is essential to hold the five executions that would be affected by a preliminary injunction on the dates currently scheduled, where those dates come at the height of the pandemic, and with all we know about the spread of COVID-19.  These executions do not need to happen in December 2020 and January 2021 in order for Defendants "to vindicate the penological interests underlying duly imposed sentences."  Def. Opp. 31.  Plaintiffs do not seek the "halting of all federal executions," *id*. at 13, they are asking the Court to postpone the December and January executions for a limited time, consistent with their right to be protected from unreasonable and unnecessary harm while in the Defendants' custody.

One week has passed since Plaintiffs filed their request for a preliminary injunction. Within the space of that single week:

- The number of confirmed COVID-19 cases in the U.S. has increased by more than one and a half million people, to **14,396,444** cases, *see* https://coronavirus.jhu.edu/ (12/5/20);
- Another **15,000** Americans have died (current total: **279,253**), *id*.;
- Record highs have been achieved for daily new cases, hospitalizations, and deaths;
- The number of confirmed COVID-19 cases in Indiana has increased by more than **42,000**, to **367,329** cases, *see* https://coronavirus.jhu.edu/region/us/indiana (12/5/20);
- **530** additional Indiana residents have died from COVID-19 (current total:  **6,122**), *id*.;
- Vigo County has had more than **500** new confirmed cases (current total: **7,002**) and at least **3** more deaths (current total: **111**),  https://www.coronavirus.in.gov/2393.htm (12/5/20); and

150377309.1

- As noted above, the combined number of inmates and staff at FCC Terre Haute who are *currently* positive has increased from 104 as of November 27 to at least **223** as of December 4, *see* https://www.bop.gov/coronavirus/index.jsp (12/5/20).

Also within the past week:  the White House Coronavirus Task Force informed states that "the COVID risk to all Americans is at a historic high,"[2] and CDC issued new guidance to reduce the risk of spreading COVID-19, including "[p]hysical distancing and limiting contacts," "[a]voiding nonessential indoor spaces," "[s]afeguarding persons most at risk for severe illness or death," "[p]rotecting essential workers," "[p]ostponing travel," and "[i]ncreased room air ventilation...."[3]  Postponing executions at FCC Terre Haute would be consistent with all of these generally applicable recommended steps, and with the CDC's specific guidance for correctional institutions.  *See* Pl. Mem. 11.  Defendants suggest they are following the CDC's guidance, Def. Opp. 4, but they clearly are not following the most important recommendations, which are to postpone travel, limit contacts, avoid putting people in confined indoor spaces, ensure adequate social distancing, and suspend non-essential prison visits and movement between prisons.

---

[2] "White House Coronavirus Task Force:  "We Are in a Very Dangerous Place," Center for Public Integrity (Dec. 2, 2020), https://publicintegrity.org/health/coronavirus-and-inequality/white-house-coronavirus-hospital-capacity-dangerous-place/.  Copies of the Task Force's November 22 report for the nation (following Pennsylvania data) and its November 22 report for Indiana are attached as Exs. 2 and 3 to the Second Rampolo Declaration [Filing No. 29-3 and 29-4].

[3] "Summary of Guidance for Public Health Strategies to Address High Levels of Community Transmission of SARS-CoV-2 and Related Deaths, December 2020," at 4-6, CDC Morbidity and Mortality Weekly Report (Dec. 4, 2020), Ex. 4 to Second Rampolo Decl. [Filing No. 29-5];  *id.* at 6 ("Travel increases the likelihood of SARS-CoV-2 exposure and infection and could translocate infection between communities. Postponing travel is the best way to reduce this risk.").

150377309.1

"The pandemic nightmare scenario—the buckling of hospital and health-care systems nationwide—has arrived,"[4] America's 911 system is at "the breaking point,"[5] prisons continue to be COVID-19 hotspots despite adopting the same type of safety measures described by the Defendants,[6] and frontline responders are pleading for help in stemming the pandemic.[7]   The Defendants' response?   Not our issue.

