UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| PATRICK R. SMITH, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 2:20-cv-00630-JMS-DLP |
| ) | |
| WILLIAM P. BARR, et al. ) | |
| ) | |
| Defendants. ) | |

**Order Denying Motion for Preliminary Injunction**

The novel coronavirus, or COVID-19, has killed more than 280,000 Americans and more than 6,000 Indiana residents. COVID-19 infections are surging in Indiana, with hospitalizations at an all-time high. At FCC Terre Haute, 285 inmates and staff member are currently COVID-positive. Despite these alarming numbers, the Attorney General of the United States and Federal Bureau of Prisons have determined that proceeding with the execution of five condemned inmates at FCC Terre Haute in December and January is an appropriate course of action.

The plaintiffs are two inmates at FCI Terre Haute who have preexisting conditions that increase their likelihood of severe complications if they were to contract COVID-19. The plaintiffs allege that the government's decision to proceed with the scheduled executions manifests deliberate indifference to their health. They have moved the Court to enjoin all five executions until the threat of the pandemic has passed and all inmates and staff at FCC Terre Haute have been vaccinated.

Although the Court shares the plaintiffs' concerns that conducting executions at this time may well result in more COVID-19 cases for those involved in the executions, the plaintiffs have

1

not shown that increased risk extends to them, and thus have not shown a likelihood of success on the merits of their motion. Accordingly, the motion for preliminary injunction must be denied.

### I. Background

#### A. COVID-19 in the Community

COVID-19 has been spreading in the United States since early 2020. It is a highly contagious and deadly disease. While most people who contract COVID-19 experience mild symptoms, the virus can lead to respiratory failure, lung damage, heart damage, neurological damage, and death. The virus is generally spread "through exposure to respiratory droplets when a person is in close contact with someone who has COVID-19," though there is also evidence that transmission can occur amongst people who are farther apart if they are in enclosed spaces with inadequate ventilation.[1] Wearing masks, hand-washing, and social distancing help prevent the spread of the virus. *Id.*

This year, more than 13 million people in the United States have tested positive and more than 280,000 Americans have died from COVID-19-related illnesses.[2] The virus has upended every aspect of American life. More Americans work from home than ever. Businesses such as restaurants, movie theaters, and concert venues have shuttered—some temporarily, some permanently. Millions of children are attending school virtually. Hospitals' resources are stretched to their limits. Dr. Anthony Fauci, the nation's top infectious disease expert, has urged Americans to cancel Christmas travel plans, citing the uptick in cases from ill-advised Thanksgiving travel.[3]

---

[1] CDC, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last updated Oct. 28, 2020).

[2] CDC, *Covid Tracker*, https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last accessed Dec. 8, 2020).

[3] Alex Korab, *Dr. Fauci Warns You Cancel Christmas Travel Now,* YAHOO LIFE (Dec. 4, 2020), https://www.yahoo.com/lifestyle/dr-fauci-warns-cancel-christmas-125504391.html

On March 6, 2020, Indiana Governor Eric Holcomb declared a public health emergency throughout the State of Indiana and renewed that declaration for the ninth time on December 1, 2020.[4] In Indiana, more than 387,000 Indiana residents have contracted COVID-19, and 5,986 have died.[5] Indiana has experienced a surge of positive cases in recent weeks. As of December 1, 2020, Indiana ranks second in the nation for COVID-19 hospitalizations per capita, with roughly 50 out of every 100,000 Hoosiers currently hospitalized with COVID-19.[6] The number of Indiana residents now hospitalized with COVID-19 exceeds any other time in the pandemic. *Id.* With over 1,400 COVID-19 deaths, November was the deadliest month in Indiana since the pandemic began.[7]

In light of the surge of cases in Indiana, Governor Holcomb has implemented new measures to "counter the spread" of COVID-19, including enhanced social distancing and limits on how many people may convene "in a single space."[8] The Indiana Department of Health has created a system of color-coding counties based on the number of weekly cases per 100,000 and the seven-

---

[4] Executive Order 20-49, *Ninth Renewal of the Public Health Emergency Declaration for the COVID-19 Outbreak*, (Dec. 1, 2020) available at, https://www.in.gov/gov/files/Executive-Order-20-49-Ninth-Renewal-of-Emergency-Declaration.pdf

