# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| PATRICK RYAN SMITH; and BRANDON SCOTT HOLM, Individually and on Behalf of All Other Inmates at the Terre Haute Federal Correctional Complex, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 2:20-cv-630-JMS-DLP |
| WILLIAM P. BARR, in his official capacity as the Attorney General of the United States; MICHAEL CARVAJAL, in his official capacity as the Director of the Federal Bureau of Prisons; and T.J. Watson, in his official capacity as Complex Warden for the Terre Haute Federal Correctional Complex, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**DECLARATION OF DR. NINA H. FEFFERMAN**

I, Nina Fefferman, certify under penalty of perjury that the following statement is true and correct:

1.      I am a full Professor at the University of Tennessee, Knoxville, in both the Department of Ecology and Evolutionary Biology and the Department of Mathematics. I am also the Director of the Mathematical Modeling Consulting Center at the National Institute for Mathematical and Biological Synthesis, and the Associate Director of the University of Tennessee One Health Initiative. My research focuses on complex adaptive systems, with a focus on the interplay between individual behavior and infectious disease epidemiology. Complex

1

adaptive systems are systems that have a large number of components that interact and adapt such that the system is more complicated than its various parts— for example, living organisms, economies, or cities.

2.      I have worked for the past 16 years as a researcher of the epidemiology, ecology, and evolution of infectious disease, pandemic preparedness, national biosecurity, and infrastructure protection. I hold a Master's degree in mathematics from Rutgers University and a PhD in Biology from Tufts University.

3.      For over a decade, I was one of the primary researchers of the Command, Control, and Interoperability Center for Advanced Data Analysis, a U.S. Department of Homeland Security ("DHS") Center of Excellence, where I ran a research group focusing on the mathematics of both biosecurity and cybersecurity. As part of my role in that center, I actively contributed models and policy recommendations to DHS and its affiliate agencies for how to manage and mitigate pandemic threats from H1N1 2009 flu, Ebola in West Africa, and Zika virus. I have also consulted for various additional state and federal agencies and private companies, domestically and abroad, in the area of outbreak management since 2004.

4.      I have studied COVID-19 extensively since February, 2020 and modeled the COVID-19 outbreak with specific attention to the risks of spread from and within carceral facilities and the corresponding implications for community healthcare resources. I received a grant from the National Science Foundation on May 1, 2020 to model the coupled social and epidemiological networks that determine the success of behavioral interventions on limiting spread of COVID-19. In addition to my research, I have given numerous presentations in my field, including presentations about modeling for the pandemic for the National Institute for Mathematical and Biological Synthesis on March 31, 2020 and modeling the risk of COVID-19 for prisons and health care resources at COVID-19 Special Track to 28th Conference on Intelligent

Systems for Molecular Biology on July 16, 2020.

5.     My C.V., attached as **Exhibit A**, includes a list of my honors, experience, and publications.

6.     I have been asked to evaluate the risk that holding three federal executions during the week of January 11, 2020 poses to prisoners detained in FCC Terre Haute, including in particular FCI Terre Haute. I am donating my time reviewing materials and preparing this report. If I were to provide any live testimony, it would also be provided *pro bono*.

7.     This declaration is based upon my experience modeling COVID-19, my review of the scientific literature regarding COVID-19, and my review of materials provided to me by counsel. For the description of the execution plans and layout of FCC Terre Haute, I rely upon multiple declarations signed by BOP staff, including those from Rick Winter, an attorney with the Bureau of Prisons (November 21, 2019; July 12, 2020; November 24, 2020), and T.J. Watson, the Warden of FCC Terre Haute. These declarations are attached as **Exhibit B**. I rely upon a fairly limited set of BOP materials regarding contact tracing and testing related to FCC Terre Haute and federal executions, which I understand have been produced by FCC Terre Haute or BOP (with redactions), attached as **Exhibit C**.

8.     Based on my review of these materials, it is my opinion that the plan to carry out executions during the week of January 11, 2021 poses a substantial risk of COVID-19 spread and illness to FCC Terre Haute prisoners, including those incarcerated at FCI Terre Haute. As explained below, this is because the executions will introduce hundreds of individuals to the prison environment, significantly increasing the number of potential exposures to infection from COVID-19 for the staff and in turn for prisoners at FCI Terre Haute, USP Terre Haute and the FPC. The risk is not limited to inmates in USP Terre Haute, where death row prisoners are housed, because of the high transmissibility of COVID-19, including by individuals who are pre-

symptomatic and asymptomatic; the involvement in the executions of numerous FCC Terre Haute staff members from all facilities, who then return to their normal duties and extensively interact with inmates and fellow staff members in those facilities; and the ease with which any disease is transmitted in a congregate setting like a prison, where social distancing is impossible and other preventative measures such as wearing masks and frequent hand-washing occur inconsistently at best.  The risk is compounded if a prison is overcrowded, which I understand is the case here (including within FCI Terre Haute), and if a prison fails to systematically test prison staff  and inmates and then contact trace those staff and inmates who test positive, which appears to be the case at FCC Terre Haute.  Holding executions also disrupts the existing precautions enacted at FCC Terre Haute to reduce the spread of COVID-19.

