UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

_____

|  |  |  |
|---|---|---|
| PATRICK R. SMITH and BRANDON S. HOLM, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:20-cv-630-JMS-DLP |
| | ) | |
| JEFFREY A. ROSEN,[1] in his official capacity as the Acting Attorney General of the United States; MICHAEL CARVAJAL, in his official capacity as the Director of the Federal Bureau of Prisons; and T. J. WATSON, in his official capacity as Complex Warden for the Terre Haute Federal Correctional Complex, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

_____

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
SECOND MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiffs filed an initial motion for a preliminary injunction on November 30, 2020 (Dkt. 14), which Defendants opposed (Dkt. 28).  On December 8, 2020, the Court entered an Order Denying [Plaintiffs'] Motion for Preliminary Injunction (Dkt. 37).

Although agreeing in its prior Order that "conducting executions at this time may well result in more COVID-19 cases for those involved in the executions," the Court concluded that the two named plaintiffs had not shown that the increased risk "extends to them, and thus ha[d] not shown a likelihood of success on the merits of their motion."  Dkt. 37 at 1-2.  According to the Court, "the evidence shows—and common sense dictates—that carrying out executions on prison property with prison staff involved creates *some* additional risk of COVID-19 infection for prisoners, including the plaintiffs."  *Id*. at 14 (original emphasis).  However, the Court found that

---

[1] Substituted for former Attorney General William P. Barr pursuant to Fed. R. Civ. P. 25(d).

the Plaintiffs had not provided "sufficient evidentiary support" of a "causal relationship between the executions and the rate of COVID-19 infections in the general prison population," in the form of "compelling scientific evidence or statistical evidence." *Id.* at 14-15.

Plaintiffs now file a second motion for preliminary injunction, that responds to the evidentiary concerns noted by the Court. As shown below, ample evidence supports a finding that that holding executions creates a substantial risk of serious harm to the general prison population. The evidence includes new facts involving a massive outbreak of COVID-19 infections at FCC Terre Haute, information produced in discovery by Defendants, and a declaration from an expert in modeling risk for infectious diseases, Dr. Nina Fefferman (Dkt. 47-2).

Defendants have acknowledged that executions require assistance from USP, FCI and FPC staff, and that those staff interact with Execution Team members, execution witnesses, and other visitors. As discussed by Dr. Fefferman, introducing a large number of people from the outside community into the facility, creating large numbers of interactions among visitors and staff with no requirement for testing or quarantining and no systematic approach to contact tracing after an execution, and allowing FCI, USP and FCP staff to return to work with no required testing or quarantining creates a substantial risk of COVID-19 infection for Plaintiffs and other inmates. A preliminary injunction is therefore warranted, temporarily postponing any further executions until adequate measures are taken to protect the health of all inmates at FCC Terre Haute.[2]

## UPDATED STATEMENT OF FACTS

Many of the relevant background facts are already known to the Court. To avoid unnecessary refiling of papers, Plaintiffs incorporate by reference the evidence submitted in support of their Emergency Motion for Preliminary Injunction and Request for Expedited

---

[2] According to the BOP, three executions are scheduled in January 2021: Lisa Montgomery (Jan. 12), Cory Johnson (Jan. 14), and Dustin Higgs (Jan. 15). *See* www.bop.gov/resources/federal_executions_info.jsp (12/26/20). However, the U.S. District Court for the District of Columbia recently vacated the BOP order that scheduled Ms. Montgomery's execution for January 12th, as it violated a stay previously entered by that court when Ms. Montgomery's attorneys contracted COVID-19 and were not available to assist with her clemency request. *Montgomery v. Rosen*, No. 1:20-cv-03261-RDM (D.D.C. Dec. 24, 2020) (Dkt. 47). The status of Ms. Montgomery's scheduled execution is therefore unclear.

Consideration (Dkt. 13).  COVID-19 "is a highly contagious and deadly disease" which "can lead to respiratory failure, lung damage, neurological damage, and death."  Dkt. 37 at 2. The named plaintiffs are "inmates at FCI Terre Haute who have preexisting conditions that increase their likelihood of severe complications if they were to contract COVID-19."  *Id*. at 1.

When the Court wrote its prior decision in the first week of December, 13 million people had tested positive in the United States and more than 280,000 had died; in Indiana, more than 387,000 residents had contracted COVID-19 and 5,986 had died.  Dkt. 37 at 2-3.  Three weeks later, more than 19 million people in the U.S. have tested positive and almost 333,000 have died, https://coronavirus.jhu.edu/ (Dec. 27, 2020), while Indiana now has 492,021 confirmed cases and 7,801 deaths, https://coronavirus.jhu.edu/region/us/indiana (Dec. 27, 2020). Governor Holcomb has issued an additional Executive Order to help limit the disease's spread, applicable to "all ... entities situated or operating in the State of Indiana," including "governmental" entities, and imposing restrictions on the size of "events" they hold based upon the number of COVID-19 cases in their county and encouraging them to consider "temporarily suspend[ing] some of [their] operations." Executive Order 20-50 at 5, 7-8 (12/10/20), https://www.in.gov/gov/files/Executive-Order-20-50-Continuation-of-Color-Coded-County-Assessments.pdf.  "Hospitals are stretched to their limits."  *Id.* at 2.

"Prisons have been hotspots for COVID-19 outbreaks."  Dkt. 37 at 4.  As of December 23, 2020, "6,537 federal inmates and 1,616 BOP staff ... have confirmed positive test results for COVID-19 nationwide;" another  29,566 inmates and 2,746 staff previously tested positive previously but recovered; and 172 federal inmates and 2 BOP staff members have died from COVID-19.  *See* https://www.bop.gov/coronavirus/ (12/27/20).

Since Plaintiff's initial filing for a preliminary injunction, and on the heels of the three most recent executions, the Terre Haute prison complex is experiencing an enormous COVID-19 outbreak, including in USP Terre Haute, where death row prisoners are housed.  USP Terre Haute now has more inmates who are currently positive for COVID-19 than *any* other BOP prison in the country (and there are 127 such prisons).  Only **4 inmates** in the USP were reported as positive as

of November 27.  As of December 28, however, **410 inmates** were reported as positive, following executions on November 19, December 10, and December 11 (https://www.bop.gov/coronavirus/ (12/28/20)).

