UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| PATRICK R. SMITH and<br>BRANDON S. HOLM, individually and<br>on behalf of all others similarly situated,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>JEFFREY ROSEN in his official<br>capacity as the Acting Attorney General of<br>the United States, *et al.*,<br><br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Cause No. 2:20-cv-00630-JMS-DLP |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS'
## SECOND MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

Having tried and failed to halt federal executions for the duration of the COVID-19 epidemic, plaintiffs—two non-capital inmates at FCI Terre Haute—renew their motion on the same grounds this Court previously found wanting.  When plaintiffs moved for a preliminary injunction several weeks ago, the Court concluded that they satisfied none of the requirements for preliminary injunctive relief.  Their Eighth Amendment claim was unlikely to succeed on the merits because they could not show that "carry[ing] out executions during the pandemic creates substantial additional risks for their health," ECF No. 37 at 14; they had no irreparable injury because they "ha[d] not shown that they are likely to be infected with COVID-19 because of the scheduled executions," *id.*; the federal government has a "substantial legal interest in timely enforcement of criminal defendants' sentences," *id.*; and plaintiffs' interest in avoiding unreasonable exposure to COVID-19 "d[id] not weigh heavily . . . because the plaintiffs ha[d] not shown that the scheduled executions will create a substantial additional risk to their health,"

*id.*

All those deficiencies remain, and plaintiffs' latest preliminary-injunction motion does nothing to cast doubt on the Court's conclusions.  Plaintiffs' legal theory is the same: that the Eighth Amendment prohibits defendants from temporarily bringing additional staff and other individuals onto the vast Terre Haute complex to carry out critical penological operations with which plaintiffs disagree, if those operations cannot be carried out without mitigating COVID-19 to plaintiffs' satisfaction and in their preferred manner.  But as before, plaintiffs make no showing that carrying out executions elsewhere in the Terre Haute complex "creates substantial additional risks for their health," ECF No. 37 at 14; they instead simply continue to speculate that the temporary presence of additional individuals within the Terre Haute complex may increase the risk that inmates housed at the complex will experience one or more additional COVID infections.  And their proposed remedy makes plain that plaintiffs are, at bottom, still using this worldwide epidemic as a vehicle to pursue their desired policy outcome of prohibiting federal executions.  In short, plaintiffs are resubmitting their previous motion with some cosmetic changes but without fixing the fundamental deficiencies this Court identified.

Plaintiffs still lack standing to bring this suit.  Their alleged injury—an increase to their risk of contracting COVID—is speculative.  Among many shortcomings, plaintiffs fail—in light of the precautions taken by the Bureau of Prisons (BOP) to reduce the spread of COVID both generally and with respect to executions—to sustain their burden to demonstrate standing to seek the extraordinary remedy of a preliminary injunction,.

Even if Article III were satisfied, plaintiffs have once again failed to demonstrate they are likely to succeed on the merits of their Eighth Amendment claim.  The Eighth Amendment requires a showing that the risk inflicted on an inmate is, objectively, one that civilized society

would not tolerate and a showing that the government is acting with deliberate indifference, which the Seventh Circuit has made clear must "approach[] a total unconcern for the prisoner's welfare," *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012).  This Court previously held that plaintiffs could not show a substantial increase in risk merely by arguing that "executions, like any mass gathering, are risky during the COVID-19 pandemic."  ECF No. 37 at 13.  But plaintiffs again present those same generalized concerns, without significant improvement to their claims for relief.  And this Court held that plaintiffs could not carry their heavy burden of showing a deliberately indifferent mindset merely by arguing that "defendants and prison staff could do more to prevent COVID-19 transmission in the prison."  *Id.*  But plaintiffs' latest motion tries to do exactly that, arguing that FCC Terre Haute would be safer if defendants crippled prison operations by encasing it in a bubble.  Moreover, by offering only an untenable set of alternatives to the prohibition of federal executions, plaintiffs are essentially asking this Court to declare that BOP cannot carry out executions during COVID, a claim the Seventh Circuit has already heard and rejected.  *See Peterson v. Barr*, 965 F.3d 549, 553 (7th Cir. 2020), *application for stay denied*, *Peterson v. Barr*, __ S. Ct. __, 2020 WL 3964236 (Mem.) (July 14, 2020).  Plaintiffs' latest motion offers nothing that casts doubt on the Court's prior conclusions, and nothing that would justify deciding this motion any differently.

Because plaintiffs have not demonstrated that they are likely to succeed on the merits of their claims, this Court should deny injunctive relief.  If the Court were to proceed to the remaining injunctive relief factors, however, the result would be the same.  As before, plaintiffs have failed to demonstrate any likely irreparable harm from the executions—executions that do not directly affect them.  And any alleged harm from an increased risk of COVID-19, however attenuated and marginal, could not possibly outweigh the long-recognized weighty public

interest in carrying out lawful death sentences.  *Cf. Peterson*, 965 F.3d at 553 (rejecting request by victims' family members to enjoin BOP from carrying out execution during the COVID-19 epidemic which allegedly impaired their right to attend as witnesses).

## BACKGROUND

Defendants here incorporate the Background section of their Opposition to Plaintiffs' Motion for a Preliminary Injunction, ECF No. 28, and supplement it with the following information.

Inmates and staff at prisons around the United States have contracted COVID-19.  *See* data at https://www.bop.gov/coronavirus/; Exhibit 1, Jan. 4, 2021 Third Declaration of T.J. Watson ("Third Watson Dec.") ¶ 14.  FCC Terre Haute unfortunately has not been spared from the virus, despite the many precautions the BOP has taken.  Third Watson Dec. ¶ 14.  But there is no indication that the conduct of executions at FCC Terre Haute makes it an outlier in that regard; to the contrary, prisons where executions are not conducted have experienced the spread of COVID-19, some of them with much higher numbers of cases than FCC Terre Haute.  *Id.* Additionally, the county in which FCC Terre Haute is located is experiencing an increased spread of COVID-19, similar to communities all over the country and world.  *Id.*  As the Court has noted, it appears much more plausible that staff and inmates at FCC Terre Haute are experiencing transmission of COVID-19 due to an increase in the community, rather than from execution events, as plaintiffs continue to urge.  ECF No. 37 at 14; ECF No. 47 at 7–8.[1]

---

[1] Additionally, the Court previously expressed concern about positive COVID-19 test results among the execution team after the November 2020 executions.  ECF No. 37 at 10.  We note that, as further evidence of the likelihood of community spread, rather than spread resulting from executions, after the executions in December 2020, three execution team members were tested for COVID-19 at FCC Terre Haute, and all three were negative.  Exhibit 2, Jan. 4, 2021 Declaration of Rick Winter ("Second Winter Dec.") ¶ 5.  No team members have reported a positive COVID-19 test since the executions in December 2020.  *Id.*

The multitude of COVID-19 related precautions that BOP has implemented in its prisons and at FCC Terre Haute remain in effect with respect to inmates, BOP staff members, visitors, and execution team members, but BOP and FCC Terre Haute have taken further steps to combat COVID-19 since the Court denied plaintiffs' first preliminary-injunction motion.  Third Watson Dec. ¶¶ 7, 12; Exhibit 2, Jan. 4, 2021 Declaration of Rick Winter ("Second Winter Dec.") ¶¶ 6, 10.  As of December 30, 2020, multiple BOP facilities including FCC Terre Haute had received the COVID-19 vaccine, and FCC Terre Haute has now provided the first round of the vaccine to 355 of its approximately 2,228 inmates, and 206 of its approximately 709 staff members.  Third Watson Dec. ¶¶ 8–9.  In addition, 11 members of the execution team for the January 2021 executions have received the first dose of the vaccine, and additional team members may receive it as it becomes available.  Second Winter Dec. ¶ 7.