The responsible thing for the Defendants to do in their role as custodians for Plaintiffs and others incarcerated at FCC Terre Haute (not to mention from a general public health perspective) is to postpone the executions scheduled to take place at FCC Terre Haute in December and January. Postponing the executions would also be consistent with the Defendants' stated commitment to do

---

[4] "The U.S. Has Passed the Hospital Breaking Point," The Atlantic Magazine (Dec. 4, 2020), https://www.theatlantic.com/health/archive/2020/12/the-worst-case-scenario-is-happening-hospitals-are-overwhelmed/617301/.   The Court may recall that it asked the Defendants about the ventilation system at FCC Terre Haute in connection with the *Hartkemeyer* case and was told that (1) there was not enough time to do anything about that system, and (2) ventilation systems do not meaningfully contribute to the risk of spreading COVID-19.  *See* Response to Court's Order Dated July 12, 2020 (ECF No. 79), *Hartkemeyer v. Barr*, No. 2:20-cv-00336-JMS-DLP (ECF No. 81 at 3-4).  The latest CDC guidance undercuts the latter proposition.  The Defendants also assured the Court in that filing that there was very little chance the spiritual advisors for Mr. Purkey and Mr. Honken would contract COVID-19 because of all the precautionary measures in place at FCC Terre Haute.  *Id.* at 1-3.  Those purported measures, however, did not prevent Orlando Hall's spiritual advisor, Mr. Nur, from contracting COVID-19.

[5] "Pandemic is pushing America's 911 system to 'breaking point,'" Washington Post (Dec. 3, 2020), https://www.washingtonpost.com/health/2020/12/03/911-ambulance-services-breaking-point/.

[6] *See, e.g.*, "Almost half of inmates in [Alaska's biggest prison] have active coronavirus infections," Anchorage Daily News (Dec. 4, 2020), https://www.adn.com/alaska-news/2020/12/03/almost-half-of-all-inmates-at-alaskas-biggest-prison-have-active-covid-19-cases-right-now/; "Brooklyn federal jail holding Ghislaine Maxwell has COVID outbreak," New York Daily News (Dec. 3, 2020), https://www.nydailynews.com/new-york/ny-brooklyn-federal-jail-mdc-covid-19-outbreak-20201203-kdyploog35axpokuosx2uslgge-story.html; "COVID-19 outbreak infects more than half of inmates at [Pennsylvania] prison for elderly and infirm," Philadelphia Inquirer (Dec. 2, 2020), https://www.inquirer.com/news/pennsylvania-doc-covid-outbreak-sci-laurel-highlands-somerset-20201202.html.

[7] "With hospitals slammed by covid-19, doctors and nurses plead for action by governors," Washington Post (Dec. 3, 2020), https://www.washingtonpost.com/health/doctors-demand-covid-restrictions/2020/12/03/88c1afc6-34e1-11eb-8d38-6aea1adb3839_story.html;   "After 256 days working nonstop, doctor pleads with public to help halt Covid-19," CNN (Dec. 1, 2020), https://www.cnn.com/2020/12/01/health/covid-doctor-varon-patient-photo-trnd/index.html;   "'Nobody Sees Us': Testing-Lab Workers Strain Under Demand," New York Times (Dec. 3, 2020), https://www.nytimes.com/2020/12/03/health/coronavirus-testing-labs-workers.html?referringSource=articleSharejme.

150377309.1

'"everything we can to mitigate the spread of COVID-19 in [BOP] facilities,'" *see* Pl. Mem. 4, with the BOP Executions Protocol statement that "BOP will make every effort in the planning and preparation of an execution to ensure the execution process ... is handled in a manner that minimizes the negative impact on safety ... and operational integrity of the correctional institution in which it occurs and ... [a]llows for ... delays in the execution countdown," [Filing No. 33-1 at 10-11, ¶¶ IV.B.2, IV.B.6], and with how federal executions have been handled historically when there is a change in administrations.  "The last time the U.S. government carried out an execution between a presidential election and the inauguration of the new president for a federal crime was nearly 132 years ago, on January 25, 1889," during the "outgoing administration of Grover Cleveland...."[8]  The Defendants nevertheless press on.