[5] IN.GOV, *Department of Health: Health Department Updates Statewide COVID-19 Case Counts* (Dec. 7, 2020), https://events.in.gov/event/health_department_updates_statewide_covid-19_case_counts_5636

[6] Shari Rudavsky and Emily Hopkins, *Indiana has more people per capita hospitalized for coronavirus than any other state but one*, INDIANAPOLIS STAR (Dec. 1, 2020), https://www.indystar.com/story/news/health/2020/12/01/indiana-covid-state-2nd-nation-hospitalizations-per-capita/6468779002/

[7] Shari Rudavsky and Stephen Beard, *November is deadliest month to date for Indiana*, INDIANAPOLIS STAR (Dec. 3, 2020), https://www.indystar.com/story/news/health/2020/12/03/indiana-covid-deaths-hit-record-high-november/3797155001/

[8] Executive Order 20-48, *County—Based Measures and Restrictions Based on the Impact and Spread of the Coronavirus Disease* (Nov. 19, 2020), available at https://www.in.gov/gov/files/Executive_Order_20-48_Color-Coded_County_Assessments.pdf

day positivity rate. *Id.* Counties rated Red have the highest number of active cases, followed by Orange, Yellow, and Blue. *Id.* Health guidelines depend on the county's color. *Id.* For counties designated as Orange, no more than 50 individuals may be present at an event "in a single space, indoors or outdoors, at the same time"; for counties designated as Red, the limit is 25 individuals. *Id.* Groups seeking to host an event with more individuals are required to submit a safety plan to the local board of health. *Id.* Vigo County is currently designated Orange, but local health officials expect Vigo County to turn Red by the week of December 6, 2020.[9] Due to rising number of COVID-19-related deaths, the Vigo County Health Department recently rented "four refrigerated semi-trailers" to serve as a temporary morgue, with a health department administrator stating, "We have to have some place for mass casualties to go, and this is one of those situations that is going to get worse before it gets better."[10]

### B. COVID-19 in the BOP

Prisons have been hotspots for COVID-19 outbreaks.[11] There are many challenges in the prison setting that create an increased risk of a COVID-19 outbreak: prisoners and staff cannot appropriately practice social distancing; prisons lack adequate personal protective equipment; prisons are often poorly ventilated; and prisoners are transported between facilities, hospitals, and

---

[9] WTHI-TV 10, *Looking ahead to the future: Vigo County's COVID-19 status may turn red* (Dec. 2, 2020), https://www.wthitv.com/content/news/Looking-ahead-to-the-future-Vigo-county-may-be-going-red--573268361.html

[10] Sue Loughlin, *Vigo County orders refrigerated trucks for bodies*, TRIBUNE-STAR (Nov. 13, 2020), https://www.tribstar.com/news/vigo-county-orders-refrigerated-trucks-for-bodies/article_a200de04-25c7-11eb-92b9-277611899579.html

[11] *See, e.g.,* Edmund L. Andrews, *Why prisons and jails have become COVID hotspots*, Stanford Engineering (Sept. 23, 2020), https://engineering.stanford.edu/magazine/article/why-prisons-and-jails-have-become-covid-hotspots

court in multi-person vans.[12] Because of the inherent risk of exposure to COVID-19 in the correctional setting, the CDC has designated correctional officers as high priority to receive a vaccine once it becomes available.[13] As of December 1, 2020, in the United States more than 227,300 prisoners have tested positive for COVID-19, and over 1,500 inmates have died.[14] Specific to the Federal Bureau of Prisons (BOP), as of December 7, 2020, there are 124,610 federal inmates and approximately 36,000 staff members. Of those, 5,555 inmates and 1,613 staff are currently positive with COVID-19, over 22,600 inmates and 2,100 staff have recovered, and at least 151 inmates and 2 staff members have died.[15] At FCC Terre Haute, 264 inmates and 21 staff currently have COVID-19, 301 inmates and 48 staff have recovered, and at least 3 inmates have died. *Id.*