9.      In the context of COVID-19 transmission, people can act as carriers in spreading the disease even when they are exhibiting no symptoms (and may never exhibit any symptoms), and relatively modest contact with an infected individual can result in passing the disease to someone else -- who, again, may or may not exhibit symptoms, or may do so only several days later, but is nonetheless capable of spreading the disease.  And once disease begins to spread, one case quickly becomes two, two become four, four become eight, eight become sixteen, etc., in exponential progression.

10.      COVID-19 is not a static disease that is easily contained, even in the best environment and even with the conscientious implementation of safety measures.  A prison is the antithesis of such an environment.   Bringing anyone who has COVID-19 into a prison complex -- even one as geographically large as FCC Terre Haute and with separate facilities within the complex -- creates a significant risk of spreading COVID to all parts of the complex.  The risk is, of course, greatest when the incidence of COVID infections outside the prison is extremely high, as is the case now and as will continue to be the case for the near term at least.  It is essential to

do everything one can to limit the number of contacts among individuals, some of whom might be infectious, where other factors are not guaranteed to be controlled (*e.g.*, social distancing, adequate ventilations systems, consistent use of masks, adequate restroom facilities, adequate facilities and policies for quarantining or isolating inmates, etc.).

11.     Quantifying the increased risk of contracting COVID-19 to inmates in the USP Terre Haute, the FCI Terre Haute, and the FPC from holding executions at FCC Terre Haute would be difficult to do, because relevant data and contact tracing information are extremely limited and have not, to the best of my knowledge, been made fully available to the plaintiffs' counsel.   One has, however, the scientific evidence regarding how quickly and extensively COVID-19 spreads, generally and within a prison setting; how spread can occur from individuals showing no symptoms; how spread of COVID-19 is not geographically contained; how group gatherings contribute significantly to such a spread; and how certain populations are at an increased health risk if they contract disease, which include males, people over 65, and individuals with pre-existing conditions (all of which define large numbers of individuals within FCC Terre Haute).

12.     Based upon this scientific evidence, and as noted above, it is my opinion that inmates from all three facilities within FCC Terre Haute would face a substantially increased risk of contracting COVID-19, and suffering serious health problems as a result, if executions continue at FCC Terre Haute at the current time and in the manner in which executions have been held earlier this year at the prison.   The extent of this risk cannot be quantified given the information available, but it is certainly higher than if no executions occurred at the present time and, in my opinion, it is substantial.   The executions risk increased importation of new COVID-19 infections as well as more efficient transmission of the virus within the prison because of staff mixing and other factors relating to the executions and conditions within the prison.

13.     It is perhaps helpful in this regard to consider examples of how COVID-19 has spread well beyond the narrow geographical confines in which contact first occurred between an infectious individual and a susceptible individual.  One such example is a highly publicized wedding that occurred in rural Maine, attended by only 55 people.  The wedding led to COVID-19 outbreaks in the local community, in a long-term care facility located in a different county, and in a correctional facility in yet another county.  Overall, at least 177 COVID-19 cases were linked to the event, including seven hospitalizations and seven deaths.[1]  The spread to the correctional facility occurred because a facility employee attended the wedding and then worked his normal shifts in different housing units at the correctional facility, leading to 18 other staff members, 16 members of staff households, and 48 inmates testing positive.[2] This is emblematic of how easily one infectious person can infect many people throughout a correctional facility, leading to otherwise avoidable infection and risk of serious complications, including death.

14.     A second example was a business conference in Boston attended by approximately 175 people over two days in February 2020.[3]  With the luxury of extensive genome data and reliable contact tracing information, researchers concluded that a single positive case likely led

---

[1] "Multiple COVID-19 Outbreaks Linked to a Wedding Reception in Rural Maine — August 7–September 14, 2020," CDC Morbidity and Mortality Report at 1686-87 (Nov. 13, 2020) ("The reception was held at a lodging establishment in county A that had an attached restaurant and four dining areas, including the event room, breakfast room, bar, and an open deck. Guests were seated indoors in the event room, which had 10 tables, with 4–6 guests seated around each table. The total number of wedding guests (55) exceeded Maine's 50-person limit for indoor gathering in a shared space. Facility staff members had conducted temperature checks for all guests at the facility entrance; these were reported as normal. Although the facility had signs posted at the entrance instructing visitors to wear masks, guests did not comply with this requirement nor maintain a physical distance of ≥6 feet, and staff members did not enforce these measures; all staff members wore masks.  The facility did not collect contact information from guests."), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6945a5-H.pdf.