The Court allowed Plaintiffs to pursue limited discovery after it entered its preliminary injunction ruling on December 8th. *See* Dkt. 45. Although Defendants were not entirely forthcoming in responding to that discovery,[3] we now know of **eleven BOP employees** who tested positive contemporaneously with participating in executions:  the FCC Terre Haute staff member disclosed in the *Hartkeyemer* case who worked in the FCI and USP, the previously disclosed eight Execution Team members who participated in Orlando Hall's execution in November (Dkt. 33-2 at 2, ¶ 8), an additional Execution Team member who participated in the July executions, and an additional FCC employee who worked in the USP and FCI who assisted with the executions in late September.  (Plaintiffs' discovery requests were served prior to the executions on December 10 and 11 and did not request information regarding BOP employees who tested positive after participating in those executions.)

Consistent with CDC guidance, Defendants should have conducted contact tracing with respect to all of the BOP employees who tested positive, and—if shared with Plaintiffs and the Court—this would have provided the type of information the Court was referring to when it said it was "hamstrung by the limited information the government chose to disclose."  Dkt. 37 at 11. Unfortunately, with only one apparent exception, the BOP did not conduct contact tracing for

---

[3]  Defendants refused to disclose such basic information as the number of FCI Terre Haute staff who participated in prior executions or who will participate in the executions scheduled for January.  *See* Dkt. 47-10 at 3 ("The Defendants have considered your request that we identify the number of people who worked at the FCC Terre Haute, and whose job duties involved working in the FCI, and who also assisted in any way in the executions held at FCC Terre haute in August, September or November 2020. The BOP has informed me that it cannot reliably provide a response to this question without, at a minimum, interviewing each of the employees who may have assisted in any way in the executions.  As set forth in prior declarations and responses, approximately 70+ employees at FCC Terre Haute have functions related to execution events. These employees are not part of the execution team, but have tangential duties related to the executions, including managing checkpoints, perimeter security, staffing the Command Center, and escorting witnesses and demonstrators. These employees include staff who work at the USP, FCI and the Camp. Some of the staff have duties that require them to enter more than one Institution on a regular basis.").

Execution Team members who tested positive following the executions in August, September and November.  They produced a single page, largely redacted, reporting on one Execution Team member, Resp. No. 2 to Doc. Requests (Dkt. 47-8 at 19-20), and said that if any contact tracing was done for the other Team members, it was not done by the BOP, Int. Resp. No. 4 (Dkt. 47-9 at 5-7).

The BOP's failure to conduct contact tracing for eight of the nine Execution Team members who tested positive following executions is contrary to what Defendants previously said would happen for any BOP employee who tested positive following an execution.  (Dkt. 28-1 at 9, ¶ 24 (Watson Decl.) ("BOP will continue to conduct the same contact tracing procedures [as occurred with the staff member from *Hartkemeyer*] if additional staff members test positive."). Defendants attempted to justify this failure, in part, by saying that one or more of the eight Execution Team members quarantined before returning to work, thereby "negating the need for contact tracing."  Int. Resp. No. 4 (Dkt. 47-9 at 6).  As noted by Dr. Fefferman, however, this reflects "a basic and disturbing misunderstanding of the principles and purpose of contact tracing." (Dkt. 47-2 at ¶ 37).[4]  Defendants also stated that, "when team members report back to their home institution, the institution staff may not know that the employee was a member of execution team in order to contact trace them," Int. Resp. No. 4 (Dkt. 47-9 at 6), but contact tracing should have occurred even if an institution did not know that a staff member was on the Execution Team.

At the end of the day, Defendants appear to place a greater priority on protecting the anonymity of individuals who serve on Execution Teams than they place on protecting the health of FCC Terre Haute staff members or others who came in contact with infectious Execution Team members, or the health of anyone with whom those individuals subsequently interact, including

---

[4]  Contact tracing is intended to alert people who came in contact with an infected individual, so that they can take precautions and thereby protect themselves (by getting tested) and others.  It is not intended to benefit the person who tests positive or people he or she might interact with after testing positive (at which point the infected person should be isolating).

inmates throughout FCC Terre Haute.[5]  In all events, contrary to what the Defendants previously said would happen, systematic contact tracing has not occurred.

This and other lapses in the Defendants' procedures for preventing COVID-19 spread within FCC Terre Haute[6] make for an even more flammable environment in which to introduce new sources of contagion by holding additional executions.  Given these lapses, the challenges that all prisons confront in containing the spread of COVID-19, and the absence of adequate safety measures when holding executions, it is no surprise that there has been a surge in COVID-19 infections at USP Terre Haute following the executions of Orlando Hall, Brandon Bernard, and Alfred Bourgeois on November 19, December 10, and December 11:

> Cases of COVID-19 at the Federal Correctional Complex in Terre Haute have increased dramatically in recent weeks and have spread to include death row inmates scheduled for execution.
>
> As of Tuesday afternoon [(December 22)], the United States Penitentiary at Terre Haute had the highest number of COVID-19 cases in the federal prison system with 281 inmates testing positive, according to federal Bureau of Prisons website. That was an increase over the 252 reported in the previous daily update.
>
> An additional 51 inmates and 22 staff members were reported as testing positive at the adjacent medium-security prison on the federal prison property....

---

[5]  *See* Resp. No. 2 to Doc. Requests ("Defendants ... object to producing information that could lead to the identity of the team member, such as the names of or personally identifiable information related to staff members who tested positive, or the individuals named in the contact investigation [that occurred], as well as the name of the Institution where the team member works or information that could lead to the identification of the Institution where the team member works.  Defendants also object to providing the exact date of the positive tests, as doing so could lead to identifying a member of the execution team. Defendants also object to producing any contact tracing from team members' home institutions, as such investigations are not relevant to FCC Terre Haute.") (Dkt. 47-8 at 4).