Plaintiffs now demand, for the first time, an onerous set of additional conditions—some laid out in their brief (ECF No. 40 at 8) and some incorporated by reference from the declaration of their purported expert declarant (ECF No. 47-2 at ¶ 41).  Those demands include that BOP require all execution-associated FCC Terre Haute staff members and execution team members to quarantine for 14 days after executions.  ECF No. 40 at 8.  Such quarantines are not feasible.  Third Watson Dec. ¶ 14; Second Winter Dec. ¶ 8.  Seventy or more FCC Terre Haute staff members have functions related to execution events (most of which require only brief, if any, interaction with individuals from outside the FCC).  Third Watson Dec. ¶ 13.  Quarantining those staff members for two weeks would reduce the staffing level to a point that would jeopardize the safety, security, and orderly operation of the facility.  *Id.*  And particularly given the minimal significant contact between FCC Terre Haute staff members and outside visitors, a quarantine would not necessarily prevent the spread of COVID-19 at FCC Terre Haute, which

is more likely driven by increases in infection in the community surrounding Terre Haute than from execution events. *Id.* ¶ 14. Moreover, even though BOP cannot mandate that FCC Terre Haute staff members quarantine for 14 days after an execution, numerous safety procedures are in place, including requiring staff to wear masks, conducting temperature checks and COVID-19 screening, educating staff regarding the importance of staying home if they are feeling ill, requiring them to self-report any COVID-19 exposure or any positive COVID-19 test, requiring staff to stay home in accordance with CDC guidelines if they test positive, and limiting their position rotations. *Id.* ¶ 12.

Plaintiffs also demand for the first time that execution team members (as well as, under the terms suggested by their purported expert, "media, family members and legal teams," ECF No. 47-2 at ¶ 41) be required to quarantine for 14 days after arriving in Terre Haute. As an initial matter, plaintiffs undoubtedly recognize that this belated request would, as a practical matter, bar BOP from proceeding with the executions as scheduled; plaintiffs did not mention this demand until 15 days before the next scheduled execution, and they proposed a briefing schedule that would end only six days before that execution. And more fundamentally, this request, too, is infeasible. The execution team is composed of BOP staff members from various locations. Second Winter Dec. ¶ 8. Execution team members are removed from their normal duties, which include a wide range of correctional and administrative positions within BOP, several days in advance of an execution. *Id.* Removing them even further in advance to allow for a 14-day quarantine would hamper staffing, productivity, and security at their home institutions. *Id.*

Plaintiffs also demand that BOP perform COVID-19 tests on all FCC Terre Haute staff members who will assist in executions and all execution-related visitors. But BOP follows CDC

guidance on screening and testing strategies, which does not mandate routine testing of all staff across the agency.  Third Watson Dec. ¶ 11.  Such routine testing would unnecessarily divert valuable testing resources away from more needy populations and would be ineffective as a general screening tool given the turnaround time for results.  *Id.*  However, testing resources are available for all staff on a voluntary basis, *id.*, and all staff are screened for COVID-19 symptoms every time they enter FCC Terre Haute.  First Watson Dec., ECF No. 28-1 ¶ 8.

BOP similarly follows CDC guidelines with respect to visitors, including administering temperature checks and COVID-19 screening, requiring masks and providing personal protective equipment, and where possible, practicing social distancing.  Third Watson Dec. ¶ 15.  However, the CDC guidelines do not recommend testing all visitors to a correctional facility, and it is not feasible to require testing of all visitors prior to an execution, because many visitors travel from out of town and arrive too soon before the execution to allow time for lab testing, yet their presence is authorized by federal regulation.  *Id.*

Finally, while the BOP generally conducts contact tracing when a staff member tests positive for COVID-19, doing so is not always possible for members of the execution team, given the paramount need for their confidentiality due to the sensitivity of their occupation and their unique mission.  Second Winter Dec. ¶ 12.  The identities of execution team members are kept confidential to the greatest extent possible, from inmates, the public, and even from other BOP staff members.  *Id.* ¶ 12; *see also* 5 U.S.C. ¶ 552a.  Contact tracing would reveal their identities, or information leading to the disclosure of their identities, so as to threaten their safety and subject them to threats and harassment from inmates, members of the public, and others. *Id.* ¶ 11.  Although the BOP cannot always conduct contact tracing on execution team members, the execution team has very little significant interaction with staff from FCC Terre Haute, and

numerous precautions are taken to mitigate any potential risks of COVID-19 transmission.  *See* First Watson Dec., ECF No. 28-1.

**ARGUMENT**

**I.      STANDARD OF REVIEW**

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  It is "never awarded as of right," *Munaf v. Geren*, 553 U.S. 674, 690 (2008), and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).  In other words, contrary to plaintiffs' assertion that the Court should issue a preliminary injunction "until Defendants can demonstrate that executions do not create a substantial risk that Plaintiffs and other inmates will contract COVID-19," ECF No. 47 at 23, *plaintiffs* bear the burden of persuasion here.

To obtain a preliminary injunction, "a plaintiff must establish that [he] has some likelihood of success on the merits; that [he] has no adequate remedy at law; [and] that without relief [he] will suffer irreparable harm."  *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (citation and quotation marks omitted).  Only after a plaintiff passes this threshold must a court "weigh the harm that the plaintiff will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest."  *Id.* at 364 (citation and quotation marks omitted).  The Seventh Circuit "'employs a sliding scale approach' for this balancing: if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor."  *Id.* (citation and quotation marks omitted).  A plaintiff "seeking preliminary relief [must] demonstrate that irreparable injury is *likely*," not

8

merely possible, "in the absence of an injunction." *Winter*, 555 U.S. at 22.  As discussed below, plaintiffs have failed to make the requisite showings.

## II.     PLAINTIFFS LACK STANDING

Plaintiffs' suit should be dismissed for lack of standing because there is even less evidence now than there was before of a connection between the executions of other Terre Haute inmates and any concrete injury plaintiffs will experience.  In order to have standing, plaintiffs must demonstrate "injury in fact, causation, and redressability." *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam).  Here, plaintiffs cannot satisfy the injury-in-fact requirement because they fail to demonstrate the existence of a concrete future "threatened injury [that is] 'certainly impending.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401, 409 (2013) (quoting *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990)).  Plaintiffs' theory of injury instead continues to rest on a speculative chain of possibilities: that individuals attending executions in the execution facility at Terre Haute may be infected with COVID-19, even though BOP will screen them for the virus and deny entrance if they have an elevated temperature, ECF No. 28-1 ¶ 8; that those infected individuals may then transmit the virus to staff at FCC Terre Haute, despite BOP's requirements that all visitors, staff, and inmates wear masks and practice social distancing where possible, and even though interactions between FCC Terre Haute staff and execution-related visitors are brief and infrequent, *id.* ¶¶ 8, 9; and that infected FCC Terre Haute staff may then transmit the virus to plaintiffs despite BOP's many precautions, including mask and social-distancing requirements and daily staff COVID-19 screenings, *see id.* ¶ 8.