Plaintiffs demonstrated in their opening brief that a preliminary injunction is warranted because carrying out executions during the resurgent COVID-19 pandemic reflects "deliberate indifference" to a "substantial risk of serious harm" to inmates at FCC Terre Haute, in violation of the Plaintiffs' rights under the Eighth Amendment to the United States Constitution.  *See Farmer v. Brennan*, 511 U.S. 825, 828-33 (1994); *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *Hudson v. Palmer*, 468 U.S. 516, 526-27 (1984).  No less than when an overcrowded prison system endangers prisoners by depriving them of adequate medical care, a prison violates the Eighth Amendment by taking non-essential actions that it knows will increase the risk that inmates will contract COVID-19 and suffer severe physical injuries and possibly death.  *See Brown v. Plata*, 563 U.S. 493, 510 (2011).  In both instances, the government's actions are "incompatible with the concept of human dignity" and have "no place in a civilized society."  *Id.*

To award preliminary injunctive relief, a court need only conclude that a plaintiff's chances of prevailing "are 'better than negligible,'" which is a "low threshold," *Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 966 (7th Cir. 2018) (citation omitted).  Here, Plaintiffs are likely

---

[8] "Federal Government to Conduct First Lame Duck Federal Executions in More than a Century," Death Penalty Information Center (Nov. 18, 2020), https://deathpenaltyinfo.org/news/dpic-analysis-federal-government-to-conduct-first-lame-duck-federal-executions-in-more-than-a-century.

to succeed on the merits of their Eighth Amendment claim. The other factors also support a preliminary injunction.  Plaintiffs face a significant risk of irreparable harm absent a preliminary injunction, given the incontestable dangers presented by COVID-19 (particularly in a prison environment) and the enhanced risk that the named Plaintiffs and members of the putative plaintiff class (which includes all inmates at FCC Terre Haute) will contract the disease if executions proceed as scheduled.  The balance of equities tips in Plaintiffs' favor because Defendants' general interest in implementing death sentences is greatly diminished by the significant delay that Defendants' own actions have caused in implementing the executions that would be affected by a preliminary injunction, and because that interest is outweighed in all events by the risk of harm to other inmates if the executions occur when currently scheduled. And the requested preliminary injunction would benefit the public enormously by reducing the domino effect of a raging pandemic, thereby preventing harm and saving lives in and out of the FCC Terre Haute prison. Not surprisingly, the Defendants ignore the public interest factor altogether.  The Court should temporarily enjoin all further executions at FCC Terre Haute.

## ARGUMENT

**I.  Plaintiffs Are Likely To Prevail On The Merits.**

    **A.  Plaintiffs Have Standing to Seek Injunctive Relief to Protect Their Eighth Amendment Rights.**

Defendants argue that the Plaintiffs' risk of injury from the upcoming executions is too speculative to support their standing to sue. *See* Def. Opp. 11-12. They claim that "plaintiffs have failed to demonstrate that, even if an individual attending the execution had COVID-19, it would be transmitted to inmates in the FCI and they would contract COVID-19 and become symptomatic." *Id.*  But Plaintiffs do not have to "demonstrate" that they will in fact contract COVID and become symptomatic in order to have standing to assert their Eighth Amendment claim.

Plaintiffs state "a cause of action under the Eighth Amendment by alleging that petitioners have, with deliberate indifference, exposed [them] … [to] an unreasonable risk of serious damage

to [their] future health." *Helling v. McKinney*, 509 U.S. 25, 35 (1993); *see also Lehn v. Holmes*, 364 F.3d 862, 871 (7th Cir. 2004) ("Lehn's complaint states that IDOC's practice [of housing non-smoking inmates with smokers] threatens his future health and causes him presently to suffer from headaches and burning eyes.  This is the type of injury that the Supreme Court found cognizable in [*Helling*].").  Defendants' plans for the upcoming executions pose an unreasonable risk to Plaintiffs' health and safety.  *See supra* at 2-9, Pl. Mem. 2-20, 22-25.  This is sufficient injury to support Article III standing and an Eighth Amendment claim.  *Cf. Helling*, 509 U.S. at 33 ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the grounds that nothing yet had happened to them.").