Despite the surge in COVID-19 cases in Vigo County (and the rest of the country) and the current COVID-19 outbreak at FCC Terre Haute, the Department of Justice has scheduled five executions at FCC Terre Haute in December 2020 and January 2021: Brandon Bernard on December 10, Alfred Bourgeois on December 11, Lisa Montgomery on January 12, Cory Johnson on January 14, and Dustin Higgs on January 15.[16] Citing concern with the increase of COVID-19

---

[12] CDC, *COVID-19 in Correctional and Detention Facilities, United States, February – April 2020* (May 6, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e1.htm

[13] CDC, *Meeting of the Advisory Committee on Immunization Practices (ACIP)* (Nov. 23, 2020), https://www.cdc.gov/vaccines/acip/meetings/downloads/min-archive/summary-2020-11.pdf.

[14] THE MARSHALL PROJECT, *A State-by-State Look at Coronavirus in Prisons*, https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons (last updated Dec. 7, 2020).

[15] BOP, *Covid-19 Cases*, https://www.bop.gov/coronavirus/index.jsp. (last updated Dec. 7, 2020).

[16] Federal Bureau of Prisons, *Scheduled Executions*, https://www.bop.gov/resources/federal_executions_info.jsp

cases, the American Bar Association,[17] members of Congress,[18] and a group of nearly 100 law enforcement professionals[19] have urged the government to postpone the executions until they are safe to conduct—perhaps until a vaccine is widely available. No state has held an execution since July 2020, and several state executions have been postponed for COVID-related reasons.[20]

FCC Terre Haute is situated on approximately 1,145 acres and is comprised of three separate prisons in three separate buildings: the United States Penitentiary (USP), which is a high security prison; the Federal Correctional Institution (FCI), which is a medium security prison; and the Federal Prison Camp (FPC), which is a minimum security prison camp. Dkt. 28-1 at ¶ 6. There is also a utility plant, a staff training center, the National Bus Center, a garage, and other buildings on the property. *Id.*

The execution facility is separate from the other buildings. *Id.* It is approximately one hundred feet from the FCI but is physically separated by perimeter fencing and razor wire. *Id.* The execution facility is the equivalent of several city blocks from the FPC, which is further south on

---

[17] Letter from ABA President Patricia Lee Refo to President Donald J. Trump (Nov. 12, 2020), https://www.americanbar.org/content/dam/aba/administrative/government_affairs_office/fed-executions-letter-111220.pdf

[18] *See, e.g.*, Letter from the Congressional Black Caucus to Attorney General William Barr (Nov. 17, 2020), https://cbc.house.gov/uploadedfiles/cbc_letter_to_ag_barr_on_pending_executions.pdf.

[19] Fair and Just Prosecution, *Joint Statement by Criminal Justice and Law Enforcement Leaders in Opposition to Application of the Federal Death Penalty* (Dec. 2020), available at https://fairandjustprosecution.org/wp-content/uploads/2020/12/FJP-Federal-Death-Penalty-Joint-Statement.pdf

[20] *See* Death Penalty Information Center, *Outcomes of Death Warrants in 2020*, https://deathpenaltyinfo.org/stories/outcomes-of-death-warrants-in-2020 (showing last state execution held in Texas on July 8, 2020, and other cases postponed due to COVID-19) (last updated Nov. 30, 2020); Travis Loller, ASSOCIATED PRESS (Dec. 3. 2020), *Tennessee inmate's execution put on hold due to COVID-19,* https://abcnews.go.com/US/wireStory/tennessee-inmates-execution-put-hold-due-covid-19-74526641 (Tennessee Supreme Court indefinitely postponing inmate's execution "because of the multiple issues caused by the continuing COVID-19 pandemic.").

the property, and even farther from the USP, which is south of the FPC. *Id.* The execution facility is quite small. The chamber is approximately ten feet by twelve feet and is flanked by three even smaller viewing rooms separated by plexiglass. *See* dkt. 13-5 at ¶ 9, dkt. 13-29 at ¶¶ 14–15.