[2] *Id*. at 1688-89.

[3] "Phylogenetic analysis of SARS-CoV-2 in Boston highlights the impact of superspreading events," Science Mag. (Dec. 10, 2020), https://science.sciencemag.org/content/early/2020/12/09/science.abe3261.

to roughly 100 people from the event testing positive, which in turn may have led to as many as 300,000 becoming infected in Massachusetts, in other states, and in other countries.  The disease did not remain within the conference facilities, or Boston, or the adjoining counties, or even the United States.

15.     In similar fashion, execution events -- which involve roughly the same number of participants as the Boston conference and more participants than the Maine wedding -- could lead to a spreading of the disease well beyond an initial point of contact, even if it begins within the building that houses the death chamber or elsewhere in USP Terre Haute.  I am not suggesting that executions will lead to as many as 300,000 people contracting COVID-19 who otherwise might not have done so, as with the Boston conference, or even 177 people, as with the Maine wedding (although the latter number is certainly possible).  The point is simply that, given the current prevalence of COVID throughout most of the United States, including Indiana, one or more people in a large group, who have not been quarantining, are likely COVID-positive and will spread infection to multiple individuals absent adequate safeguards, who in turn will further spread the disease, well beyond where it began.  This is not a low-risk hypothetical, it is a high-probability likelihood, with potentially deadly consequences.

16.     **Individuals traveling to Terre Haute for executions.** The BOP describes a large number of individuals who will travel to Terre Haute for each execution.  This includes the:

 a. The BOP execution team members.  Most recently, BOP has stated that the "execution team is comprised of approximately 40 BOP employees who are employed at locations other than FCC Terre Haute." (Ex. B p. 9, ¶ 17).  Previously, BOP referred to an execution team of over **40 BOP staff members**.  The BOP noted that the "staff members will, by necessity, be removed from their normal duties, **which include a wide range of correctional and administrative positions within the BOP**. Pursuant to the current operational plan, these staff members are **scheduled to cease their normal duties several days in advance of a scheduled execution**, in order to give the team time to practice and prepare for their role in an execution. In addition to the team members, **a number of BOP administrators will be present as well, also ceasing their normal duties in the days in advance of an execution**." (Ex. B p. 2, Winter Decl. ¶ 5.) (emphasis added).

b. An unknown number of contractors. (Ex. B p. 2, Winter Decl. ¶ 6.) ("Additionally, the BOP plans to **use contractors** who have made themselves available and presumably have made any necessary arrangements for personal and work related matters based on the executions scheduled in December.") (emphasis added).

c. Several out of state witnesses to the execution. It is my understanding that none of the individuals scheduled for execution in January 2020 are from Indiana and that all of the family members of the victims as well as the family members and counsel for the prisoners reside out of state.

d. Journalists witnessing the executions or covering the executions.

e. Protestors of the execution.

f. Additional security from "federal, state, and local law enforcement agencies." (Ex. B. p. 2, Winter Decl. ¶ 7).

Most recently, the BOP estimated that between 50 and 125 individuals will travel to Terre Haute for each federal execution. (Ex. B. p. 9, Watson Decl. ¶ 16).  For the execution scheduled for January 12, 2020, of Lisa Montgomery, it appears that additional personnel will be involved because of the need to transport Ms. Montgomery from a Texas women's prison where she is currently incarcerated (and where her lawyers apparently contracted COVID when visiting her). (Ex. B pp. 17-18, Winter Decl. ¶¶ 4, 7-8.  The execution team members "arrive only a few days prior to a scheduled execution" and begin "various team-sensitive tasks upon their arrival." (Ex. B p. 9, Watson ¶ 17). They do not quarantine upon arrival. *Id*.

17.     Each of the individuals traveling to the Terre Haute facility is a potential carrier of the COVID-19 disease and a potential source of infection to others with whom they have close contacts.  A close contact is defined by the CDC as someone who is within six feet of an infected person for at least 15 minutes cumulative over a day, starting from 2 days before the onset of the illness.  Individuals traveling to the executions may be infected without knowing it before they begin the travel, either in the period before onset of symptoms or in the absence of symptoms if

they are asymptomatic. Those individuals might also become exposed through travel. Airplane

travel, staying in hotels, taking cabs or an Uber, and eating at restaurants all carry risks. The

potential for one infected person to pass the virus to a group is the basis for the health directives

issued by state and local public health officials around the country discouraging holiday travel

and gatherings.  It is also the basis for the CDC's recommendation that prisons avoid all non-

essential visitors when there is a COVID outbreak inside the prison or in the local community.

18.     **FCI Terre Haute staff's participation in the executions and the risk of spread**

**to FCI Terre Haute prisoners**.  The involvement of FCI Terre Haute staff in the executions

poses significant risk for spreading of COVID-19 throughout the complex, including to FCI Terre

Haute prisoners, in light of the large number of prison staff involved in the executions and the

many interactions those staff have with others as a result of and following the executions.