[6]  Plaintiffs showed previously, for example, that Defendants' mask requirement for inmates and staff has significant gaps. *See, e.g.*, Dkt. 13-15 at ¶ 42, Dkt. 13-21 at ¶¶ 18-19, Dkt. 13-26 at ¶¶ 13-14 (Smith, Holm and Davis Decls.).  This includes gaps involving Execution Team members, as testified to by Mr. Nur. *See* Dkt. 13-29 at ¶¶ 15-18, Dkt. 29-6 at ¶ 6.  Defendants disputed Mr. Nur's testimony (Dkt. 33-2 at ¶¶ 5-7), but his testimony is consistent with testimony from an individual who witnessed another recent execution. (*See* Dkt. 47-6 ¶ 14) (Formosa Decl.).  Contact tracing records for the staff member disclosed in the *Hartkemeyer* case also reflect numerous instances of masks not being worn by staff and inmates. *See* Doc. Resp. No. 1 at 1 ("[I] wore mask while speaking with inmates, but not with staff [in the USP]"), 4 ("Went to USP with officers.  No masks.", "USP meeting, no mask, no staff [with] mask", "Interviewed 2 FCI inmates....  Had mask on.  Doesn't think inmates had mask on.") (Dkt. 47-10 at 5, 8).

> Attorneys and representatives of death row inmates including Corey Johnson and Dustin John Higgs—both set for execution in January before President Donald Trump leaves office—have said those men have tested COVID-19 positive.
>
> As many as 14 of the 50 inmates on Death Row have been reported as COVID-19 positive, according to a New York Times report.
>
> The Tribune-Star requested information from the Bureau of Prisons twice on Tuesday about the COVID-19 outbreak at the Terre Haute facilities. As of 4:30 p.m. Tuesday, no response had been received....
>
> A Bureau of Prisons spokesperson at the recent execution of Alfred Bourgeois on Dec. 11 said at that time no inmates on death row were positive for COVID-19.

"COVID-19 soars at Terre Haute federal prison complex," Tribune Star (Dec. 22, 2020), www.tribstar.com/news/covid-19-soars-at-terre-haute-federal-prison-complex/article_57a3ad58-4464-11eb-b444-0702db9b765d.html.

While the executions themselves are carried out in a small stand-alone facility, staff from the FCI, USP and FCP are involved in security processing at the USP Terre Haute, accompanying witnesses from various origin points to the execution facility and through additional security processing, participating in training meetings and exercises, other security operations, and planning for the executions. These actions bring them into close contact with numerous, potentially infectious individuals for periods well in excess of a combined fifteen minutes each day.  Staff then return to their normal duties and to their families, with no required testing or quarantining. This "poses a substantial risk of COVID-19 spread and illness to FCC Terre Haute prisoners, including those incarcerated at FCI Terre Haute."  Fefferman Decl. ¶ 8 (discussed further below).

As recently as December 7th, another inmate from FCI Terre Haute died from COVID-19. He had been placed in medical isolation at the prison for a week, was transported to a local hospital when his condition worsened, and died 12 days later (after calling upon the limited resources and overburdened medical staff of that hospital).[7]  His death is reflected in the following chart, which shows the exponential increase in COVID-19 infection the three most recent executions:

---

[7]    BOP  Press  Release  (Dec.  8,  2020),  "Inmate  Death  at  FCI  Terre  Haute," https://www.bop.gov/resources/news/pdfs/20201208_press_release_thx.pdf.

150434782.1

|  | Inmates Positive | FCI | USP | Inmate Deaths |
|---|---|---|---|---|
| **Nov. 27, 2020** | **88** | **84** | **4** | 3 |
| Dec. 4, 2020 | 202 | 153 | 49 | 3 |
| Dec. 7, 2020 | 326 | 198 | 128 | 4 |
| Dec. 11, 2020 | 296 | 155 | 141 | 4 |
| Dec. 14, 2020 | 339 | 169 | 170 | 4 |
| Dec. 23, 2020 | 332 | 51 | 287 | 4 |
| **Dec. 28, 2020** | **458** | **48** | **410** | 4 |

*See* BOP Inspector General COVID-19 Dashboards for FCI and USP Terre Haute, https://experience.arcgis.com/experience/ab22fb4c564e4f4b986e257c685190e8/page/page_2/; BOP COVID-19 Cases, https://www.bop.gov/coronavirus/ (12/28/20, 12/24/20, 12/15/20, 12/13/20, 12/9/20); Dkt. 14 at 10 (11/30/20); Dkt. 31 at 3 (12/7/20).

The health of Plaintiffs and other putative class members is at stake if Defendants continue to hold executions at FCC Terre Haute.  Plaintiffs therefore renew their request for a preliminary injunction.  The requested relief would postpone—not prohibit—further executions at FCC Terre Haute until inmates no longer face an unreasonable risk of contracting COVID-19 because of the executions.  Defendants can address that risk by (1) administering an FDA-approved vaccine to the inmate population, or (2) implementing measures to prevent the introduction of additional sources of COVID-19 infection when executions are held, such as testing and a reasonable period of quarantining of all Execution Team members *before* they begin working within the Complex, testing of all other individuals involved in an execution before they enter FCC Terre Haute, and testing and quarantining FCC staff who participated in executions before they resume their normal duties.  *See* Fefferman Decl. at ¶¶ 40, 41, Dkt. 47-2.

Further executions should not be permitted at the present time, if conducted in the same manner as the other recent executions.  The evidence shows that Plaintiffs and other inmates face a substantial risk of serious harm if additional executions are held now at FCC Terre Haute.  *See id.* at ¶¶ 6-41 (Fefferman Decl.); Dkt. 13-1 at ¶¶ 52-63 (Goldenson Decl.).  Plaintiffs are therefore

likely to prevail in showing a violation of their Eighth Amendment rights and a clear risk of suffering irreparable harm absent injunctive relief.

## ARGUMENT

**I.    Applicable Preliminary Injunction Standard.**

'"To obtain a preliminary injunction, a plaintiff must show that (1) without this relief, it will suffer 'irreparable harm'; (2) 'traditional legal remedies would be inadequate'; and (3) it has some likelihood of prevailing on the merits of its claims.' If a plaintiff makes such a showing, the court proceeds to a balancing analysis, where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it. This balancing process involves a 'sliding-scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (citation omitted).

Thus, as Defendants' counsel noted during the December 8 hearing, a "plaintiff must demonstrate that 'its claim has some likelihood of success on the merits, not merely a 'better than negligible' chance." *Id*. at 822. "What amounts to 'some'" will depend upon the facts of a given case, because of the "sliding scale" employed in this circuit. *Id*.