While the Court previously concluded that plaintiffs had "sufficiently alleged that carrying out additional executions creates at least some additional risk that they will contract COVID-19," ECF No. 37 at 12, Article III requires that an injury be "*certainly impending*";

"allegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409.  Indeed, the Court previously concluded that plaintiffs' Eighth Amendment claim was likely to fail because they had not demonstrated "that the decision to carry out executions during the pandemic creates substantial additional risks for their health."  ECF No. 37 at 14.  New evidence confirms that plaintiffs do not face a certainly impending threat of injury if BOP conducts executions of other inmates elsewhere in the Terre Haute complex.

Since the executions in December 2020, the daily number of active COVID-19 cases at FCI Terre Haute, where plaintiffs reside, has actually *declined*.  *See* https://oig.justice.gov/coronavirus.  The three execution team members who were tested for COVID-19 after the December 2020 executions had negative results, and no team member has reported a positive test since those executions took place.  Second Winter Dec. ¶ 5.  And BOP intends to take all the same precautions for the January 2021 executions that it took for the December 2020 executions, including requiring staff to wear masks, conducting temperature checks and COVID-19 screening, educating staff regarding the importance of staying home if they are feeling ill, requiring them to report any known or suspected COVID-19 exposure and any positive COVID-19 test, requiring staff to stay home in accordance with CDC guidelines if they test positive for COVID-19, and, as much as possible, assigning staff to the same posts and avoiding rotations in positions.  Third Watson Dec. ¶ 12.  Execution team members will also again be required to wear N-95 respirator masks for the January 2021 executions, as will FCC Terre Haute staff who are responsible for processing witnesses through security checkpoints. Second Winter Dec. ¶ 6; Third Watson Dec. ¶ 12.

In addition, the COVID-19 vaccine has been delivered to multiple BOP facilities, including Terre Haute, and BOP has given the first round of the vaccine to 355 of its

approximately 2,228 inmates, and 206 of its approximately 709 staff members.[2]  Third Watson

Dec. ¶ 8.  Nine of the execution team members for the January 2021 executions have been

given the first dose of the vaccine, and additional team members may be vaccinated depending

on availability of doses.  Second Winter Dec. ¶ 7.  These measures complement the multiple,

CDC-guided safety measures already in effect at Terre Haute.  *See* Watson Declarations.  The

cumulative effect of all these precautions demonstrates that plaintiffs face no "certainly

impending" threat of contracting COVID-19 simply by virtue of the fact that executions take

place at Terre Haute.  *See Clapper*, 568 U.S. at 401.

Plaintiffs also cannot show that the risk of contracting COVID-19 "fairly can be traced"

to defendants' actions rather than "result[ing] from the independent action of some third party."

*See Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42 (1976).  While the number of

COVID-19 cases at FCC Terre Haute has trended upward, the same is true of the surrounding

county,[3] and given the rigorous precautions BOP is taking at Terre Haute, it cannot be

reasonably concluded that the increased infection level at Terre Haute is fairly traceable to the

executions rather than simply to infectivity from the surrounding communities.  Third Watson

Dec. ¶ 14.  When the Court denied plaintiffs' first motion for a preliminary injunction, the Court

concluded that "the most reasonable inference to draw from the plaintiffs' evidence [was] that

FCC Terre Haute's infection rates are driven by the rates of infection in Vigo County," ECF No.

37 at 14, and evidence postdating the Court's ruling only further supports that conclusion.

And finally, there is no indication that halting the executions unless BOP implements

---

[2] The vaccine is thought to be close to 50% effective ten days after the first dose.  *See*
https://www.nytimes.com/2020/12/08/health/covid-vaccine-pfizer.html.
[3] *See* Third Watson Dec. ¶ 14 n.1 (describing how to access COVID infection numbers for the
counties that host correctional facilities).

11

plaintiffs' proposed additional mitigation measures will remedy plaintiffs' alleged injury by slowing or stopping the spread of COVID-19 at Terre Haute.  As explained, BOP is already working assiduously to mitigate the risks in accordance with CDC guidelines, including guidance on screening and testing, social distancing, wearing face coverings, donning personal protective equipment, educating staff, requiring self-reporting and quarantining, and minimizing interactions and staff rotations.  Third Watson Dec. ¶¶ 11–12.  In addition, BOP has now provided the first round of vaccines to over 500 inmates and staff members at Terre Haute.  *Id.* ¶¶ 8–9.  Plaintiffs seek to impose additional requirements that far exceed the CDC guidelines for correctional facilities—asking the Court to compel BOP to test all execution-associated visitors and Terre Haute staff members, require execution team members to quarantine for 14 days after arrival, and require execution-associated staff members to quarantine for 14 days after each execution.  ECF No. 48 at 23.  But given the robust safety measures already in effect at Terre Haute, which govern not only inmates and staff, but also execution-associated individuals, plaintiffs can only speculate that their proposed additional testing and quarantining measures would reduce the risk of COVID-19 infection even further.  *See E. Ky. Welfare Rights Org.*, 426 U.S. at 43.  Plaintiffs lack standing to halt all federal executions until BOP takes supplemental measures whose effects on plaintiffs' chances of contracting COVID-19 are attenuated at best. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (noting that equitable principles require that any relief "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs").

## III.   PLAINTIFFS' EIGHTH AMENDMENT CLAIM IS UNLIKELY TO SUCCEED ON THE MERITS.

Even if they had standing, plaintiffs would be unlikely to succeed on their novel Eighth Amendment claim that carrying out a capital sentence on another prisoner at another facility

amounts to cruel and unusual punishment of plaintiffs because it allegedly increases the risk that

plaintiffs will contract and be injured by COVID-19.  To succeed on their claim that this alleged

condition of their confinement will violate the Eighth Amendment, plaintiffs must show two

things.  First, they must show "a deprivation that is, from an objective standpoint, sufficiently

serious that it results 'in the denial of the minimal civilized measure of life's necessities.'"  *Gray*

*v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (quoting *Farmer*, 511 U.S. at 834).  That

"requires more than a scientific and statistical inquiry into the seriousness of the potential harm

and the likelihood that such injury to health will actually be caused"; it requires a showing that

"society considers the risk that the prisoner complains of to be so grave that it violates

contemporary standards of decency to expose *anyone* unwillingly to such a risk."  *Helling v.*

*McKinney*, 509 U.S. 25, 36 (1993).  Second, they must show that "prison officials are

deliberately indifferent to this state of affairs."  *Gray*, 826 F.3d at 1005 (quoting *Farmer*, 511

U.S. at 834).  They cannot satisfy either standard.

> **A.      Plaintiffs have not shown that they face a substantially increased risk of contracting COVID as a result of the executions.**

Plaintiffs fail to cure the shortcoming that this Court previously found fatal.  Rather than

presenting evidence showing that federal executions substantially increase plaintiffs' own risk of

contracting COVID, they once again rest their argument solely on what this Court previously

described as an assertion that "carrying out executions on prison property with prison staff

involved creates *some* additional risk of COVID-19 infection for prisoners."  ECF No. 37 at 14.