Defendants' "traceability" argument cavalierly disclaims any responsibility for the specific and the enhanced risks from the executions.  *See* Def. Opp. 12-14.  Defendants admit that COVID-19 cases are already surging and that it is difficult to contain these risks in prisons, yet they disaffirm any responsibility to Plaintiffs or other members of the putative class relative to the scheduled executions because "the risk exists that Terre Haute staff and inmates may become infected regardless of whether executions take place…." *Id.* at 13.[9]

This ignores the nature of Plaintiffs' injury in this case.  The issue before the Court is the specific and enhanced risk of serious illness or death due to Defendants' specific execution plans at FCC Terre Haute.  *See Booker-El v. Superintendent, Indiana State Prison*, 668 F.3d 896, 899 (7th Cir. 2012) ("[T]he injury-in-fact requirement can be satisfied by a threat of future harm or by an act which harms the plaintiff only by increasing the risk of future harm that the plaintiff would have otherwise faced, absent the defendant's actions.") (citation omitted).  The serious risk to Plaintiffs based on the planned executions is traceable to the Defendants, and they cannot credibly argue otherwise.  It is certainly true that any number of conditions within FCC Terre Haute make

---

[9] Defendants argue that Plaintiffs' alleged injury must be traceable to their actions, "'and not injury that results from the independent action of some third party.'"  Def. Opp. 12-13 (citing *Simon v. E. Ky. Welfare Rights Org.*).  It is not clear which "third party" Defendants believe is the "independent" source of Plaintiffs' injury.  From their ensuing argument, it seems to be the coronavirus itself.  *See id.* at 13 ("The unfortunate risk is that inmates will become infected regardless of whether executions take place at Terre Haute.").

- 11 -

the prison a combustible environment for contracting COVID-19.  Some number of inmates, however, will contract COVID-19 only because Defendants needlessly chose to light a match despite knowing about those combustible conditions.

Defendants also suggest that the Plaintiffs are not the object of the government action they challenge.  *See* Def. Opp. 13 and n.6.  It is of course true that Plaintiffs are not the ones scheduled for execution.  But Defendants are taking specific actions that knowingly and undeniably affect Plaintiffs.[10]  Plaintiffs' threatened injury is directly attributable to Defendants.

Defendants' redressability arguments are also based on an incorrect legal premise. They claim that Plaintiffs are not seeking the right kind of relief by simultaneously asking for too much and too little, and that Plaintiffs therefore lack standing to sue.  *See id.* at 14.  They cite *Gill v. Whitford*, *Madsen v. Women's Health Center*, and *Bucklew v. Precythe* for their argument that Plaintiffs are purportedly pursuing the wrong relief, *see id.*, but none of these cases addressed standing.  "[S]tanding and entitlement to relief are not the same thing…. If the court becomes too enmeshed in the plaintiff's entitlement to relief, it will stray beyond the standing inquiry into the merits."  *Arreola v. Godinez*, 546 F.3d 788, 794-95 (7th Cir. 2008).  And in any event, Defendants' self-serving assertion that Plaintiffs cannot pursue an injunction that would postpone the executions currently scheduled at FCC Terre Haute conflicts with their concession that Plaintiffs have standing "to request relief that will redress their alleged harms, *i.e.*, the risk of COVID-19 infection[.]"  Def. Opp. 14.  Plaintiffs' request to postpone the execution events that are a source of this risk would redress that harm.  Plaintiffs have alleged "specific, concrete facts demonstrating that the challenged practices harm [them], and that [they] personally would benefit in a tangible way from the court's intervention."  *Warth v. Seldin*, 422 U.S. 490, 508 (1975).