The BOP and FCC Terre Haute have issued a variety of directives in light of the pandemic. Dkt. 28-1 at ¶ 8. The guidelines are derived from the World Health Organization, the Centers for Disease Control (CDC), the Office of Personnel Management, and the Office of the Vice President. *Id.* The BOP announced agency-wide modified operations in response to COVID-19 on March 13, 2020,[21] and the modifications remain in place to date. *Id.* BOP-wide modifications include the following measures, among others: (1) all staff, contractors, and visitors undergo temperature checks and COVID-19 screenings, with those who register a temperature of 100.4° Fahrenheit or higher denied access to the grounds; (2) as much as possible, staff are being assigned to the same posts and are not rotating; (3) inmate movement is limited so as to prevent congregating and to maximize social distancing; (4) all new intakes to an institution are screened for COVID-19, and those who test positive or exhibit symptoms are placed in medical isolation, while those who test negative and are asymptomatic are placed in quarantine. *Id.*

At FCC Terre Haute, policies in place require all staff, inmates, and visitors to wear masks inside the institution, and masks are provided if a visitor does not have one. *Id.* at ¶ 9. Social distancing is practiced "[w]here possible." *Id.* Staff are required to self-report any COVID-19 exposure (known or suspected) as well as any positive COVID-19 test. *Id.* at ¶ 10. Staff do not move between the separate facilities and buildings unless necessary, although some positions "by their nature involve working at multiple institutions, including custody staff, facilities staff, as

---

[21] Federal Bureau of Prisons, *Federal Bureau of Prisons COVID-19 Action Plan: Agency-wide Modified Operations*, (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp

well as medical, dental, and psychology staff." *Id.* FCC Terre Haute has multiple rapid Abbot test machines which are used to immediately test symptomatic inmates (and asymptomatic inmates with whom the sick inmates have been in close contact) in an effort to isolate and quarantine them more quickly. *Id.* at ¶ 12.

Each execution will bring approximately 50 to 125 individuals to FCC Terre Haute. Dkt. 28-1 at ¶ 16. Each execution requires the efforts of approximately 40 BOP employees brought from out-of-state facilities ("the execution team") and approximately 70 FCC Terre Haute staff. *Id.* at ¶¶ 16–17, 22. The execution team does not quarantine upon their arrival in Indiana because they generally arrive only a few days prior to a scheduled execution. *Id.* at ¶ 17. The execution team is primarily engaged in duties in and around the execution facility and generally does not interact with inmates outside of the execution facility. *Id.* The execution team generally does not enter the FCI, USP, or FPC while at FCC Terre Haute, although some members of the team interact with FCC Terre Haute personnel incident to their role in the operation of the execution. *Id.* During these interactions, "BOP staff are required to wear masks and to the extent possible remain socially distanced." *Id.* The FCC Terre Haute staff who help facilitate execution-related events have duties such as managing check points and perimeter security, staffing the command center, and escorting witnesses and demonstrators. *Id.* at ¶ 22. These "FCC staff will have some interaction with both the public and the BOP personnel attending the execution." *Id.*

Other individuals who otherwise would not be at FCC Terre Haute—including media witnesses, members of the defendants' legal team, victims' family members, and inmates' family members—also congregate at the prison to witness the execution. *Id.* at ¶ 16. These individuals do not enter FCI or interact with any FCC Terre Haute inmates other than the condemned. *Id.* at ¶ 19. Although demonstrators are permitted to demonstrate on FCC Terre Haute grounds, so far none

have chosen to come onto the grounds, instead electing to demonstrate in an area across the street from the property. *Id.* at ¶ 21. If demonstrators choose to enter the property, they will be screened and temperature checked. *Id.* Further, the demonstration area is near the main public road and not near any of the prison buildings. *Id.*

COVID-19 tests for BOP employees are conducted on a voluntary basis. *Id.* at ¶ 23. Eight federal executions have taken place this year, and only five to seven members of the BOP execution team have elected to be tested after returning to their home communities. *Id.* In July, a BOP staff member who had interacted with the execution team tested positive for COVID-19 before an execution. *Hartkemeyer v. Barr*, 2:20-cv-00336-JMS-DLP, dkt. 77-1. Per BOP policy, contact tracing was immediately initiated to determine the staff member's close contacts, and no additional cases of COVID-19 were discovered as a result of traced persons' contact with the infected member. Dkt. 28-1 at ¶ 24.