Somewhere between 70 and 200 FCC Terre Haute staff participate in the security, logistics and

transportation support during an execution. (Ex. B p. 2, Winter Decl. ¶ 8, describing 200 FCC

Terre Haute staff members); (Ex. B p. 11, Watson Decl. ¶ 22 describing execution events as

requiring "70 or more" FCC Terre Haute staff).  The Complex Warden described the role of FCC

Terre Haute employees:

> These FCC Terre Haute employees are not considered part of the execution team, and instead
> include staff that work at the USP, FCI, and FPC. For example, **FCC staff manage check
> points and perimeter security, staff the command center, and escort witnesses and
> demonstrators**. FCC staff **managing check points** will check ID's and temperatures; some
> staff in the command center will likely **meet with some execution team staff** in order to
> coordinate the operation; and staff escorting witnesses and demonstrators will by necessity
> interact with the witnesses and demonstrators.  (Ex. B p. 11, Watson Decl. ¶ 22). (See also
> Watson Decl. ¶ 17:  "Some members of the execution team have interaction with FCC Terre
> Haute personnel incident to their role in the operation of the execution.  For example, the
> execution team may interact [with FCC Terre Haute staff] wen going through security check
> points, receiving the inmate, receiving witnesses, and meeting with Terre Haute personnel
> to discuss operations logistics and equipment.")

FCI prisoners are at heightened risk of spread of COVID-19 for each interaction that FCI staff

have in preparing for or carrying out the executions that places them in close contact of potentially infected individuals. FCI prisoners are also at a heightened risk of contracting COVID from any contact they have with any staff member (assigned to FCI Terre Haute or not) who, although not involved with the executions, subsequently interacted as a close contact with any FCC employee who was involved with the executions.

19.     As with the consequences of the Maine wedding or the Boston conference referenced above, there may well be degrees of separation between FCI inmates and individuals who directly participated in an execution and who may have been infected. Those degrees of separation, however, mean even less in a prison environment than they did after the wedding or conference, because prison staff work in multiple facilities, adequate protective measures are not taken relative to execution team members and other visitors before they enter FCC Terre Haute, and adequate protective measures are not taken after an execution before FCC staff members are allowed to resume their normal duties. I discuss such protective measure later in this declaration.

20.     COVID-19 is highly efficient at transmission before individuals become symptomatic. It may be fourteen days before an infected person becomes symptomatic, or as short as 2 days. In a carceral setting, where rates of transmission are particularly high because of crowding (and, in the case of FCC Terre Haute, overcrowding) and the lack of adequate ventilation, this is of heightened concern. The worst-case scenario is where one individual becomes a super spreader, spreading infection to a large number of individuals over a short period of time. But even assuming an average reproduction number (or R0, pronounced "R naught") of 2 for COVID-19 (*i.e.*, the average number of individuals someone infects when positive), the disease will spread quickly for each day it is undetected. This means that if a correction officer contracted COVID-19, his infection was not detected, and he continued to work for three days before becoming

symptomatic, each of those three days could see a two-fold increase in the number of individuals

at the prison infected by the staffer. For example, on day 1, the staffer could infect 2 people and

by day 3 (the first day anyone might notice the staffer was infected without exhaustive screening

of apparently healthy people), eight people might have become infected based on average infection

rates:



*See* "R0: How scientists quantify the intensity of an outbreak like coronavirus and predict the

pandemic's spread," The Conversation, https://theconversation.com/r0-how-scientists-quantify-

the-intensity-of-an-outbreak-like-coronavirus-and-predict-the-pandemics-spread-130777.

21.     The individuals at risk are all those who were close contacts with anyone who was

infected, defined by the CDC as someone "within 6 feet of an infected person for a cumulative

total of 15 minutes or more over a 24-hour period starting from 2 days before illness onset (or, for

asymptomatic patients, 2 days prior to test specimen collection) until the time the patient is

isolated." The CDC notes that the individual exposures should be added together over a 24-hour

period (*e.g.*, three 5-minute exposures for a total of 15 minutes).  For example, a staff member who

goes through security three times a day for five minutes each is a close contact of those other staff

11

members who work at the security check point and sit or stand within 6 feet of those who pass

through security.

22.    The declaration filed by Rick Winter on July 12, 2020 and contact tracing

documents concerning the July federal executions provide a window into the exposures created

by one FCI Terre Haute staff member who participated in the execution preparations while

positive for COVID-19, before he was aware of his exposure or illness. (Ex. B pp. 20-22, Winter

Decl.; Ex. C). That staff member – I will designate him as Staffer A - indicated in his contact

tracing interview that he was in contact with "A lot" of staff and "A lot" of prisoners in days

before the onset of his illness, including contact with prisoners through rounds of prisoner units.