Here, Plaintiffs face a risk of serious irreparable harm:  grave physical injury and potentially death. They also face the risk of having their Constitutional rights violated, which is an additional form of irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion). Plaintiffs have at least some likelihood of prevailing on the merits of their Eighth Amendment claim, given the government's incontestable obligation to protect prisoners from a substantial risk of serious harm and the evidence that it would fail to meet that obligation if it holds executions in the midst of a raging pandemic with all that is known about how quickly COVID-19 spreads in prisons. Plaintiffs have shown that "the decision to carry out executions during the pandemic creates substantial additional risk for their health." Order at 14 (Dkt. 37).

The remaining preliminary injunction factors also support relief, consisting of a balancing of the equities and the public interest.  *See Winter v. Nat. Res. Def. Council*, 557 U.S. 7, 20 (2008). The government has a strong interest in seeing that sentences are carried out.  That interest, however, is not unduly prejudiced by a short delay in when an execution occurs, particularly where the government itself delayed in putting a new execution protocol in place so that it could schedule executions. The public interest weighs firmly in favor of the requested preliminary injunction, because it will help reduce the spread of a disease that has now killed more than 300,000 Americans, created lasting physical injuries for many more people, and devastated virtually all aspects of our lives.

The discussion that follows focuses on the likelihood-of-success factor.  As the Court noted in its Order (Dkt. 37 at 15), that factor overlaps with the issue or irreparable harm:  the more evidence there is that executions increase the risk of inmates contracting COVID-19, the greater the likelihood that Plaintiffs will prevail on the merits of their Eighth Amendment claim *and* the clearer the risk that Plaintiffs would suffer irreparable harm absent a preliminary injunction. Plaintiffs provide additional evidence below that there is a significant risk to Plaintiffs and other inmates from holding executions at FCC Terre Haute at the current time and in same manner as prior executions, warranting entry of a preliminary injunction.

## II. For Purposes Of Preliminary Injunctive Relief, Statistical Data Is Not Required To Establish A Likelihood Of Success On The Merits Of Plaintiffs' Eighth Amendment Claim.

To prove an Eighth Amendment claim for unconstitutional prison conditions, a plaintiff must show that he was exposed to an objective risk of serious harm and that prison officials subjectively acted with deliberate indifference to inmate safety.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "Recklessly disregarding" a known and substantial risk constitutes deliberate indifference.  *Id*. at 835–836.  Thus, prison officials may not "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *see also Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 382 (7th

Cir. 2017) ("[T]he Constitution does require [the defendant] to ensure that a well-recognized risk for a defined class of prisoners not be deliberately left to happenstance.").

Plaintiffs are not required to demonstrate with statistical certainty that they or any other putative class member will definitely contract COVID-19 as a result of the executions in order to show a violation of their constitutional rights.  It is sufficient for them to demonstrate that the execution events will "very likely … cause serious illness and needless suffering" among some number of inmates, "the next week or month or year."  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).  It is irrelevant that "the possible infection might not affect all of those exposed."  *Id.* (discussing *Hutto v. Finney*, 437 U.S. 678, 682 (1978)).

Deliberate indifference is often a question of fact, and it can be made out by "inference from circumstantial evidence."  *Farmer*, 511 U.S. at 842.  That evidence can be in the form of statistical evidence or other compelling scientific evidence that supports an inference of substantial risk to inmates of serious injury from the challenged governmental action.  [*See* Order at 15 (stating that, "without compelling scientific or statistical evidence," the Plaintiffs "do not have a strong likelihood of success on their Eighth Amendment claim") (Dkt. 37).

Plaintiffs obviously cannot prove in advance that they are going to get COVID-19 or exactly how this might happen, but that is not their legal burden.   Their burden is to establish that there is a substantial risk of serious harm.  The seriousness of the harm in undeniable, *see, e.g.,* Dkt. 13-1  at ¶¶ 8-15, and has not been refuted by Defendants. That leaves only the question whether holding executions at FCC Terre Haute as they are currently held, and in the current COVID-19 environment, creates a substantial risk that plaintiffs or other inmates will contract COVID-19.

Dr. Fefferman addresses this question in her declaration.  Dkt. 47-2.  Dr. Fefferman is a Professor at the University of Tennessee in the Department of Ecology and Evolutionary Biology and the Department of Mathematics.  She also serves as the Director of the Mathematical Modeling Consulting Center at the National Institute for Mathematical and Biological Synthesis.  She has researched infectious diseases and pandemic preparedness for the past 16 years and was one of the

primary researchers for a U.S. Department of Homeland Security Center of Excellence, where she ran a research group that made policy recommendations to DHS and its affiliate agencies for how to manage and mitigate pandemic threats from the H1N1 2009 flu, Ebola in West Africa, and the Zika virus.  Dr. Fefferman has studied COVID-19 extensively since February 2020, including modeling "the COVID-19 outbreak with specific attention to the risks of spread from and within carceral facilities and the corresponding implications for community healthcare resources."  *See generally* Dkt. 47-2 at ¶¶ 1-4 and Ex. A thereto (CV) (Dkt. 47-3).

Dr. Fefferman was asked to evaluate the risk that holding executions during the week of January 11, 2020 poses to inmates at FCC Terre Haute, including inmates in FCI Terre Haute (where the named plaintiffs are housed).  *Id.* at ¶ 6.  Based upon her review of declarations provided by BOP employees in this case and other court cases, Mr. Nur's declarations in this case, contact tracing records from FCC Terre Haute, discovery responses in this case, and the scientific literature regarding COVID-19, and upon her experience modeling COVID-19, Dr. Fefferman provides the following opinion and related information:

> [I]t is my opinion that the plan to carry out executions during the week of January 11, 2021 poses a substantial risk of COVID-19 spread and illness to FCC Terre Haute prisoners, including those incarcerated at FCI Terre Haute.  As explained below, this is because the executions will introduce hundreds of individuals to the prison environment, significantly increasing the number of potential exposures to infection from COVID-19 for the staff and in turn for prisoners at FCI Terre Haute, USP Terre Haute and the FPC.  The risk is not limited to inmates in USP Terre Haute, where death row prisoners are housed, because of the high transmissibility of COVID-19, including by individuals who are pre-symptomatic and asymptomatic; the involvement in the executions of numerous FCC Terre Haute staff members from all facilities, who then return to their normal duties and extensively interact with inmates and fellow staff members in those facilities; and the ease with which any disease is transmitted in a congregate setting like a prison, where social distancing is impossible and other preventative measures such as wearing masks and frequent hand-washing occur inconsistently at best.  The risk is compounded if a prison is overcrowded, which I understand is the case here (including within FCI Terre Haute), and if a prison fails to systematically test prison staff and inmates and then contact trace those staff and inmates who test positive, which appears to be the case at FCC Terre Haute. Holding executions also disrupts the existing precautions enacted at FCC Terre Haute to reduce the spread of COVID-19.