But as this Court explained, "'[t]he Eighth Amendment demands that officials ensure reasonable

safety, not that they protect against all risks,'" and plaintiffs could succeed on an Eighth

Amendment claim only by "show[ing], at least, that the decision to carry out executions during

the pandemic creates *substantial* additional risks for their health."  *Id.* (quoting *Estate of Simpson*

*v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017)) (emphasis added).  Plaintiffs' theory in this case

would imply that almost any change of prison operations during the COVID epidemic would

give rise to an Eighth Amendment claim, requiring this Court to dictate in exacting detail

whether staff and non-staff can come into FCC Terre Haute each day and what their individual

interactions inside and outside of the institution must look like.  Plaintiffs admitted as much

during oral argument on their previous motion, agreeing that their Eighth Amendment theory

would similarly prohibit even bringing in a "contracting crew" during the COVID epidemic.

Exhibit 3, Transcript of Dec. 8, 2020 hearing ("Trans.") 25 at 19–25.  In short, plaintiffs' theory

remains that the risk posed to them by any change in personnel or any change in prison

operations is "so grave that it violates contemporary standards of decency," *Helling v.

McKinney*, 509 U.S. 25, 36 (1993), a theory fundamentally at odds with relevant

pronouncements of the Supreme Court and Seventh Circuit.  *See, e.g.*, *Mays v. Dart*, 974 F.3d

810, 820 (7th Cir. 2020) (holding that courts evaluating the objective reasonableness of prison

administrators' COVID-19 response must consider "the totality of the measures [administrators]

ha[ve] taken to combat the spread of COVID-19" and "must account for the legitimate interests

that stem from the government's need to manage the facility in which the individual is detained")

(quotation marks omitted).

     This Court's previous order made clear that plaintiffs could not satisfy the substantial-

risk requirement by simply arguing that "executions, like any mass gathering, are risky during

the COVID-19 pandemic," ECF No. 37 at 13, but that is exactly what they attempt to do in their

renewed motion.  The one new piece of evidence, the purported expert declaration of Nina

Fefferman, advances the same abstract argument—that COVID is infectious and that bringing in

additional staff and non-staff poses some generalized "risk of COVID-19 spread and illness to

14

FCC Terre Haute prisoners."  ECF No. 47-2 at ¶ 8.  Her declaration admits that she cannot quantify or even estimate any increase in risk, *id.* at ¶¶ 11–12, and that her evaluation of increased risk rests predominately on general points such as "how quickly and extensively COVID-19 spreads," *id.* at ¶ 11.  Again, defendants do not dispute that COVID is a dangerous, transmissible disease that defendants, like the rest of the country, have been grappling with for almost a year.  But plaintiffs cannot show that the executions substantially increase their risk of COVID infection merely by arguing that admitting new entrants to FCC Terre Haute or changing staff duties poses a nonzero risk that the institution will experience one or more additional COVID infections.

In denying plaintiffs' last motion for a preliminary injunction, this Court found it especially important that plaintiffs had failed to show past executions were linked to an increase in the COVID infection rate.  ECF No. 37 at 13–14.  Plaintiffs' purported expert declarant Nina Fefferman addresses that point in two ways that are deficient and seriously damage her credibility as a purported expert.  First, she simply asserts that "waves of infection … have occurred in connection with past executions."  ECF No. 47-2 at ¶ 35.  She provides no further explanation, such as what data show those "waves" or how she has concluded that such "waves" resulted from past executions.  As discussed in prior briefing, plaintiffs asserted that COVID "spikes" followed past executions, but the available data in fact showed no such spikes; if she is relying on those past assertions, she is relying on plaintiffs' own disproven assertions instead of on any data.  *See* ECF No. 37 at 14 (finding that plaintiffs had failed to prove their "contention that executions are driving the increases in positive COVID-19 cases").  Second, immediately after she claims that past executions caused waves of infection, she claims that it would be erroneous to draw conclusions from an *absence* of past waves, as she asserts it is impossible to

distinguish "the various factors that influence the spread of COVID."  ECF No. 47-2 at ¶ 35.  In

short, Fefferman contends that any past increases in COVID infection rates are attributable to

executions, whereas the absence of past increases should be ignored because we cannot know

what factors have played a role in past COVID infection rates.  That heads-I-win, tails-you-lose

explanation of the historical data is inconsistent and wholly fails to address the evidentiary

failing this Court previously identified.

In fact, the most recent data—available publicly online but glaringly not addressed by

Fefferman—shows that the December executions were once again not followed by any "spike"

in COVID infections.  The daily number of documented active cases among inmates at FCI Terre

Haute, where plaintiffs reside, has *fallen* by over ninety percent since December 11, from 155 on

December 11 to 55 on December 27, to 13 on January 3.  Plaintiffs have repeated their failure to

show any "spikes"—or, in Fefferman's terms, "waves"—of infections within FCI Terre Haute as

a result of the past executions.[4]



(Active COVID-19 cases at FCI Terre Haute)

Plaintiffs instead claim that there is a post-execution COVID spike at USP Terre Haute—

a separate facility from the one housing plaintiffs—but the data does not support that claim

---

[4] These numbers and graphs are available on an interactive dashboard hosted by the U.S.
Department of Justice, Office of the Inspector General, previously described in the December 4,
2020 Declaration of T.J. Watson, ECF No. 28-1 ¶ 14.

either.  Instead, the number of active COVID infections among USP inmates began to climb as early as December 1, after staying steady for the ten days following the November 19 execution. The number of active infections increased from 6 on November 30, to 18 on December 1, to 144 by the December 11 execution, and to 410 on December 28, before decreasing to 344 by January 3.  In short, as shown by the graph below, the December 10 and 11 executions took place during an increase in infections that long preceded them and continued long after them.  Plaintiffs offer no explanation how that increase in the COVID infection rate can be attributed to the executions.



(Active COVID-19 cases at USP Terre Haute)

In sum, plaintiffs claim in their briefing that the executions caused an "exponential increase in COVID-19 infection," ECF No. 48 at 7, but they can show only (1) a dramatic *decrease* in the COVID rate at plaintiffs' institution, and (2) a *preexisting* increase at USP Terre Haute.  As with their earlier unsuccessful application for a preliminary injunction, plaintiffs' theory requires accepting that any possible shape of a COVID infection graph reflects a post-execution spike in infections.  The same backwards analysis is urged by their purported expert declarant, who otherwise merely repeats generalized concerns regarding the possibility that bringing in outsiders and redistributing staff creates an abstract risk of increased COVID infection within FCC Terre Haute generally.  Because plaintiffs have once again failed to show that holding an execution substantially increases their risk of contracting COVID, their effort to prohibit federal executions must be denied.