---

[10]  Plaintiffs' claims are not based on injury to other parties. Their claims are particular to their own alleged injuries and are based on their Eighth Amendment right to be free from cruel and unusual punishment. Plaintiffs have no one to protect themselves in the face of the risks created by Defendants through the conduct of the executions.  *Peterson v. Barr* and the other cases cited by Defendants in footnote 6 of their brief are inapposite.

- 12 -

Finally, Defendants argue that Plaintiffs cannot seek relief that would bar "*another inmate's* lawful execution[.]"  Def. Opp. 10 (original emphasis); *see also id.* at 12 (citing *Linda RS v. Richard D.*).  But Plaintiffs are not challenging the executions themselves, nor are they seeking to "bar" the executions.[11]  The Defendants may hold executions elsewhere.  What the Plaintiffs are challenging is the government's decision to carry out executions at their facility, at the current time, given the current state of the COVID-19 crisis. They are challenging Defendants' irresponsible and callously indifferent decision to conduct the executions in the midst of the pandemic, at FCC Terre Haute, thereby enhancing the serious risk of COVID-19 exposure across the FCC Terre Haute population. Plaintiffs are plainly injured by Defendants' acts, their injury is traceable to Defendants, and their threatened injury can be redressed by the injunctive relief sought in this action.  Plaintiffs have standing to challenge actions taken by Defendants that jeopardize Plaintiffs' health and well-being, even if other inmates (*i.e.*, the parties who are scheduled to be executed) might be impacted by the Court's relief.

**B.  Plaintiffs are Likely to Succeed on Their Eighth Amendment Claim.**

While the Eighth Amendment does not require "'perfect action'" on the part of prison officials, Def. Opp. 27 (citation omitted), it does require them to "take reasonable measures to guarantee the safety of the inmates" under their care.  *Hudson v. Palmer*, 468 U.S. 516, 526-27 (1984). "[T]the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833.

This case is not like any of the cases string-cited by the Defendants as having "rejected claims--Eighth Amendment and otherwise--from inmates claiming that BOP's COVID-mitigation efforts were legally insufficient."  Def. Opp. at 16 and n.8.  While the COVID-mitigation efforts at FCC Terre Haute have indeed been insufficient, they are not the subject of this lawsuit.  This case involves a decision by the Defendants to take certain actions at a time and in a way that

---

[11] Plaintiffs' reliance on *Bucklew* and their complaint about last-minute impediments to scheduled executions misses the point.  Plaintiffs are not challenging their own sentences.  They are fighting to have their health and safety interests recognized and accounted for as part of the Defendants' plans to proceed with executions at FCC Terre Haute in the midst of the pandemic.

- 13 -

significantly increase the risk that Plaintiffs and other inmates will contract COVID-19.  The actions consist of bringing large numbers of people to Terre Haute from across the country, having them interact with inmates and staff at FCC Terre Haute, permitting them to interact with people in the broader community, and then putting them together with many other people in small, windowless spaces for extended periods of time--all while millions of Americans are contracting COVID from such interactions and almost three hundred thousand have died.  No similar facts were present in any of those cases.

 1.  **The Objective Component of an Eighth Amendment Violation is Satisfied: Conducting Executions in the Midst of the COVID-19 Pandemic Poses a Substantial Risk of Serious Harm to Plaintiffs.**

To satisfy the objective prong of an Eighth Amendment claim, a plaintiff must show that the harm he faces is, objectively viewed, serious.  If the claim is "based on a failure to prevent harm," as here, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  *Farmer*, 511 U.S. at 834 (citations omitted).

The Defendants do not dispute that the harm presented by COVID-19 is "sufficiently serious" to satisfy the objective element of an Eighth Amendment claim.  They dispute only whether other inmates at FCC Terre Haute face a substantial risk of contracting COVID-19 if executions proceed.  Def. Opp. 16-22.  The Defendants assert that Plaintiffs have "cite[d] no evidence that the scheduled executions pose th[e] risk" of becoming a super-spreader event, and that Plaintiffs "cannot grind the wheels of prison administration to a halt based on a speculative and evidence-free contention...."  *Id*. at 18.