Although safety measures have been implemented, enforcement is another matter. Orlando Hall was the last person to be executed at FCC Terre Haute on November 19, 2020. Mr. Hall's spiritual advisor, Yusuf Ahmed Nur, witnessed the execution and observed several instances of non-compliance with the aforementioned policies. To attend the execution, Mr. Nur drove to the Vigo County Sheriff's office parking lot, where a BOP staff member drove him, three witnesses, two prison officials, and a chaplain in a van to USP for processing. Dkt. 13-29 at ¶ 5. The eight individuals were in the van with the windows rolled up for about 15 minutes. *Id.* He observed several BOP staff either not wearing masks or wearing them incorrectly. Dkt. 13-29 at ¶¶ 8, 11, 18. Mr. Nur alleges that neither of the two executioners wore masks at all within the execution chamber, *id.* at ¶ 15, but another witness attested that the two individuals wore masks except to make announcements as the execution process began, dkt. 33-2 at ¶¶ 6–7. Mr. Nur tested

9

positive for COVID-19 shortly after the execution. Dkt. 13-29 at ¶¶ 25–29. Mr. Nur believes he contracted COVID-19 because of his participation in Mr. Hall's execution, but given his contact with his children and a host of other unknowns, the source of his illness is uncertain.

Six execution team members also tested positive for COVID-19 approximately a week after Mr. Hall's execution. Dkt. 33-2 at ¶ 8. The government did not advise Mr. Nur about the positive tests amongst the execution team—although any contact between the COVID-positive execution team members and Mr. Nur is unclear—nor did the government contact Mr. Nur regarding his positive COVID-19 test results to conduct any contact tracing. Dkt. 29-6 at ¶¶ 9–10. The COVID-positive execution team members are following CDC guidelines with respect to whether they will travel to Terre Haute for the December executions. Dkt. 33-2 at ¶ 9.

Plaintiffs Smith and Holm reside in FCI and thus do not interact with inmates on death row, who reside at USP, or with anyone in the execution facility. At FCI, they have also personally observed flouting of the COVID-19 safety policies, including lack of proper social distancing, little or no access to soap, lack of mask enforcement, sick inmates serving food, and a two-week disruption of hot water. Dkts. 13-15 at ¶¶ 30–32, 40–43; 13-21 at ¶ 17–23. Mr. Smith also believes from personal observation that there have been more COVID-19-related inmate deaths at FCC Terre Haute than reported on the BOP website. Dkt. 13-15 at ¶ 28. The plaintiffs' observations, of course, are not specific to execution-related events but the operation of the facility generally. Significantly, the plaintiffs acknowledge that these violations that affect them directly are not the subject of this lawsuit. *See* dkt. 31 at 13 ("While the COVID-mitigation efforts at FCC Terre Haute have indeed been insufficient, they are not the subject of this lawsuit.").

According to the plaintiffs, the number of positive COVID-19 cases at FCC Terre Haute increased after the executions that took place in August and September. Dkt. 13-27 at ¶¶ 25;

10

dkt. 13-1 at ¶¶ 60–62. Three executions took place the week of August 23, when there were 26 positive cases at FCC Terre Haute. The next week, there were 88 positive cases, followed by another 32 the following week. After the executions that took place on September 22 and 24, the number of positive cases amongst inmates went from 2 to 7 new cases (Sept. 27–Oct. 3), the next week 8 more (Oct. 4–10), and the next week 19 more (Oct. 11−19). After Mr. Hall's execution, 104 staff and inmates were positive as of November 27, and 285 inmates and staff are positive as of December 7.[22] However, COVID-19 cases have been increasing in Vigo County and Indiana generally these past few weeks.[23]

The Court held a hearing by video on December 8, 2020, to discuss the plaintiffs' motion for a preliminary injunction. Counsel for the government did not know whether any of the 21 staff who are currently COVID-positive were among the 70 FCC staff who performed execution-related duties at Mr. Hall's execution. Although contact tracing for the six COVID-positive execution team members was presumably conducted, *see* dkt. 28-1 at ¶ 24, counsel for the government did not know if contact tracing for these individuals resulted in the discovery of additional COVID-19 cases at FCC Terre Haute. The Court is unfortunately hamstrung by the limited information the government chose to disclose.