(See Exhibit C).



Staffer A reported that while conducting his daily tasks during the days between exposure and

diagnosis, many of the persons he came into contact with at the prison were not masked.





23.     The BOP noted that Staffer A, while potentially infected, "among other things, attended the law enforcement meeting with outside law enforcement in preparation for the scheduled executions; attended a meeting regarding the handling of demonstrators at the scheduled executions; and attended to an issue at the SCU."   (Ex. B p. 21, Winter Decl. ¶ 6). Based on that information and assuming the execution-related meetings were at least 15 minutes long, Staffer A's close contacts included: all FCC Terre Haute staff assisting in the execution, other federal employees and other law enforcement who attended the law enforcement meeting; all FCC Terre Haute staff who attended the demonstrator meetings; other federal employees who attended the meeting; all incarcerated people in the USP or FCI who were within six feet of Staffer A for a total of 15 minutes in any 24-hour period in the two days before his exposure; and all other staff in contact with Staffer A or another infectious individual throughout the work shift for a total of 15 minutes, including at security, in break or meal rooms, or other staff meetings. Any of those individuals who became infected would themselves have created their own waves of exposure.

24.     The introduction of potential new sources of infection in prisons is particularly concerning because of the higher rates of contact amongst susceptible incarcerated people, due to the density and structure of prison housing arrangements (including limited ability to quarantine potentially exposed individuals and to segregate individuals who test positive), the lack of ability to socially distance or isolate, inadequate facilities for personal hygiene, difficulty in maintaining adequate disinfection of high-touch surfaces, and poor ventilation within prisons. These dynamics drive the resulting efficacy (or lack of efficacy) of any proposed interventions.

25.     **Impact on COVID-19 preventative measures and contact tracing**.  The BOP

has pledged to "continue to do everything [it] can to mitigate the spread of COVID-19 in [its]

facilities," which presumably includes incorporating CDC recommended precaution into visiting

procedures. The BOP has said that it is following guidance from both the CDC and the World

Health Organization. (Ex. B p. 6, Watson Decl. ¶ 8).  It has adopted a number of preventative

COVD-19 measures, including "[a]s much as possible" assigning staff to the same posts (rather

than rotating staff between facilities) "as an additional measure to mitigate the spread of the virus."

(Ex. B p. 6, Watson Decl. ¶ 8, citing BOP COVID 19 Modified Operations).  (However, staff

apparently do move "between the separate facilities and buildings" when "necessary, for example,

if one institution is in need of additional staff due to staff being on leave on a given day, or

otherwise requires assistance of additional staff."  (Ex. B p. 7, Watson Decl. ¶ 10)).

26.     Visitation at FCI Terre Haute is suspended to reduce the spread of COVID-19.

Federal Bureau of Prisons, FCI Terre Haute, https://www.bop.gov/locations/institutions/tha/ (Dec.

19, 2020) ("! Visiting at the prison camp has been suspended until further notice.").

27.     The BOP quarantines and isolates all new intake to the prison into either quarantine

for asymptotic individuals or medical isolation for symptomatic individuals for at least 14 days.

BOP Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp.

28.     Prisoners are only released to the general population after a negative COVID-19

test at the end of the quarantine period.  *Id.*

29.     These precautions are sound.  However, they are significantly undermined by the

federal executions, which require large numbers of staff to be reassigned to execution-related

functions.  The Warden has described the impact of the executions on functioning of the prison,

saying that "[w]ith its staff pulled away from their normal duties, FCC Terre Haute will not be

14

able to operate under normal conditions. For example, due to expected staffing issues and changes in security procedures, FCC Terre Haute will not be able to prepare inmate meals in the ordinary fashion." (Ex. B p. 2, Winter Decl. ¶ 5). The fact that large numbers of staff must be pulled form normal duties is of consequence in light of COVID-19 for a number of reasons. The plan to pull significant numbers of staffing itself adds pressure to the system for likelihood of spread within the prison. By pulling staff from their regular duties, other staff will necessarily be reassigned to cover those missing positions. This increases the circles of exposure. Reduced staffing also means that staff will likely have a slower response time to respond to individuals who become sick and need medical attention, thereby increasing the exposure times for cell-mates or cell neighbors of those developing symptoms.

30.     There are other areas of concern. For example, without adequate staffing, the distribution plan for meals or medications could require additional movement or gathering of larger groups of inmates at one time, increasing exposures. The staffing shortage problems are exacerbated by the fact that, according to the BOP website, 20+ FCC Terre Haute employees currently have COVID-19 and presumably are out of the workplace. Other staff must cover for the staff members who are out of work, again leading to increased exposures and an increased risk of spread among the inmate population, including within FCI Terre Haute.