In the context of COVID-19 transmission, people can act as carriers in spreading the disease even when they are exhibiting no symptoms (and may never exhibit any symptoms), and relatively modest contact with an infected individual can result in passing the disease to someone else -- who, again, may or may not exhibit symptoms, or may do so only several days later, but is nonetheless capable of spreading the disease.  And once disease begins to spread, one case quickly becomes two, two become four, four become eight, eight become sixteen, etc., in exponential progression.

COVID-19 is not a static disease that is easily contained, even in the best environment and even with the conscientious implementation of safety measures.  A prison is the antithesis of such an environment.  Bringing anyone who has COVID-19 into a prison complex -- even one as geographically large as FCC Terre Haute and with separate facilities within the complex -- creates a significant risk of spreading COVID to all parts of the complex.  The risk is, of course, greatest when the incidence of COVID infections outside the prison is extremely high, as is the case now....

Quantifying the increased risk of contracting COVID-19 to inmates in the USP Terre Haute, the FCI Terre Haute, and the FPC from holding executions ... would be difficult to do, because relevant data and contact tracing information are extremely limited and have not, to the best of my knowledge, been made available to the plaintiffs' counsel.  One has, however, the scientific evidence regarding how quickly and extensively COVID-19 spreads, generally and within a prison setting; how spread can occur from individuals showing no symptoms; how spread of COVID-19 is not geographically contained; how group gatherings contribute significantly to such a spread; and how certain populations are at an increased health risk if they contract disease, which include males, people over 65, and individuals with pre-existing conditions (all of which define large numbers of individuals within FCC Terre Haute).

Based upon this scientific evidence, and as noted above, it is my opinion that inmates from all three facilities within FCC Terre Haute would face a substantially increased risk of contracting COVID-19, and suffering serious health problems as a result, if executions continue at FCC Terre Haute at the current time and in the manner in which executions have been held earlier this year at the prison.  The extent of this risk cannot be quantified given the information available, but it is certainly higher than if no executions occurred at the present time and, in my opinion, it is substantial.  The executions risk increased importation of new COVID-19 infections as well as more efficient transmission of the virus within the prison because of staff mixing and other factors relating to the executions and conditions within the prison.

It is perhaps helpful in this regard to consider examples of how COVID-19 has spread well beyond the narrow geographical confines in which contact first occurred between an infectious individual and a susceptible individual.  One such example is a highly publicized wedding that occurred in rural Maine, attended by only 55 people.  The wedding led to COVID-19 outbreaks in the local community, in a long-term care facility located in a different county, and in a correctional facility in yet another county.  Overall, at least 177 COVID-19 cases were linked to the event, including seven hospitalizations and seven deaths.  The spread to the correctional facility occurred because a facility employee

attended the wedding and then worked his normal shifts in different housing units at the correctional facility, leading to 18 other staff members, 16 members of staff households, and 48 inmates testing positive. This is emblematic of how easily one infectious person can infect many people throughout a correctional facility, leading to otherwise avoidable infection and risk of serious complications, including death.

A second example was a business conference in Boston attended by approximately 175 people over two days in February 2020. With the luxury of extensive genome data and reliable contact tracing information, researchers concluded that a single positive case likely led to roughly 100 people from the event testing positive, which in turn may have led to as many as 300,000 becoming infected in Massachusetts, in other states, and in other countries. The disease did not remain within the conference facilities, or Boston, or the adjoining counties, or even the United States.

In similar fashion, execution events -- which involve roughly the same number of participants as the Boston conference and more participants than the Maine wedding -- could lead to a spreading of the disease well beyond an initial point of contact, even if it begins within the building that houses the death chamber or elsewhere in USP Terre Haute. I am not suggesting that executions will lead to as many as 300,000 people contracting COVID-19 who otherwise might not have done so, as with the Boston conference, or even 177 people, as with the Maine wedding (although the latter number is certainly possible). The point is simply that, given the current prevalence of COVID throughout most of the United States, including Indiana, one or more people in a large group, who have not been quarantining, are likely COVID-positive and will spread infection to multiple individuals absent adequate safeguards, who in turn will further spread the disease, well beyond where it began. This is not a low-risk hypothetical, it is a high-probability likelihood, with potentially deadly consequences.

Dkt. 47-2 at ¶¶ 8-15.

Dr. Fefferman's opinion is consistent with, but significantly expands upon, the opinion previously provided by Dr. Goldenson regarding the risk that executions pose to other inmates at FCC Terre Haute:

[I]t is my professional opinion that inmates at FCC Terre Haute are at a heightened risk of contracting COVID-19 as a result of the nature of conducting executions at the facility, which involves bringing people from outside the community onto the facility before and during executions; the sharing of staff members from the FCI and USP complexes to participate in the executions; and the failure to follow CDC-recommended guidelines at FCC Terre Haute for inhibiting the spread of COVID-19. The same is true of staff members at FCC Terre Haute and their families and members of the broader Terre Haute community, all of which groups would likely have a higher risk of contracting COVID-19 than they would if the executions were postponed, with the attendant risk of serious illness and death for some number of the members of those groups.

Dkt. 13-1 at ¶ 63.

- 14 -

Other evidence, much of which was discussed in Plaintiffs' original preliminary injunction papers and in the Court's initial Order, also supports the ultimate fact finding that holding executions at FCC Terre Haute at the present time and in the manner in which such executions have been implemented this year creates a substantial risk that other inmates in the prison will contract COVID-19 and suffer serious injury that otherwise would have been avoided:

- The CDC recommends limiting group gatherings especially in small places, discontinuing visits to a prison following an outbreak at the prison or in the local community, not travelling, not allowing staff to work in different parts of the prison, social distancing, contact tracing, and testing and quarantining of "all close contacts," including restricting "quarantined individuals from leaving the facility ... during the 14-day quarantine period" —all things that do ***not*** happen when executions are held at FCC Terre Haute. *See* "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" at 3, 7, 9-12, 15-16 (updated Dec. 3, 2020) (Dkt. 13-12).