**B.      Plaintiffs have not shown a criminally reckless disregard for the risks of COVID.**

Even if plaintiffs had shown that holding executions would substantially increase their own risk of contracting COVID, they have failed to show—or even to argue—that holding the executions under the already-discussed safety precautions shows a criminally reckless disregard for plaintiffs' health and safety.  In the last round of briefing, defendants documented the extensive efforts they have undertaken to reduce the spread of COVID within FCC Terre Haute, including with respect to the executions, and minimizing the contact between the execution team and FCC Terre Haute staff.  *See* ECF No. 28 at 4–9, 22–31.  Those same precautions remain in effect.  Third Watson Dec. ¶ 7.  And federal courts across the country have repeatedly vindicated BOP's COVID precautions.[5]

Rather than explaining how those measures reflect a deliberate indifference to their welfare, Plaintiffs continue to rest on their previous assertion that holding executions at all during the COVID epidemic *per se* violates the Eighth Amendment, regardless of the precautions

---

[5] *Wilson v. Williams*, 961 F.3d 829, 841 (6th Cir. 2020) (BOP had responded reasonably to the risk posed by COVID-19 and therefore had not been deliberately indifferent to the inmates' Eighth Amendment rights"); *Hallinan v. Scarantino*, No. 5:20-HC-2088-FL, slip op. 29 (E.D.N.C. June 11, 2020) [ECF No. 62] (same); *Wragg v. Ortiz*, No. 20-cv-5496, slip op. 64–65 (D.N.J. May 27, 2020) [ECF No. 40] (same); *Chunn v. Edge*, 465 F. Supp. 3d 168, 202 (E.D.N.Y. 2020) (same); *Bowman v. Sawyer*, No. 1:19-cv-1411, slip op. 4 (D. Colo. May 27, 2020) [ECF No. 78] (public interest did not favor granting inmate's request for preliminary injunction barring the addition of new inmates to the facility to prevent overcrowding in light of COVID-19); *Grinis v. Spaulding*, No. 20-cv-10738, slip op. 4–5 (D. Mass. May 8, 2020) [ECF No. 45] (finding no deliberative indifference to the health risks of inmates due to COVID-19); *Jones v. Bergami*, No. 20-cv-132, slip op. 3–4, 6 (W.D. Tex. May 21, 2020) [ECF No. 2] (noting BOP's measures to reduce risk of COVID-19 transmission and holding that the court should not manage BOP's response to the pandemic); *Livas v. Myers*, No. 20-cv-422, slip op. 17 (W.D. La. April 22, 2020) [ECF No. 30] (declining to superintend BOP's operation of the prison by granting *inmate's request for lesser form of detention in light of COVID-19); Cf. Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020) (plaintiffs were unlikely to establish deliberate indifference when prison officials were taking measures "informed by guidance from the CDC and medical professionals").

taken.  Their alternative list of demands—essentially, that FCC Terre Haute cripple its operations and impose burdensome conditions on all parties involved—serves only to show that plaintiffs can identify no constitutional deficiency in BOP's current efforts to mitigate the COVID epidemic within their facilities and instead simply seek to halt the scheduled executions.  Indeed, the very first operational change plaintiffs request is to mandate a fourteen-day quarantine of all execution team members before an execution can take place, which would necessarily preclude the current execution schedule, given that plaintiffs requested this measure for the first time only 15 days before the next scheduled execution and proposed a briefing schedule that would end less than a week before that date.  Their purported expert declarant's recommendations, to which plaintiffs point this Court (ECF No. 48 at 8), would extend that pre-execution quarantine requirement to all "other BOP staff, media, family members and legal teams, state and local law enforcement personnel and contractors … who travel to Terre Haute to participate in some manner in the executions."  ECF No. 47-2 at ¶ 41.

Deliberate indifference imposes a "high hurdle," requiring a showing "approaching a total unconcern for the prisoner's welfare."  *Rosario*, 670 F.3d at 821.  "[T]he conduct must be reckless in the criminal sense"; negligence and even gross negligence do not suffice.  *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).  More generally, prison officials' conduct is judged based on "the constraints facing the official," *Wilson v. Seiter*, 501 U.S. 294, 303 (1991), and managing a prison while combating a novel virus requires officials to balance competing interests.  *See id.* (explaining that the deliberate-indifference test applies in medical contexts because "the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities").  One of those interests is the Government's strong interest in carrying out its capital sentences.  *See infra* V.

The Supreme Court has repeatedly affirmed that the Eighth Amendment does not authorize courts to superintend prison officials' decisions about how to balance competing interests within the constraints of the prison setting.  Prison officials act with deliberate indifference in violation of the Eighth Amendment only if they "know[] of and disregard[] an excessive risk to inmate health or safety," a standard that "incorporates due regard for [officials'] unenviable task of keeping dangerous men in safe custody under humane conditions."  *Farmer*, 511 U.S. at 837, 845 (quotation marks omitted).  As the Seventh Circuit has recently emphasized, "[c]orrectional administrators must have 'substantial discretion to devise reasonable solutions to the problems they face,'" and courts must give "considerable deference . . . to the judgment of prison administrators" about how to balance competing objectives.  *Mays*, 974 F.3d at 820–21 (quoting *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 326 (2012)); *see also Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011) (noting that the Eighth Amendment "leav[es] ample room for professional judgment, constraints presented by the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources").  The Supreme Court has accordingly emphasized that courts must use "caution" in issuing injunctions in the prison context and may not "enmesh[]" themselves "in the minutiae of prison operations."  *Farmer*, 511 U.S. at 846–47.

In light of defendants' exhaustively documented efforts to reduce the spread of COVID within FCC Terre Haute (*see* ECF No. 28 at 4–9, 22–31), plaintiffs cannot show that BOP is acting with deliberate indifference to the risks of COVID.  Federal courts across the country have repeatedly rejected claims—Eighth Amendment and otherwise—that BOP's COVID-mitigation efforts have been legally insufficient.  *See* n.5, *supra* (collecting cases).  And earlier in this litigation, this Court held that plaintiffs had not carried their burden on this requirement merely

by presenting disputed evidence that defendants "could do more to prevent COVID-19 transmission in the prison." ECF No. 37 at 13. Plaintiffs have supplied no new evidence or argument regarding BOP's supposedly reckless mindset since their last unsuccessful effort to obtain a preliminary injunction, and this Court should adhere to its past decision. Indeed, showing their commitment to reducing COVID transmission within FCC Terre Haute, BOP began an immediate program of vaccinating staff and inmates as soon as the vaccine was available to the facility; to date, BOP has administered the first dose of the vaccine to 355 of its approximately 2,228 inmates, and 206 of its approximately 709 staff members. Third Watson Dec. ¶¶ 8–9.

By relying solely on their argument that holding executions increases the risk of COVID transmission, plaintiffs are once again arguing for a rule that the Eighth Amendment *per se* prohibits holding executions during the COVID pandemic—that the interest in carrying out lawful capital sentences is insufficient to justify even the remotest risk, at least so long as some hypothetical (and unattainable) set of precautions might further reduce that risk to any degree. But that position has no basis in law. Indeed, the Supreme Court itself has repeatedly held that even the capital inmate himself does not have an Eighth Amendment right to "the avoidance of all risk of pain in carrying out executions." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019) (quoting *Baze v. Rees*, 553 U.S. 35, 47 (2008)). As the courts have made repeatedly clear, the Eighth Amendment does not require the elimination of all risky or injurious conditions of confinement. *See, e.g.*, *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) ("The Eighth Amendment demands that officials ensure 'reasonable safety,' not that they protect against all risks."); *see also Hope v. Warden York Cty. Prison*, 972 F.3d 310, 330 (3d Cir. 2020) ("Nor does a failure to eliminate all risk establish that the Government was deliberately

indifferent to their serious medical needs.").  The Eighth Amendment does not require that

officials "take perfect action."  *Rosario*, 670 F.3d at 822.  Plaintiffs' attempt to wholly bar a

legitimate form of punishment, duly imposed here on individuals other than plaintiffs for horrific

crimes, without regard to the penological objectives served by those sentences, is extraordinary

and finds no support in precedent.