These assertions are easily addressed.  Contrary to what the Defendants say, evidence has been presented to show a causal  connection between holding executions at FCC Terre Haute and increasing the spread of COVID-19 within the FCC Terre Haute population.  That evidence has been discussed at length and will not be repeated here.  And putting five executions temporarily on hold in the midst of a surging global pandemic will in no way "grind the wheels of prison

administration to a halt."  Quite the opposite, as it will assist the prison in administering its operations in a way that protects the safety of inmates and staff alike.

The objective prong of an Eighth Amendment violation "is easily satisfied" here given the substantial harm that COVID-19 can cause, and the ease with which it can spread in prisons. *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020).

### 2. The Subjective Component of an Eighth Amendment Violation is also Satisfied:  Defendants are Being Deliberately Indifferent to the Health and Safety of Inmates by Holding Executions at the Present Time.

Under the subjective prong of an Eighth Amendment claim, "a prison official must have a 'sufficiently culpable state of mind,'" which in the present context means a state of mind "of 'deliberate indifference' to inmate health or safety."  *Farmer*, 511 U.S. at 834 (citation omitted). A prison official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference."  *Id*. at 837.  "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  *Id*. at 842.  These propositions are readily applied to the present facts:

1) Defendants know that COVID-19 presents an excessive risk of harm to inmates;

2) Defendants know that there is a substantial risk that holding executions at FCC Terre Haute will cause other inmates to contract COVID-19, given the logistics of the execution process, the physical limitations of the prison facilities and environment, the current rate at which COVID-19 is spreading in the United States and Indiana, and the increase in COVID-19 cases within the prison that followed prior executions; and

3)  Despite knowing these risks, Defendants insist on proceeding with the executions.

The Defendants offer four responses, none of which withstands analysis.

First, the Defendants argue that the deliberate indifference requires almost a "'total unconcern for the prisoner's welfare,'" to the point of being "'reckless in the criminal sense.'"  Def. Opp. 22 (citations omitted).  But this does not get them very far.  Knowing what they know,

- 15 -

holding executions in the current environment exhibits almost a total lack of concern for the welfare of FCC Terre Haute inmates (and for the welfare of prison staff, the broader Terre Haute community, the residents of Indiana, and other Americans).  It is not a question of Defendants simply acting in a negligent manner.  It is a question of them taking actions that they know  "may cause injury," even if they cannot "divine the most likely victim."  *Delaney v. DeTella*, 256 F.3d 679, 686 (7th Cir. 2001).

Second, the Defendants argue that "the Eighth Amendment does not authorize courts to superintend prison official's decisions about how to balance competing interests within the constraints of the prison setting."  Def. Opp. 23.  Again, however, the stated proposition does not get them very far.  "Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."  *Brown v. Plata*, 563 U.S. 493, 511 (2011).

Third, the Defendants argue that "the Supreme Court has made clear during this pandemic that the responsibility for responding to COVID-19 belongs primarily to the political branches." Def. Opp. 24 (citing *Valentine v. Collier* and *South Bay United Pentecostal Church v. Newsom*). Neither of those cases, however, purport to abdicate the role of courts in ensuring that Constitutional protections are respected during this pandemic.  *See South Bay United Pentecostal Church v. Newsom*, 590 U.S. __ (2020), No. 19A1044, at 2 ("Although California's guidelines place restrictions on places of worship, those restrictions appear consistent with the Free Exercise Clause of the First Amendment.") (Roberts, C.J., concurring); *Valentine v. Collier*, 590 U.S. __ (2020), No. 19A1034, at 2 ("While states and prisons retain discretion in how they respond to health emergencies, federal courts do have an obligation to ensure that prisons are not deliberately indifferent in the face of danger and death.") (Sotomayor, J., statement respecting denial).