## II.     Standing

The defendants argue that the plaintiffs do not have standing to bring their Eighth Amendment claim because any future injury is speculative, not traceable to the defendants' actions, and cannot be remedied by the relief they seek. Dkt. 28 at 12−15. But the defendants' standing arguments rely on a number of disputed facts that need not be resolved at this stage. *Compare id.*

---

[22] BOP, *Covid-19 Cases*, https://www.bop.gov/coronavirus/index.jsp (last visited Dec. 8, 2020).

[23] Indiana COVID-19 Dashboard and Map, https://www.coronavirus.in.gov/2393.htm (last updated Dec. 7, 2020).

at 12−14 (asserting that BOP has implemented "rigorous safety measures" and arguing that plaintiffs might be infected with COVID-19 whether or not executions go forward), *with* dkt. 14 at 13−18 (alleging numerous breaches of these safety measures and arguing that executions increase the already existent risk of prisoners contracting COVID-19). The plaintiffs have sufficiently alleged that carrying out additional executions creates at least some additional risk that they will contract COVID-19. That is enough at this stage of proceedings, so the Court will not dismiss for lack of standing. *See Booker-El v. Superintendent, Indiana State Prison*, 668 F.3d 896, 899 (7th Cir. 2012) ("[T]he injury-in-fact requirement can be satisfied by a threat of future harm or by an act which harms the plaintiff only by increasing the risk of future harm that the plaintiff would have otherwise faced, absent the defendant's actions." (quoting *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 634 (7th Cir.2007)) (alteration in *Booker-El*).

### III.   Preliminary Injunction

In deciding whether to issue a preliminary injunction to stay an execution, the Court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). "The first two factors . . . are the most critical." *Id.* The burden to show "likely" success is lightest when the prospect of irreparable injury is greatest, and vice versa. *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020).

#### A.   Likelihood of Success on the Merits

The Eighth Amendment prohibits cruel and unusual punishment. Corollary to this prohibition is a duty upon prison officials, who must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the

12

safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526−27 (1984)). To prove Eighth Amendment deliberate indifference, the plaintiffs must show that the defendants knew of, but disregarded, a "substantial risk of harm" to their health. *Goodloe v. Sood*, 947 F.3d 1026, 1030−31 (7th Cir. 2020). The level of disregard required is roughly equivalent to criminal recklessness. *Davis v. Kayira*, 938 F.3d 910, 915 (7th Cir. 2019).

The defendants do not dispute that contracting COVID-19 would be a serious harm. But they argue that conducting executions in the manner they have planned does not constitute deliberate indifference toward the plaintiffs.

The plaintiffs make well-supported—though disputed—allegations that the defendants and prison staff could do more to prevent COVID-19 transmission in the prison. *See*, *eg.*, dkt. 14 at 13−14 (alleging that social distancing is impossible even in communal areas, that inmates commonly interact with others who have recently tested positive, that protective equipment is lacking, that inmates are required to reuse masks for months at a time, and that mask use is not enforced); *see also* dkts. 13-5 at ¶¶ 30–32, 40–43; 13-21 at ¶ 17–23 (supporting declarations). While certainly most disturbing, these allegations do not demonstrate a strong likelihood of success on the plaintiffs' claim that the defendants have shown deliberate indifference by making the decision to proceed with executions.

The plaintiffs also make well-supported—though disputed—allegations that executions, like any mass gathering, are risky during the COVID-19 pandemic. *See*, *e.g.*, *id.* at 14−18 (describing multiple close contacts among those present, staff failures to wear masks properly or at all, and a spiritual advisor's positive COVID-19 test on November 29, 2020, following the execution of Orlando Hall on November 24). But the plaintiffs will not be present for the scheduled executions, and the Seventh Circuit has made clear that the defendants have nearly unfettered

discretion to schedule executions, pandemic or no. *See*, *e.g.*, *Peterson v. Barr*, 965 F.3d 549, 552−53 (7th Cir. 2020) (rejecting as "frivolous" a victim's grandmother's claim to postpone the execution until after the resolution of the COVID-19 pandemic to ensure she could safely witness it).