31.     The redistributing and mixing of staff also complicate efforts to conduct meaningful contact tracing. The CDC stresses the importance of "case investigation and contact tracing, a core disease control measure employed by local and state health department personnel" as a method for or preventing spread of COIVD-19.[4] The CDC directs that public health staff should work to identify all individuals with close contacts to an exposed person, and then to warn those individuals

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/php/principles-contact-tracing.html.

of the exposure and recommend 14-day home quarantines after their last known exposure.  It has made clear that "identifying contacts and ensuring they do not interact with others is critical to protect communities from further spread."  *Id.*

32.     Returning to the example of Staffer A, he was notified on July 8 of his own exposure to someone who was positive, took a test for COVID-19 on July 8, and received his positive test results on July 11. (Ex. C, p. 1). The BOP reported on July 12 that it had begun contact tracing for Staffer A. This is consistent with the spreadsheet that shows that staff continued to be identified and tested for several days after the disclosure. BOP contact tracing documents of "exposure testing info" for staff show that the 23 additional BOP staff who were exposed to Staffer A were identified and given tests on July 12, July 13, July 14, July 15, July 16, or July 17. (Ex. C, pp. 9-10).  As it turns out, these staff all had negative tests:

| 7/8/2020 | EXP | SWAB | 7/11/2020 | POSITIVE/Recovered | | | RECOVERED - 2 negative tests reported |
|---|---|---|---|---|---|---|---|
| 7/13/2020 | EXP | SWAB | 7/20/2020 | Negative | | contact tracing 68 | |
| 7/13/2020 | EXP | SWAB | 7/17/2020 | Negative | | contact tracing 66 | |
| 7/13/2020 | EXP | SWAB | 7/17/2020 | Negative | | contact tracing 68 | |
| 7/13/2020 | EXP | SWAB | 7/18/2020 | Negative | | contact tracing 68 | |
| 7/13/2020 | EXP | SWAB | 7/17/2020 | Negative | | contact tracing 68 | |
| 7/12/2020 | EXP | SWAB | 7/16/2020 | Negative | | contact tracing 68 | |
| 7/13/2020 | EXP | SWAB | 7/17/2020 | Negative | | contact tracing 68 | |
| 7/12/2020 | EXP | SWAB | 7/20/2020 | Negative | | contact tracing 68 | |
| 7/13/2020 | EXP | SWAB | 7/17/2020 | Negative | | contact tracing 68 | |
| 7/13/2020 | EXP | SWAB | 7/17/2020 | Negative | | contact tracing 68 | |
| 7/13/2020 | EXP | SWAB | 7/17/2020 | Negative | | contact tracing 68 | |
| 7/16/2020 | EXP | SWAB | 7/22/2020 | Negative | | contact tracing 68 | |
| 7/17/2020 | EXP | SWAB | Return to work 7/26/2020 Test results 7/31/2020 | Negative | | contact tracing 68 | Tested at CVS |
| 7/17/2020 | EXP | SWAB | Return to work 7/26/2020 Test results 7/31/2020 | Negative | | contact tracing 68 | Tested at CVS |
| 7/17/2020 | EXP | SWAB | Return to work 7/27/2020 Test results 8/1/2020 | Negative | | contact tracing 68 | Tested at CVS |
| 7/13/2020 | EXP | SWAB | 7/17/2020 | Negative | | contact tracing 68 | |
| 7/14/2020 | EXP | SWAB | 7/17/2020 | Negative | | contact tracing 68 | |
| 7/14/2020 | EXP | SWAB | 7/16/2020 | Negative | (b)(6) (b)(7)(C) | contact tracing 68 | |
| 7/14/2020 | EXP | SWAB | 7/18/2020 | Negative | | contact tracing 68 | |
| 7/14/2020 | EXP | SWAB | 7/18/2020 | Negative | | contact tracing 68 | |
| 7/13/2020 | EXP | SWAB | 7/18/2020 | Negative | | contact tracing 68 | |

(Ex. C, p. 9).  Had any one of them been positive, however, several days would have gone by

since Staffer A tested positive, during which dozens if not hundreds of contacts might have occurred with other staff and with inmates, and the inmates could easily have been located in different facilities given staffing practices at FCC Terre Haute.