- According to the CDC, "[t]he best way to protect incarcerated/detained persons, staff, and visitors is to quarantine for 14 days." *Id.* at 3.

- Large numbers of people come to Terre Haute in connection with each execution, interact with one another and with FCC staff in multiple settings where social distancing is impossible to maintain and masks are often not worn, and eventually congregate in very small rooms in preparation for and during the execution, where adequate social distancing is again impossible to maintain. Dkt. 13-29 at ¶¶ 3-21 (Nur Decl.); Dkt. 28-1 at ¶¶ 15-22 (Watson Decl.); Dkt. 47-6 at ¶¶ 2-16 (Formosa Decl.).

- "[F]or the upcoming executions, BOP estimates that approximately 50 to 125 individuals including the BOP's execution team, state and local law enforcement, and various witnesses, and demonstrators will travel to FCC Terre Haute."  Dkt. 28-1 ¶ 16 (Watson Decl.).

- "The execution team is comprised of approximately 40 BOP employees, who are employed at locations other than FCC Terre Haute."  (Dkt. 28-1 at ¶ 17; *see also* Dkt. 13-4 at ¶ 11).

- "The execution team does not quarantine upon arriving in Indiana...." Dkt. 28-1 at ¶ 17. The team arrives "a few days prior to a scheduled execution" and starts work "upon their arrival." *Id.*

- "[A]pproximately 70 or more FCC Terre Haute staff have functions related to execution events. These FCC Terre Haute employees … include staff that work at the USP, FCI, and FPC…. FCC staff manage check points and perimeter security, staff the command center, and escort witnesses and demonstrators… [S]ome staff in the command center will likely meet with some execution team staff in order to coordinate the operation; and staff escorting witnesses and demonstrators will by necessity interact with the witnesses and demonstrators. Therefore, FCC staff will have some interaction with both the public and the BOP personnel attending the execution." Dkt.. 28-1 at ¶ 22.

- FCC staff are "pulled away from their normal duties" to participate in the execution. Dkt. 13-7 at ¶ 8. Unless they choose to be tested for COVID-19 and test positive, or experience COVID-19 symptoms which they report, they return to their normal duties throughout the Complex after the execution is over. Dkt. 28-1 at ¶ 23.

- As part of those normal duties, FCC staff move between each of the component facilities (FCI, USP, and FPC) whenever an institution needs staff. Dkt. 28-1 at ¶ 10.

- Members of the Execution Team interact "with FCC Terre Haute personnel incident to their role in the operation of the execution. For example, the execution team may interact when going through security check points, receiving the inmate, receiving witnesses, and meeting with Terre Haute personnel to discuss operations logistics and equipment." Dkt. No. 28-1 at ¶ 17; *see also id.* at ¶ 22.

- Execution witness rooms do "not allow for great distancing." Dkt. No. 28-1 at ¶ 20.

- Although Warden Watson testified that "all members of the execution team must wear a mask," Dkt. 28-1 at ¶ 20, individuals who attended the executions of Orlando Hall (November 19) and Brandon Bernard (December 10) testified that there were members of

- 16 -

the Execution Team who did not wear masks for extended periods of time.  Dkt. 13-29 at
¶ 15 (Nur Decl.); Dkt. 29-6 at ¶¶ 5-6 (Second Nur Decl.); Dkt. 47-6 at ¶ 14 (Formosa Decl.).

- "After an execution, the BOP execution team members are afforded an opportunity to test
  for COVID-19," while "FCC Terre Haute staff are ... encouraged to obtain a test if they
  had a known exposure or experience symptoms."  Dkt. 28-1 at ¶ 23.

- Only "5-7 members of the BOP execution team have historically elected to be tested prior
  to returning to their home communities."  Dkt. 28-1 at ¶ 23.

- "Incident to the November execution," 6 of the 40+ members of the BOP Execution Team
  chose to take COVID-19 tests before returning home and tested negative.  Dkt. 33-2 at ¶ 8
  (Winter Decl.).

- However, eight other members of the Execution Team tested positive soon after getting
  home (*i.e.*, after (i) working at FCC Terre Haute, (ii) staying in hotels and  mingling in the
  Terre Haute community, and (iii) traveling home).  Dkt. 33-2 at ¶ 8.

- Defendants disclosed in their recent discovery responses that an additional member of an
  Execution Team (for the July executions) tested positive when he returned home.  Int. Resp.
  No. 4 (Dkt. 47-9 at 6-7).

- Defendants also disclosed in their discovery responses that a USP employee "who also
  worked in the FCI Terre Haute" tested positive after assisting in activities related to the
  Orlando Hall execution in November.  Resp. No. 3 to Doc. Requests (Dkt. 47-8 at 5-6).

- The FCC Terre Haute staff member who was identified in the *Hartkemeyer* case as testing
  positive for COVID-19 was assigned to FCI Terre Haute and had contact with "A lot" of
  inmates and "A lot" of other staff members during the 48-hour window before he tested
  positive or showed symptoms.  Resp. No. 1 to Doc. Requests (Dkt. 47-8 at 3).

- Additional Execution Team members might also have been positive for COVID-19 when
  they got home from FCC Terre Haute but may not have been tested because they were
  asymptomatic or experienced only minor symptoms. According to the CDC's best
  estimate, 40% of COVID-positive individuals are asymptomatic, but individuals who are

asymptomatic can still spread the disease.[8]  The disease can also be spread by individuals when they "pre-symptomatic," and most people go six days between contracting COVID-19 and exhibiting symptoms.[9]

- COVID-19 spreads in an "invisible" manner, "through layers of separation."[10]  It can therefore be difficult to determine exactly where someone got COVID-19 or where it might spread, "especially without extensive contact tracing."[11]

- The CDC recently noted this "silent spread of disease," pointing out that approximately 50% of transmission comes "from asymptomatic persons," and that "the United States has entered a phase of high-level transmission" during which it is "essential" to implement "all evidence-based public health strategies at both the individual and community levels."[12]

- Because disease spreads "like wildfire" when it gets into FCC Terre Haute, staff at the Complex are extremely concerned about their own safety and the safety of their families. Dkt. 14 at 3 n.4.  This has led the union which represents prison staff at FCC Terre Haute and elsewhere  to file a complaint with the U.S. Department of Labor alleging that the BOP's "actions and inactions" are "proliferating the spread of a known and deadly contagion both within our prison system and to our surrounding communities," resulting

---

[8]  "COVID-19 Pandemic Planning Scenarios," at 2, 4 (updated 9/10/20),  www.cdc.gov/coronavirus/2019-ncov/hcp/planning-scenarios.html.