Nor have plaintiffs demonstrated that the alternative relief they request, incorporated

from the purported expert declaration of Nina Fefferman, has any relation to the standards of the

Eighth Amendment or to the increased risk of transmission supposedly caused by the executions.

Fefferman's proposed response to the COVID epidemic requires apparently novel, impossibly

onerous requirements that she does not claim are followed at any other institution. Notably,

Fefferman's recommended practices for prison operations far exceed the CDC's own

recommendations, which plaintiffs previously presented as the gold standard for evaluating

COVID prevention.  ECF No. 14 at 24 (contending that holding the executions would violate the

Eighth Amendment because "Defendants will be ignoring the CDC's recommendation").  And

rather than identifying special additional risks posed by executions and proposing tailored

precautions to counteract those risks, Fefferman takes aim at everyday prison operations that will

occur regardless of the executions—such as the presence of staff and contractors who spend their

nights outside of prison walls—and insists that those operations must end unless the executions

are halted.  She fails to account for the many precautions BOP is taking to prevent COVID-19

transmission at FCC Terre Haute, both with respect to executions and more generally, which she

describes as "sound," ECF No. 47-2 at ¶ 29; her only response is to speculate that executions

might cause staffing changes that might affect downstream prison operations in ways that might

cause increased contacts or make contact tracing more difficult—in sum, nothing but speculation

on speculation about the minutiae of prison staffing and its generalized effects. That falls far

short of identifying any way in which defendants are recklessly ignoring an alleged substantial

risk posed by the scheduled executions.

Merely to state Fefferman's and plaintiffs' demands is to discredit them, especially when

compared against the CDC's far-less-onerous recommendations for correctional institutions.  *See*

CDC, Guidance for Correctional and Detention Facilities (Jan 2, 2021),

https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-

correctional-detention.html (CDC Guidance).  Fefferman recommends that anybody involved in

the execution—including staff members who might already be regularly present at FCC Terre

Haute, as well as third parties such as witnesses, reporters, lawyers, and family members of the

victims—be confined to Terre Haute for a fourteen-day quarantine before the execution and not

be released after the quarantine until they test negative.  ECF No. 47-2 at 20–21.  The BOP

staffers being quarantined in this fashion would be policed to ensure they do not engage in

"profligate activities" with one another. *Id.* ¶ 21.  But the CDC, far from demanding that all

people crossing the threshold of a correctional institution be quarantined for fourteen days

beforehand, recommends instead "verbal screening and temperature checks for

incarcerated/detained persons, staff, volunteers, and visitors who enter correctional and detention

facilities." CDC Guidance.  BOP is taking those precautions.  *See* ECF No. 28-1 ¶¶ 8, 16.  And

under CDC guidelines, staff are not recommended to quarantine fourteen days before each day

they show up to work, as Fefferman insists, but are instead recommended to quarantine—at

home, not as guests of the prison—if they are "identified as close contacts of someone with

COVID-19."  CDC Guidance.  The CDC guidelines appear to offer no commentary on

"profligate activities."  In short, the CDC's recommendations recognize that a prison operates

through staff, visitors, and volunteers who live and interact outside of the prison, and who cannot

be required to quarantine fourteen days before each day they spend in the facility.

Equally outside the mainstream is Fefferman's insistence that all individuals be tested

before the execution and that all involved staff be tested every day of the week of scheduled

executions.  As discussed, the CDC guidelines recommend that staff and visitors undergo verbal

screening and temperature checks, as they do at FCC Terre Haute.  Indeed, the CDC's guidance

on testing in correctional institutions emphasizes that testing programs should prioritize the

symptomatic and then the close contacts of confirmed or suspected cases; any consideration of

testing "asymptomatic individuals without known or suspected exposure" must account for

"[p]ractical considerations" such as "the availability of resources" and "timeliness of results."

CDC, Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities

(Jan. 2, 2021), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-

detention/testing.html.  The declaration of FCC Terre Haute Complex Warden T.J. Watson

makes clear that it is not feasible to conduct the testing program advocated by Fefferman.  Third

Watson Dec. ¶¶ 11, 15.  It seems unlikely that plaintiffs truly want FCC Terre Haute to divert

testing resources from other priorities—such as testing symptomatic inmates or those inmates in

close contact with suspected COVID cases—in favor of repeatedly testing asymptomatic staff

members who are not close contacts of known or suspected COVID cases.  Plaintiffs have not

shown that current testing priorities are inferior to their proposed alternatives at reducing the

spread of COVID, let alone that the decision to adopt the current testing approach over

theoretical alternatives shows deliberate indifference to the risk of COVID.

Following the executions, BOP staff under Fefferman's recommendations would be

subjected to another fourteen-day quarantine before they could resume work, even, apparently, if

24

they have no symptoms and no contact with a suspected COVID case.  Again, the CDC recommendations do not suggest that staff should be quarantined for two weeks following each shift, even if additional personnel or other outsiders—for example, a "contracting crew," Trans. 25 at 19–25—entered prison grounds during a staff member's shift.  And the declaration of FCC Terre Haute's Complex Warden, T.J. Watson, makes clear that a fourteen-day quarantine for all staff members involved in an execution would be impracticable and would seriously hamper prison operations by removing critical staff from their other duties.  Third Watson Dec. ¶ 13.  As with all of her recommendations, Fefferman offers no explanation why executions pose a unique risk of COVID that makes these recommendations constitutionally necessary when an execution staff is brought into the facility, when they would be absurd for any other prison operation that brings in different personnel or other outsiders.

In short, Fefferman and plaintiffs believe that the Eighth Amendment permits an execution to take place only if BOP quarantines staff, witnesses, victims, and members of the media for weeks, shuts down a substantial portion of its staff for a month, and polices the behavior of the quarantined group.  It is difficult to escape the conclusion that these recommendations are deliberately offered to make federal executions impossible as a practical matter.

Likewise, there is no merit to plaintiffs' suggestion that the more limited ability to conduct contact tracing on members of the execution team shows a criminally reckless disregard for plaintiffs' safety.  The declaration of Rick Winter, a BOP Regional Counsel involved in effectuating executions, describes the important practical considerations that require the identity of execution team members to remain confidential, including protecting those team members from attack in public or in their ordinary job duties within correctional facilities.  Second Winter

Dec. ¶¶ 11–14.  Plaintiffs appear to suggest that it is illegitimate for defendants to address those risks if it makes contact tracing any more difficult, but the Seventh Circuit has made clear that "[c]orrectional administrators must have 'substantial discretion to devise reasonable solutions to the problems they face,' particularly when safety and security interests are at stake." *Mays*, 974 F.3d at 820 (quoting *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326 (2012)).  Even if BOP cannot always conduct contact tracing if an execution team member tests positive for COVID-19, "the totality of the measures [BOP] already ha[s] taken to combat the spread of COVID-19," *id.*—including requirements that the execution team and all others involved in executions wear masks and maintain social distance where possible, efforts to minimize interaction between the execution team and FCC Terre Haute staff, and daily COVID-19 screening for staff and all others who enter the Terre Haute complex—refute any claim that BOP is criminally indifferent to the risks of COVID-19.  As with the recommendations that BOP staff members spend weeks in quarantined detention, this Court should reject plaintiffs' demand that members of the execution team have their identities exposed as a penalty for participating in executions.