Finally,  the Defendants argue that, far from being deliberately indifferent to the welfare of inmates at FCC Terre Haute, BOP "is working assiduously to mitigate the risks of COVID within

the inmate population." Def. Opp. 24.[12]  According to the Defendants, "BOP has undertaken a rigorous effort to stem the tide of COVID infections, ... informed by the recommendations of other authorities." *Id*. at 28.[13]  They note, for example, that "members of the execution team, BOP staff, and visitors and other members of the public undergo temperature checks and COVID screening before entering FCC Terre Haute, and they must wear masks at all times, including during an execution." *Id*. at 24-25.  (Uncontested evidence shows otherwise regarding mask use. *E.g*., Second Nur Decl. [Filing No. 29-6 at 2, ¶ 3-5]).  They also note that the "execution team does not enter the FCI (where Plaintiffs are housed), the USP, or the FPC"-- at least if they can avoid doing so -- and "*generally* does not interact with any inmate other than the inmate housed at the execution facility." Def. Opp. 25 (emphasis added).  Similarly, while execution team members "may have some interaction with FCC Terre Haute personnel," the interactions are "*usually* brief" and "infrequent," such as when going through security checkpoints, receiving the inmate, receiving witnesses, or "discussing operations logistics and equipment." *Id*. (emphasis added).  Staff members are "*encouraged* to obtain a test if they had a known exposure or experience symptoms,"

---

[12]  Defendants cite *Rosario v. Brown*, 670 F.3d 816 (7th Cir. 2012), in arguing that they are working diligently to protect inmates. *See* Def. Opp. 24-27.  In *Rosario*, police officers failed to notice that a mentally ill individual they had detained carried a razor blade in his wallet.  The individual eventually gained possession of his wallet and used the razor to commit suicide while in custody.  The description of events in *Rosario* showed police officers who worked carefully with the detained individual, leading the court to find that the officer's "inattention to detail, although ultimately tragic, does not support a constitutional claim that the officers intentionally disregarded [the individual's] known safety risks." *Id*. at 822.  The case involved compassionate treatment and an inadvertent mistake, which is not what is happening here.

[13]  One such "other authority," of course, would be the Governor of Indiana.  The Plaintiffs noted in their opening brief that holding executions now at FCC Terre Haute would be contrary not only to key recommendations of the CDC, but also to guidance provided by Governor Holcomb in a November 13, 2020 Executive Order. *See* Pl. Mem. 2.  Governor Holcomb set forth numerous measure and restrictions in his 15-page Executive Order "to reduce and slow the spread of COVID-19" across Indiana. *See id*.  The Defendants trivialize those measures and restrictions by saying they were intended to help "the people of Indiana" stay safe at "concerts and parades." Def. Opp. 31.  As a purely legal matter, the Defendants *might* be right that a state government cannot dictate what happens on federal property even during a national health emergency.  But as a factual matter, there is no question that the Governor intended his measures and restrictions to apply well beyond the scope of individuals attending a "concert, festival, carnival or parade." *Id*.

- 17 -

but (remarkably) are not required to do so even in that situation.  *Id*. at 25 (emphasis added).  "*As much as possible*," staff does not move between facilities and "inmate movement and congregations has been curtailed," and "social distancing is practiced *where possible*."  *Id*. at 26 (emphasis added).

For virtually every action that the Defendants characterize as protecting inmates at FCC Terre Haute there is a qualifier, and the actions described certainly have not "stemmed the tide of COVID infections" at FCC Terre Haute.  More importantly, those actions are irrelevant to whether the Defendants will be violating the Plaintiffs' Eighth Amendment rights if they proceed with additional executions at the present time.  If the government takes actions to protect the health and safety of inmates Monday through Friday but refuses to take an action on Saturday that it knows will prevent a substantial risk of serious harm to the inmates, Saturday's refusal to act is no less a violation of the Eighth Amendment.

The Defendants will be acting with deliberate indifference to the health of inmates in FCC Terre Haute if they proceed with executions in December 2020 and January 2021.