What the plaintiffs do not allege with sufficient evidentiary support is a causal relationship between the executions and the rate of COVID-19 infections in the general prison population. To be sure, the evidence shows—and common sense dictates—that carrying out executions on prison property with prison staff involved creates *some* additional risk of COVID-19 infection for prisoners, including the plaintiffs. But "[t]he Eighth Amendment demands that officials ensure 'reasonable safety,' not that they protect against all risks." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017). To succeed on their claim, the plaintiffs must show, at least, that the decision to carry out executions during the pandemic creates substantial additional risks for their health.

The plaintiffs' primary evidence of additional execution-based risk is the increase in positive cases at the prison following some of the execution dates. Dkt. 14 at 18−19; *see* dkt. 29-2 at 7 (graph of new weekly positive cases in Vigo County and at FCC Terre Haute, from March 15 to November 28, 2020). But the correlation is not consistent after each execution, and the most reasonable inference to draw from the plaintiffs' evidence is that FCC Terre Haute's infection rates are driven by the rates of infection in Vigo County. For each notable increase in positive cases at FCC Terre Haute, there is a corresponding increase over the prior two-to-three weeks in Vigo County. *See* dkt. 29-2 at 7. The correlation is not definitive, to be sure, but it seriously undermines the plaintiffs' contention that executions are driving the increases in positive COVID-19 cases. It

is also consistent with the defendants' argument that FCC Terre Haute staff are more likely to be infected outside of work than when interacting with the execution team.

The plaintiffs appeal to common sense and imply causation from some level of correlation between executions and COVID-19 cases at FCC Terre Haute. But without compelling scientific or statistical evidence, they do not have a strong likelihood of success on their Eighth Amendment claim.

### B.      Irreparable Injury, Defendants' Interests, and Public Interests

The irreparable injury analysis here overlaps significantly with both standing and likelihood of success. As discussed above, the plaintiffs have not shown that they are likely to be infected with COVID-19 because of the scheduled executions, and thus have no demonstrated an irreparable injury.

The defendants have a substantial legal interest in timely enforcement of criminal defendants' sentences, such that the Court should not stay an execution lightly. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1133 (2019) ("Both the [government] and the victims of crime have an important interest in the timely enforcement of a sentence.");

Finally, the constitutional right of plaintiffs' and/or the putative class members' to be free from unreasonable risk of exposure to COVID-19 is a significant public interest. *See Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (quotation marks and citation omitted)). But this factor does not weigh heavily here because the plaintiffs have not shown that the scheduled executions will create a substantial additional risk to their health.[24]

---

[24] The Court makes no finding that the conduct of the executions will not create a substantial additional risk to the health of the other participants in the execution.

Taken together, the *Nken* factors weigh against issuing a preliminary injunction, and thus the plaintiffs' motion must be denied.

### IV.     Conclusion

Circuit precedent arising from prior recent executions makes clear the nearly limitless discretion the Attorney General possesses in conducting federal executions. The only limitation to such discretion argued here is the Eighth Amendment to the United States Constitution, and the plaintiffs have not met their burden of showing their constitutional claim is likely to succeed. That others, or a court, might exercise discretion differently in light of the risks presented by a deadly virus is not the relevant calculus.

The plaintiffs' emergency motion for preliminary injunction, dkt. [12], is therefore **denied**. The plaintiffs' motion for leave to file post-hearing responses to the Court's questions, dkt. [36], is **granted**. The Court considered these responses in deciding the motion.

**IT IS SO ORDERED.**

December 8, 2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Robert A. Burgoyne
PERKINS COIE LLP
rburgoyne@perkinscoie.com

Sarah Howland
PERKINS COIE LLP
showland@perkinscoie.com

John R. Maley
BARNES & THORNBURG, LLP (Indianapolis)
jmaley@btlaw.com

Caroline M. Mew
PERKINS COIE LLP
cmew@perkinscoie.com

Lisa A. Olson
U.S. DEPARTMENT OF JUSTICE (Washington DC)
lisa.olson@usdoj.gov

Jordan L. Von Bokern
U.S. DEPARTMENT OF JUSTICE (Washington DC)
jordan.l.von.bokern2@usdoj.gov

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
shelese.woods@usdoj.gov