33.     Contact tracing in this environment, where staff's regular routines and assignments are disrupted, creates new challenges and at a minimum almost certainly slows and interferes with the contact tracing.  Introducing a large number of individuals with multiple contacts throughout the prison system, with overlapping training meetings involving multiple staff – like prison-wide doctors and custodians – increases the number of individuals who can reseed the infection. For each day that the contact tracing is slowed, there is the exponentially growing possibility of undetected transmission and spread to other staffers and prisoners. It also creates the possibility that some exposed individuals will not be detected because of the unusual and disrupted work patterns of the day.  Staffer A, for example, was not able to identify by name all of the staff with whom he came into contact several days earlier. The spreadsheets indicate that four additional staff who were symptomatic were tested between July 18 and July 27, each of whom tested positive for COVID-19:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 7/18/2020 | SYMPTOMATIC | SWAB | 7/21/2020 | POSITIVE/Recovered | | | RECOVERED - 1 negative test / Reported back to work 08/04/2020 |
| 7/20/2020 | EXP | SWAB | 7/22/2020 | Negative | | | |
| 7/20/2020 | SYMPTOMATIC | SWAB | 7/21/2020 | POSITIVE/Recovered | | contact tracing 92 | RECOVERED - 08/03/2020 - 2nd positive test; 08/10/2020 - negative test |
| 7/21/2020 | EXP | SWAB | 7/23/2020 | Negative | | | |
| 7/20/2020 | EXP | SWAB | 7/23/2020 | Negative | | contact tracing 92 | |
| 7/21/2020 | EXP | SWAB | 7/24/2020 | Negative | | contact tracing 92 | |
| 7/21/2020 | EXP | SWAB | 7/22/2020 | Negative | | contact tracing 92 | |
| 7/22/2020 | EXP | SWAB | 7/24/2020 | Negative | | | |
| 7/22/2020 | EXP | SWAB | 7/24/2020 | Negative | | contact tracing 92 | RECOVERED - Per new guidelines - He has been symptom-free for 10 days. A negative test is no longer required. Returned to work 08/12/2020. |
| 7/22/2020 | SYMPTOMATIC | SWAB | 7/27/2020 | POSITIVE/recovered | | | |
| 7/22/2020 | EXP | SWAB | 7/24/2020 | Negative | | contact tracing 92 | |
| 7/23/2020 | EXP | SWAB | 7/15/2020 | Negative | | contact tracing 94 | |
| 7/23/2020 | SYMPTOMATIC | SWAB | 7/26/2020 | Negative | | | |
| 7/24/2020 | EXP | SWAB | 7/27/2020 | Negative | | contact tracing 94 | |
| 7/26/2020 | EXP | SWAB | 8/8/2020 | Negative | | | Test CVS |
| 7/26/2020 | EXP | SWAB | 8/3/2020 | Negative | | contact tracing 94 | |
| 7/26/2020 | EXP | SWAB | 7/28/2020 | Negative | | | |
| | | | | | | | RECOVERED - Per new guidelines - She has been symptom-free for 10 days. A negative test is no longer required. Returned to work 08/11/2020. |
| 7/27/2020 | SYMPTOMATIC | SWAB | 7/31/2020 | POSITIVE/Recovered | | | |

(Ex. C, p. 10). Three of these four staff members worked at FCI Terre Haute and developed

symptoms between July 17, 2020 and July 25, 2020. [5]   Did they contract COVID from Staffer A, who assisted with the execution?  Possibly.

34.     I am not aware of any records that show any contact tracing with respect to prisoners. If it is occurring, it appears to be episodic not systematic--and it should be systematic. There have been multiple outbreaks of COVID-19 among prisoners within FCI Terre Haute. https://experience.arcgis.com/experience/ab22fb4c564e4f4b986e257c685190e8/page/page_2/.

35.     The introduction of large numbers of personnel to the prison facility who interact with FCI and other staff is a likely explanation for waves of infection that have occurred in connection with prior executions.  The fact that  infections may not have spiked following every execution, or may not have increased as dramatically, does not negate the significance of instances in which spikes did occur, given the various factors that influence the spread of COVID (*e.g.*, the prevalence of COVID infections outside the prison at the time of a given execution and thus the probability that one or more visitors would be infectious while participating in the execution).  To use an analogy, if there is a 60% chance of a given hurricane making landfall and it ends up turning beforehand, that does not mean there wasn't a huge risk to staying in the projected path of that hurricane.  The next hurricane could well make landfall as predicted.

36.     The more recent COVID-19 cases from November provide another example to view the disruption to meaningful contact tracing and subsequent risk to prisoners at FCC Terre Haute.  Following a November 17, 2020 execution, a number of individuals reported positive COVID-19 tests: 9 of the execution team members who carried out the execution and the spiritual advisor to the executed prisoner who observed the execution tested positive. The execution team members were all within the execution facility for more than 15 minutes and should be considered

---

[5] Staffer who had symptoms on 7/17/2020 worked at FCI, Ex. C p. 72; staffer who developed symptoms on 7/19/2020 worked at FCI, Ex. C p. 62; staffer who had symptoms on 7/25 worked in USP & FCI, Ex. C, p. 53.

close contacts of everyone who attended the execution; they also likely spent more than 15

minutes within other locations at the USP, including time with staff from FCC Terre Haute. The

BOP reports that, except for one team member who was the subject of an unknown degree of

contact tracing by his BOP institution, BOP did not do contact tracing of these individuals:

> Defendants state that they do not possess the test results for these individuals because the tests were conducted by outside, third-party providers, not the Bureau of Prisons. The Defendants also state that the Bureau of Prisons conducted contact tracing for one of the staff members at his home Institution; however, the Defendants to do not possess responsive documents regarding the other eight staff members because the Bureau of Prisons did not conduct the contact tracing for those individuals. By way of explanation, the execution team is comprised of members from various BOP locations and was designed to protect the confidentiality of its members. Therefore, when team members report back to their home institution, the institution staff many not know that the employee was a member of the execution team in order to contact trace them, nor do they generally know the identities of other staff members who are part of the execution team. Moreover, some execution teams members who tested positive did not return to work at their home institution until meeting CDC guidelines; therefore negating the need for contact tracing at all. Defendants have produced the redacted contact tracing records for the one execution team staff member of whom it possess responsive records. (Ex. C, p. 5).

37.     Because the BOP did not conduct contact tracing for eight of the nine infected

execution team members and says it did not receive copies of any contacting tracing reports done

by outside entities (if any contact tracing was done),  BOP's attempts, if any, to identify FCC

Terre Haute staff who may have been infected would have been hamstrung and incomplete. The

explanation by the BOP for why it did not need to do contact tracing of those infected members

of the execution team – that some of those individuals isolated at home after testing positive –

suggests a basic and disturbing misunderstanding of the principles and purpose of contact tracing.

38.     It is my understanding that the BOP also did not do contact tracing of the spiritual

advisor who attended the November execution and then tested positive. According to his

declaration, which I have read, the spiritual advisor was transported in a closed-environment

shuttle bus van with eight other people to the execution, a trip that would have lasted at least 15

minutes. The Warden's declaration suggests that transporting witnesses is the kind of assignment

to which FCC Terre Haute staff were assigned.  If the bus were staffed by FCC Terre Haute staff, those staff should have been notified as close contacts and tested. Staff who were in the execution facility with the spiritual advisor, or who processed him at security and who may have escorted him for a total of 15 minutes within the prison, should also have been notified and tested.  I am not aware of any records indicating that this occurred.  If it did not occur, all those close contacts became possible sources of disease spread within all parts of the complex.  Indeed, they became possible sources of disease spread within the Complex even if contact tracing and testing were done, for the period leading up to when any test results were obtained.

39.     In addition to the increased risk to prisoners of contracting COVID-19, a separate area of concern is the very real probability that some of the individuals attending the training, visitation, and/or execution will become exposed and travel home with the virus, increasing the overall level of risk to the broader community. Without contact tracing, exposures in this kind of large-scale event will be hard to control and prevent from spreading infection.

40.     **Necessary safety measures.** The safest way to avoid having executions spread COVID-19 within FCC Terre Haute is not to have executions during the current pandemic. Alternatively, one would delay all further executions until staff and inmates have been vaccinated.  A third option would be to implement safety measure that would significantly reduce the risk that executions pose to inmates and to others in and out of FCC Terre Haute.

41.     In order to proceed with executions in a manner that does not subject staff and prisoners of FCC Terre Haute to a substantial risk of exposure to COVID-19, the BOP would need to institute appropriate safety measures that would include at least the following measures. First, the BOP should impose precautionary restrictions upon the 70-200 persons (execution team members, other BOP staff, media, family members and legal teams, state and local law enforcement personnel and contractors) who travel to Terre Haute to participate in some manner

in the executions to ensure that they do not bring the virus into the prison. The BOP should mandate a two (2) week quarantine once they have arrived in Terre Haute (and with the 2-week clock being reset if anyone within a combined quarantine, such as individuals traveling together, develops symptoms during quarantine), and a negative test before they begin performing their duties relating to the executions or otherwise interact with any FCC Terre Haute staff.  Second, if multiple executions are scheduled for the same week (as is true for the executions scheduled in January and was true with past executions), the BOP should require rapid testing each morning for those BOP staff and FCC Terre Haute staff participating in each execution during each day of the week, to ensure that they did not become exposed and develop infection after their quarantine period. Third, the BOP should restrict congregation of the execution personnel with FCC Terre Haute staff, impose strict social distancing requirements when any interactions occur, and strictly enforce mask mandates (including prohibiting meal sharing or other activities which require removal of masks). The BOP should develop policies to ensure that execution personnel and staff members are not engaged in profligate activities together during the quarantine period, such as those involving alcohol, or other inhibition-lowering activities. Fourth, no FCC Terre Haute employee should be allowed to return to his or her normal duties within the Complex until they have quarantined for a two-week period and tested negative for COVID-19.  Finally, if the BOP or FCC Terre Haute has identified an infected team member, they must conduct comprehensive and complete contact tracing in accordance with CDC guidelines.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing declaration is true and correct.  Executed on December 28, 2020.

Nina H. Fefferman, PhD