[9]  *Id*. at 2-3.

[10]  "Young People Have Less Covid-19 Risk, but in College Towns, Deaths Rose Fast," New York Times (Dec. 12, 2020), www.nytimes.com/2020/12/12/us/covid-colleges-nursing-homes.html?referringSource=articleShare.

[11]  *Id.*

[12]  CDC, "Summary of Guidance for Public Health Strategies to Address High Levels of Community Transmission of SARS-CoV-2 and Related Deaths," at 1860, 1865 (Dec. 11, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6949e2.htm?s_cid=mm6949e2_w ("Both domestic and international travelers should stay home or reduce nonessential activities before travel, and for 7 days after travel if tested, even if test results are negative.  If not tested, this period should be extended to 10 days. Travelers should be diligent about mask wearing, physical distancing, hand hygiene, and symptom monitoring.  For 14 days after arrival, travelers should avoid close contact with persons at higher risk for severe COVID-19–associated outcomes and wear masks in household spaces shared with those who did not travel.").

in "death and severe health complications and/or possible life-long disabilities."  Dkt. 14 at 9 n.21 (quoting Dkt. 13-14 at 3-4).

- While the risk of disease spread is significant in all prisons, it is even higher at FCC Terre Haute because of overcrowding (Dkt. 13-1 at ¶¶ 46-51), and shortcomings in implementing safety protocols (*e.g.*, Dkt. 13-15 at ¶¶ 29-43; Dkt. 13-21 at ¶¶ 16-23; Dkt. 13-26); *see also Wilson v. Williams*, 961 F.3d 829, 848 (6th Cir. 2020) (noting that BOP's "multiphase action plan" has been "far less impressive than its title suggests" in "keeping the inmates safe") (Cole, C.J., concurring in part and dissenting in part).

There is thus extensive scientific evidence to support a finding that holding executions endangers the health of other inmates at FCC Terre Haute, given the number of people participating in executions, the current incidence of COVID-19 inside and outside of  FCC Terre Haute, the absence of quarantining or mandatory testing among by those coming to Terre Haute, the ease with which COVID-19 spreads within prisons, and the involvement of FCC staff in the executions and their subsequent return to work with no mandatory testing or period of quarantining.  Extensive evidence also supports a finding that the outcome of contracting COVID-19 is potentially serious injury or even death.

The Constitution does not permit custodians of prisoners to create hazardous conditions for the spread of a highly contagious and deadly disease.  Defendants know, and other federal agencies stress, that the biggest source of risk is precisely what we are seeing in connection with the federal executions: large numbers of people travelling and coming together from out of town, congregating indoors in small settings where social distancing is impossible—like buses, training rooms, waiting rooms, and security areas—and inconsistent implementation of mask requirements, sanitation procedures, and other safety measures.  These risky conditions are then made worse because Defendants allow the FCC staff to return to their normal duties in all parts of the prison without follow-up testing, quarantining or adequate contact tracing.  The absence of statistical data regarding exactly how and when COVID-19 has migrated or will migrate from (a) COVID-

infected Execution Team members or other execution-related visitors to (b) FCC staff members to (c) inmates (or other FCC Terre Haute staff members and then to inmates) does not mean that there is insufficient evidence to warrant preliminary injunctive relief, because other evidence supports a finding that executions present a substantial risk of serious injury to inmates in the FCI and elsewhere within FCC Terre Haute.

### III.   In Evaluating Likelihood of Success And The Risk Of Irreparable Harm, The Court May Consider Not Only The Named Plaintiffs But Also Other Members Of The Putative Class.

In previously opposing entry of a preliminary injunction, Defendants addressed only the two named plaintiffs in the original Complaint.  This case, however, is a putative class action brought on behalf of all inmates at FCC Terre Haute.  Although "no class has yet been certified," a court may consider "alleged harm to putative class members" as well as "the likelihood that their injuries will enable the plaintiffs to succeed on the merits" in deciding whether preliminary injunctive relief is warranted (at least where class certification is likely, as it is here).  *Strouchler v. Shah*, 891 F. Supp.2d 504, 517-18 (S.D.N.Y. 2012); *see also Doe v. Trump,* 418 F. Supp.3d 573, 603 (D. Or. 2019) ("when a plaintiff requests preliminary injunctive relief before class certification has been decided, a court may consider the harm to the putative class and grant class-wide appropriate preliminary injunctive relief to preserve the status quo, particularly when, as in this case, there is alleged class-wide harm"); *Lee v. Orr*, 2013 WL 6490577, *2 (N.D. Ill. 2013) ("'District courts have the power to order injunctive relief covering potential class members prior to class certification.'") (citation omitted); *Ligon v. City of New York.*, 925 F. Supp.2d 478, 539 (S.D.N.Y. 2013) (granting preliminary injunction where putative class members were "threatened with imminent violations of their constitutional rights") (citations omitted).

The increased risk of contracting COVID-19 if executions continue, evaluated across the putative class as a whole, cannot be disputed by the Defendants.  And, as shown above, it cannot reasonably be disputed even if the risk analysis is limited to the named Plaintiffs.

**IV.     The Court Has the Authority to Postpone Scheduled Executions**.

The Court has the authority to postpone the upcoming executions to protect the health and safety of other inmates at FCC Terre Haute, including Mr. Smith and Mr. Holm.