That BOP has not adopted plaintiffs' recommendations is not evidence of deliberate indifference to the supposed increased risk posed by the scheduled executions.  Indeed, these demands are not tailored to address the increased risk allegedly posed by the scheduled executions, but instead seem designed to address the risks of COVID that are inherent to ordinary operations at this or any other correctional institution.  For example, Fefferman proposes that even BOP staff ordinarily assigned to FCC Terre Haute be required to quarantine for two weeks before an execution, but she gives no explanation why those same staffers should not be required to quarantine before other shifts.  Presumably, if plaintiffs face an

unconstitutional risk of harm from an FCI staffer who visits a grocery store or travels to a medical appointment the week before his execution-day shift, they also face an unreasonable risk from an FCI staffer who does so the week before any other shift.  Plaintiffs' suggestion that the prison be encased in a bubble for several weeks, beyond being unreasonable in its own right, offers no explanation why the need to so encase the prison arises only when the people daily entering and exiting the prison are doing so in relation to an execution as opposed to other functions.

This latest preliminary injunction application is just another effort to use the COVID epidemic as a vehicle to enjoin federal executions.  Plaintiffs fail to identify any COVID precaution that BOP is forgoing during these executions that demonstrates the deliberate indifference required to state an Eighth Amendment claim.  But as the Seventh Circuit held and this Court recently reaffirmed, BOP has "nearly unfettered discretion to schedule executions." ECF No. 37 at 13–14 (citing *Peterson v. Barr*, 965 F.3d 549, 552−53 (7th Cir. 2020)).  Plaintiffs' burden is to show that, in carrying out those executions, BOP is exposing them to "substantial additional risks for their health" with a criminally reckless state of mind.  *Id.*  Their substitute argument, that this Court should decide executions do not serve an interest that justifies tolerating any risk, is just asking this Court to disregard the lesson from *Peterson* and from the Supreme Court's consistent jurisprudence upholding the government's interest in carrying out lawfully imposed capital sentences.

In short, this case presents the same deficiency that the Court rightly noted after the last round of preliminary injunction briefing.  Plaintiffs' claim implies that carrying out ordinary correctional activities during the COVID epidemic shows an unconstitutional disregard for the health and safety of inmates.  Rather than bring a suit challenging those ordinary operations,

which suit would surely fail, plaintiffs instead insist that halting federal executions should be the price of not shutting down the prison entirely.  Because they have failed to show that these executions are being carried out in a fashion that shows criminally reckless disregard for inmate safety, plaintiffs' claim must fail.

## IV.   PLAINTIFFS FAIL TO SHOW IRREPARABLE INJURY

Because plaintiffs have failed to establish a likelihood of success on the merits, the Court need not proceed further to consider the remaining preliminary injunction factors.  *See GEFT Outdoors*, 922 F.3d at 367–68 (noting that if a plaintiff cannot show a likelihood of success on the merits of his claim, "there [is] no need for the district court to conduct further analysis of the 'threshold phase' for preliminary injunctive relief, or to move to the 'balancing phase'"); *accord Lankford v. Talbot Dr.*, No. 1:18-cv-03935, 2020 WL 2128580, at *1 (May 5, 2020) (quoting same).  This approach is consistent with the Supreme Court's application of the preliminary injunction standard in Eighth Amendment method-of-execution challenges, where an inmate's failure to establish a likelihood of success alone warrants denial of the inmate's motion to preliminarily enjoin his execution.  *See Glossip v. Gross*, 576 U.S. 863, 877–78 (2015).

Even if the Court were to proceed, however, it should find that plaintiffs have failed to show the requisite irreparable harm that is necessary to justify an injunction.  In denying plaintiffs' first motion for a preliminary injunction, the Court concluded that plaintiffs "ha[d] no[t] demonstrated an irreparable injury" because they "ha[d] not shown that they are likely to be infected with COVID-19 because of the scheduled executions."  ECF No. 37 at 15.  Nothing in plaintiffs' second motion casts doubt on the Court's conclusion.

Plaintiffs contend that, because "the current incidence of COVID-19 inside and outside of FCC Terre Haute" is high, ECF No. 47 at 19, defendants should postpone all executions until defendants implement the additional, infeasible testing and quarantining measures for execution-

28

associated individuals that are recommended by their purported expert witness Nina Fefferman.
But, just as when the Court denied their first preliminary-injunction motion, plaintiffs still cannot
demonstrate that they are "likely" to become infected absent relief, especially given the
vaccinations and other virus-related precautions BOP has taken and offered plaintiffs.  *See* Third
Watson Dec. ¶¶ 8–9, 11–12; Dec. 5, 2020 Watson Dec. (ECF No. 28-1) ¶¶ 8–12, 15–17, 19–23.
All of those existing safeguards minimize the likelihood of plaintiffs' contracting COVID-19 as
a result of executions that take place at Terre Haute and minimize any risk of irreparable harm.
That fundamental deficiency defeats plaintiffs' claims regardless of whether they seek to halt all
executions, full stop (as they did in their first preliminary-injunction motion), or whether they
seek to halt all executions until BOP takes various infeasible measures (as they do now).[6]

## V.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST A PRELIMINARY INJUNCTION HALTING ALL FEDERAL

---

[6] Plaintiffs argue that the Court may consider members of the putative class when evaluating the likelihood of success and the risk of irreparable harm.  ECF No. 48 at 20.  This contention fails on numerous fronts.  Most fundamentally, plaintiffs make no showing that putative class members face greater risks than plaintiffs do; there is accordingly no basis to conclude that unnamed class members could carry their burdens of demonstrating Article III standing, an Eighth Amendment violation, or likely irreparable injury where plaintiffs cannot.  Beyond that, unlike in the cases they cite, plaintiffs here have not even moved for class certification or given the court any basis for evaluating whether certification would be warranted.  *See, e.g.*, *Stroucher v. Shah*, 891 F. Supp. 2d 504, 518 (S.D.N.Y. 2012); *Doe v. Trump*, 418 F. Supp. 3d 573, 602 (D. Ore. 2019), *rev'd*, ___ F.3d ___, 2020 WL 7778213 (9th Cir. Dec. 31, 2020).  And it is well established that a named plaintiff who lacks standing may not "piggy-back on the injuries of the unnamed class members," *Payton v. County of Kane*, 308 F.3d 673, 682 (7th Cir. 2002); the Supreme Court has made clear that plaintiffs must "allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent," *Warth v. Seldin*, 422 U.S. 490, 502 (1975).  The Seventh Circuit has also held that a plaintiff whose claims fail on the merits, as plaintiffs' claims here do, cannot "sue as a class representative," regardless of the strength of putative class members' potential claims.  *Sample v. Aldi Inc.*, 61 F.3d 544, 551 (7th Cir. 1995), *abrogation on other grounds recognized by Carson v. Bethlehem Steel Corp.*, 82 F.3d 157 (7th Cir. 1996).