## II.     Plaintiffs Are Likely to Suffer Irreparable Harm If The Executions Continue

The Defendants do not dispute that contracting COVID-19 constitutes irreparable harm. They argue, however, that the Plaintiffs have not shown that they are "likely" to suffer such harm, "especially given the virus-related precautions BOP has taken."  Def. Opp. 32.  They are wrong. As discussed above, the Plaintiffs have shown that it is likely that Plaintiffs or other inmates at FCC Terre Haute will contract COVID-19 if the executions proceed as scheduled.

## III.    The Balance of Harms Favors A Preliminary Injunction

The Defendants argue that "whatever harm flows to plaintiffs from an alleged increase in COVID-19, the do not outweigh the government's interest in carrying out scheduled executions after lengthy post-conviction review periods."  Def. Opp. 34.  They suggest there is a "moral dimension" to allowing them to proceed with carrying out executions, *id*., and they also quote the Seventh Circuit's statement in *Peterson v. Barr* that BOP "has the unconstrained discretion to

- 18 -

choose a date for the execution.'"  *Id.* at 35 (quoting *Peterson v. Barr*, 965 F.3d 549, 553 (7th Cir. 2020)).

Dealing with these in reverse order, the statement in *Peterson*  was made in the context of a challenge to BOP actions under the Administrative Procedure Act (APA) as being arbitrary and capricious. There was no Eighth Amendment claim, and the Eighth Amendment clearly may constrain the BOP's statutory discretion in scheduling or implementing executions.  Consistent with this settled proposition, the DOJ's regulations recognize that courts can enter orders that affect the scheduling and implementation of federal executions.  *See* 28 C.F.R § 26.3(a).

On the second point, regardless of one's views on the morality of the death penalty, it surely is not "moral" to endanger the lives of others (and potentially many others) by executing five individuals in the midst of the pending pandemic.

On the first point, the government unquestionably has an interest in seeing that sentences are carried out.  "But measuring the strength of that interest here shows that it is necessarily diminished by the United States' own delays in setting [the] execution[s]" that would be affected here, including several years where the United States "did not even have an execution protocol." *See Bourgeois v. Warden*, No. 2:19-cv-00392-JMS-DLP, 2020 WL 1154575, *6 (S.D. Ind. Mar. 10, 2020),  *rev'd on other grounds*, 977 F.3d 620 (7th Cir. 2020).  Any harm to the government's interest in carrying out executions that results from a further delay of a few months or less is offset by the harm that would result from allowing the executions to proceed as scheduled.

## IV.    The Public Interest Favors A Preliminary Injunction

The Defendants refer to the "public interest" in the heading of the final section in their brief but do not actually address it.  That is not surprising, as the public interest overwhelming supports entry of the requested preliminary injunction.

## CONCLUSION

The Court should preliminarily enjoin the defendants from holding additional executions at FCC Terre Haute.  The injunction should remain in place until all inmates have received a safe and effective vaccine, or until such other time as the Defendants can otherwise demonstrate that holding an execution on a particular date does not pose an unreasonable risk of endangering Plaintiffs and other inmates at FCC Terre Haute.

Dated:  December 7, 2020                      Respectfully submitted,

                                        /s/ *Robert A. Burgoyne*  _____

John R. Maley
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, Indiana  46204-3535
Telephone:  (317) 231-7464 (direct)
John.maley@btlaw.com

Robert A. Burgoyne, *pro hac vice*
Caroline M. Mew, *pro hac vice*
Perkins Coie LLP
700 13th St. NW, Suite 800
Washington, DC 20005-3960
Telephone:  (202) 654-1767
rburgoyne@perkinscoie.com
cmew@perkinscoie.com

Sarah Howland, *pro hac vice*
Perkins Coie LLP
1155 Avenue of the Americas, 22nd Floor
New York, N.Y. 10036-2711
Telephone:  (212) 262-6900
showland@perkins.coie.com

Attorneys for Plaintiffs

150377309.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 7, 2020, a copy of the foregoing document and its accompanying exhibits (ECF 29) were filed electronically.  Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system.


*/s/ Robert A. Burgoyne*
Robert A. Burgoyne

150377309.1