In previously analyzing Plaintiffs' likelihood of success, the Court stated that "the  Seventh Circuit has made clear that the defendants have nearly unfettered discretion to schedule executions, pandemic or no."  Order at 13-14 (citing *Peterson v. Barr*, 965 F.3d 549 (9th Cir. 2020) (Dkt.  37).  *Peterson*, however, does not prevent the Court from acting here.  *Peterson* involved an APA claim.  "The APA does not permit judicial review of an action 'committed to agency discretion by law.'"  *Peterson*, 965 F.3d at 552 (citing 5 U.S.C. § 701(a)(2) and *Heckler v. Chaney*, 470 U.S.  821 (1985)).  The Seventh Circuit's reference to the "discretion" afforded to defendants thus related specifically to the plaintiffs' APA claim and whether defendants acted arbitrarily and capriciously relative to the discretion afforded them under the statute.[13]

This case, in contrast, raises an Eighth Amendment constitutional challenge. The government does not have "unfettered discretion" to violate Plaintiffs' constitutional rights, even in connection with holding executions.  *See Farmer,* 511 U.S. at 846 ("If the court finds the Eighth Amendment's subjective and objective requirements satisfied, it may grant appropriate injunctive relief."); *Helling*, 509 U.S. at 31 ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."); *Montgomery v. Barr*, No. 20-3261 (RDM), 2020 WL 6799140 (D.D.C. Nov. 19, 2020) (granting death row inmate's motion for a preliminary injunction and staying her execution date because her lawyers contracted COVID-19 and were temporarily unable to finalize her clemency petition).

Indeed, DOJ regulations expressly recognize a court's authority to enter orders that affect the date on which the BOP has scheduled a federal execution.  *See* 28 C.F.R. § 26.3(a)(1) ("*Except*

---

[13]  *Peterson* is also distinguishable factually.  The plaintiffs in *Peterson* could avoid the risk of COVID-19 exposure by not attending the execution. The Plaintiffs here have no such choice.  FCC Terre Haute staff members will participate in the execution event, in the midst of a deadly and highly contagious pandemic, and will then interact with inmates throughout the complex, including inmates in FCI Terre Haute.

*to the extent a court orders otherwise*, a sentence of death shall be executed ... [on] a date and at a time designated by the Director of the Bureau of Prisons....") (emphasis added); *see also* 85 Fed. Reg. 7586-01, 75850 (Nov. 27, 2020) )(statement by DOJ in connection with recent amendments to its death-sentence regulations that "nothing in the proposed amendment of the regulations ... alters the court's power to set aside or postpone execution dates pursuant to their authority to issue stays and injunctions").  The BOP's execution protocol also acknowledges "Judicial Authority to Interrupt [an] Execution."  *See* BOP Execution Protocol, "Stays, Commutations and Other Delays," Ch. 7, § II.B ("A federal court of competent jurisdiction may issue a stay of execution ... as a result of ... collateral proceedings.") (Dkt. 33-1 at 53-54).

**V.      Postponing The Upcoming Executions Is Consistent With Defendants' Acknowledged Obligation And Stated Commitment To Do Everything They Can To Limit The Spread Of COVID-19 In Prisons And To Local Communities.**

Prior to resigning, Attorney General Barr acknowledged that the BOP has a "profound obligation to protect the health and safety of all inmates" from the risk of contracting COVID-19.[14]  Defendant Carvajal has also acknowledged that obligation, saying that BOP's "highest priority" is to do "everything [it] can to mitigate the spread of COVID-19 in our facilities."[15] *See also* BOP Execution Protocol, General Provisions, § IV.B.2 ("BOP will make every effort in the planning and preparation of an execution to ensure the execution process … [is] handled in a manner that minimizes the negative impact on the safety, security, and operational integrity of the correctional institution in which it occurs….") (Dkt. 33-1 at 10-11).  A preliminary injunction will simply hold the Defendants to their acknowledged obligation, consistent with what is required under the Eighth Amendment and with the Court's authority to act, and with the public interest.

---

[14]  Mem. for Director of BOP re Increasing Use of Home Confinement at Institutions Most Affected by COVID-19, at 1, 3 (April 3, 2020) ("I strongly believe we should do everything we can to protect the inmates in our care"), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf; *see also* Mem. for Director of Bureau Prisons re Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic, at 2 (March 26, 2020) (acknowledgment by the Attorney General that the federal government has "an obligation to protect BOP personnel and the people in BOP custody" and "must do the best [it] can to minimize the risk of COVID-19 to those in [its] custody, while also minimizing the risk to the public"), https://www.justice.gov/file/ 1262731/download.

[15] BOP Modified Operations at 1 (updated Oct. 8, 2020), www.bop.gov/coronavirus/covid19_status.jsp.

150434782.1

## **CONCLUSION**

The Court should issue a preliminary injunction that temporarily postpones all executions at FCC Terre Haute until Defendants can demonstrate that the executions do not create a substantial risk that Plaintiffs and other inmates will contract COVID-19.  The Defendants can make such a showing by demonstrating that an adequate number of inmates have received an effective vaccine, or that Defendants have modified the execution logistics to significantly reduce the risk of spreading COVID-19 in the Complex (*e.g.*, by requiring testing of all visitors prior to participating in execution-related activities, requiring Execution Team members to quarantine for 14 days after arriving in Terre Haute, testing all FCC Terre Haute staff members who will be assisting in the execution before they begin that work, and requiring those staff members to quarantine for 14 days before returning to their regular duties within the prison).

Dated:  December 28, 2020                    Respectfully submitted,

/s/ *Robert A. Burgoyne*_____

John R. Maley
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, Indiana  46204-3535
Telephone:  (317) 231-7464 (direct)
John.maley@btlaw.com

Robert A. Burgoyne, *pro hac vice*
Caroline M. Mew, *pro hac vice*
Perkins Coie LLP
700 13th St. NW, Suite 800
Washington, DC 20005-3960
Telephone:  (202) 654-1767
rburgoyne@perkinscoie.com
cmew@perkinscoie.com

Sarah Howland, *pro hac vice*
Perkins Coie LLP
1155 Avenue of the Americas, 22nd Floor
New York, N.Y. 10036-2711
Telephone:  (212) 262-6900
showland@perkins.coie.com

150434782.1

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 28, 2020, a copy of the foregoing document was filed

electronically. Service of this filing will be made on all ECF-registered counsel by operation of

the court's electronic filing system.

Respectfully submitted,

*/s/ Robert A. Burgoyne*
Robert A. Burgoyne

- 24 -