**EXECUTIONS UNTIL PLAINTIFFS' PROPOSED MEASURES CAN BE IMPLEMENTED**

Because plaintiffs' arguments are not likely to succeed on the merits and because they have failed to show irreparable harm, this Court need not consider the remaining injunction factors. *See GEFT Outdoors*, 922 F.3d at 364. Should the Court proceed further, however, the equities weigh heavily against issuing an injunction. *See Winter*, 555 U.S. at 32.

Plaintiffs do not even address, much less dispute, this Court's conclusion that "[t]he defendants have a substantial legal interest in timely enforcement of criminal defendants' sentences, such that the Court should not stay an execution lightly." ECF No. 37 at 15 (citing *Bucklew*, 139 S. Ct. at 1133). The American people have chosen to make capital punishment available in the federal system. *Bucklew*, 139 S. Ct. at 1123. If that decision is to be given meaningful effect, the public interest lies in the enforcement of sentences. The indefinite postponement of executions until defendants can meet plaintiffs' standards for testing and quarantining execution-associated individuals is inconsistent with the Supreme Court's teaching that "[b]oth the [government] and the victims of crime have an important interest in the timely enforcement of a [death] sentence," *Bucklew*, 139 S. Ct. at 1133 (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)); *see also Calderon v. Thompson*, 523 U.S. 538, 556 (1998) (explaining that once post-conviction proceedings "have run their course . . . finality acquires an added moral dimension"). "Only with an assurance of real finality can the [Government] execute its moral judgment in a case," and "[o]nly with real finality can the victims of crime move forward knowing the moral judgment will be carried out." *Id.* at 556. Unduly delaying executions can also frustrate the death penalty by undermining its retributive and deterrent functions. *See Bucklew*, 139 S. Ct. at 1134; *id.* at 1144 (Breyer, J., dissenting).

Indeed, the Supreme Court has routinely denied stay-of-execution applications even by

condemned inmates while their challenges to execution protocols were pending.  *See Storey v. Lombardi*, 135 S. Ct. 1198 (2015) (mem.) (denying stay-of-execution applications by Missouri inmates while challenges to Missouri's single-drug pentobarbital protocol were pending), and *Warner v. Gross*, 135 S. Ct. 824 (2015) (mem.) (same, involving a challenge to Oklahoma's execution protocol).  It defies belief that these plaintiffs' asserted harm (which hinges not on anything related to the executions, but rather a speculative increase in risk from COVID-19) merits a suspension of all executions for an indefinite period until defendants can implement plaintiffs' draconian safety standards, when the Supreme Court has rejected similar requests from inmates themselves.  Indeed, although plaintiffs have recharacterized their request for an injunction as seeking safety measures prior to the scheduled executions—rather than halting them full stop—one of plaintiffs' enumerated requests is a 14-day quarantine period *before* the scheduled executions.  That safety measure would, in effect, halt the scheduled executions, given that plaintiffs waited until the last moment to propose it.

When it denied plaintiffs' first preliminary-injunction motion, the Court correctly concluded that plaintiffs' interest in avoiding unreasonable risk of exposure to COVID-19 "does not weigh heavily" in the balance "because plaintiffs have not shown that the scheduled executions will create a substantial additional risk to their health."  ECF No. 37 at 15.  Plaintiffs' speculative allegations of harm are far outweighed by the government's interest in carrying out scheduled executions after lengthy post-conviction review periods.  *Cf. In re Federal Bureau of Prisons' Execution Protocol Cases*, 955 F.3d 106, 129 (D.C. Cir. 2020) (Katsas, J., concurring) (noting that federal courts "should not assist" attempts "to delay lawful executions indefinitely"); *LeCroy v. U.S.*, 975 F.3d 1192, 1196 (11th Cir. 2020) (finding that courts are not vested "with a free-floating, standardless reservoir of authority to postpone an already-scheduled execution, free

and clear of the traditional stay standard"); *U.S. v. Lee*, No. 4:97-cr-00243-LPR-2, 2020 WL
3921174, at *5 (E.D. Ark. July 10, 2020) (leaving to the Executive Branch the judgment about
whether to move ahead with executions during the COVID-19 crisis).  That interest is
particularly acute given the scheduling and operational difficulties surrounding executions.  *See,
e.g.,* Declaration of Kevin Pistro (ECF No. 27-2) ¶ 8.  Indeed, even where an inmate himself
directly challenges the method of execution, the Supreme Court has warned that courts must
"police carefully against attempts to use such challenges as tools to interpose unjustified delay,"
*Bucklew*, 139 S. Ct. at 1134, which can even "undermine [capital punishment's] jurisprudential
rationale by reducing its deterrent effect and retributive value," *id.* at 1144 (Breyer, J.,
dissenting) (alteration in original) (quotation marks omitted).  *Cf. Peterson*, 965 F.3d at 553
(rejecting plaintiffs' attempt to enjoin BOP from carrying out execution because BOP "has the
unconstrained discretion to choose a date for the execution").[7]

     Finally, the Government's interest and the public interest in implementing the sentences
of the inmates to be executed is "magnified by the heinous nature" of their offenses.  *See, e.g.,
Execution Protocol Cases*, 955 F.3d at 127 (Katsas, J., concurring).  The condemned inmates at
issue here were duly convicted and sentenced to capital punishment.  The sentences of those

---

[7] Plaintiffs' attempt to distinguish *Peterson* on grounds that it involved an Administrative
Procedure Act claim, ECF No. 48 at 20, is unavailing.  The holding in *Peterson* reinforces the
"unconstrained discretion [of the Attorney General and BOP] to choose" an execution date.  965
F.3d at 553.  That discretion derives from the Federal Death Penalty Act, 18 U.S.C. § 3596(a),
and applicable regulations, 28 C.F.R. § 26.3(a)(1).  *Peterson*, 965 F.3d at 552.  The fact that the
claims were brought under the APA has no bearing on the court's finding to this effect and was
relevant only insofar as the court found that the APA claim lacked "any arguable legal basis"
because the decision "to set execution dates" was "committed to agency discretion by law."  *Id.*
And although plaintiffs note that *Peterson* did not involve the Eighth Amendment, that
distinction is irrelevant because, as explained above, plaintiffs have failed to demonstrate a
likelihood of success on the merits with respect to their Eighth Amendment claim.

inmates have been upheld throughout their many years of direct and post-conviction review.  The notion that plaintiffs' interest in postponing the executions outweighs the Government's interest and the public interest in finally implementing the lawful capital sentences the inmates incurred finds no support in equity.  For all these reasons, the balance of equities tips against granting a preliminary injunction.

## CONCLUSION

For the foregoing reasons, plaintiffs' second motion for a preliminary injunction should be denied.

Dated: Jan. 4, 2021

Respectfully submitted,

JOHN C. CHILDRESS
Acting United States Attorney

Shelese Woods
Assistant United States Attorney

Brigham J. Bowen
Assistant Director

*/s/ Jordan L. Von Bokern*
Lisa A. Olson
Jordan L. Von Bokern
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20001
(202) 305-7919
Lisa.Olson@usdoj.gov
Jordan.L.Von.Bokern2@usdoj.gov

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 4, 2021, the foregoing was filed electronically through ECF/CM.  On this same date, electronic service will be made to all counsel of record through the Court's ECF/CM system.

/s/ *Jordan L. Von Bokern*
Jordan L. Von Bokern
Trial Attorney