UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

PATRICK R. SMITH, et al.                )
                                        )
                    Plaintiffs,         )
                                        )
        v.                              )        No. 2:20-cv-00630-JMS-DLP
                                        )
WILLIAM P. BARR, et al.                 )
                                        )
                    Defendants.         )

**Order Granting in Part and Denying in Part
Plaintiffs' Second Motion for Preliminary Injunction**

The plaintiffs here—two inmates at FCI Terre Haute—have made a strong showing that

they face an unconstitutional health risk if the defendants carry out scheduled executions without

significant modifications to their COVID-19 prevention measures. For this reason and those

discussed below, their second motion for preliminary injunction is granted.

**I.      Background, Procedural History, and Second Motion for Preliminary Injunction**

All federal executions take place at the Federal Correctional Complex ("FCC Terre Haute")

in Terre Haute, Indiana. FCC Terre Haute contains multiple facilities, including, as relevant here,

the United States Penitentiary ("USP"), where death row inmates are housed, the Federal

Correctional Institution ("FCI"), and the execution facility. The plaintiffs—two inmates at the FCI

who purport to represent a class of all incarcerated persons at FCC Terre Haute—allege that the

defendants' decision to carry out executions at FCC Terre Haute during a deadly pandemic violates

their rights under the Eighth Amendment. Dkt. 1, ¶ 8.

The plaintiffs filed an emergency motion for preliminary injunction on November 30,

2020, dkt. 12, which the Court denied on December 8, 2020, dkt. 37. The Court concluded that

although "conducting executions at this time may well result in more COVID-19 cases for those

1

involved in the executions, the plaintiffs have not shown that increased risk extends to them, and thus have not shown a likelihood of success on the merits of their motion." *Id.* at 1–2. The Court found that the defendants and prison staff could do more to prevent COVID-19 transmission at FCC Terre Haute generally and that conducting executions during the pandemic is risky, but that the plaintiffs failed to produce evidentiary support in the form of scientific or statistical data to demonstrate that conducting executions during the pandemic creates substantial additional risks to the inmates' health. *Id.* at 13–14. After denying the motion, the Court granted the plaintiffs' motion for expedited discovery. Dkts. 45, 46.

Brandon Bernard was executed on December 10, and Alfred Bourgeois was executed on December 11.[1] Three executions are scheduled for next week: Lisa Montgomery on January 12, Cory Johnson on January 14, and Dustin Higgs on January 15.[2]

On December 28, 2020, the plaintiffs filed a second motion for preliminary injunction and evidence in support of their motion. Dkt. 47. The evidence includes information about an outbreak of COVID-19 infections at FCC Terre Haute, information produced in discovery by the defendants, and a declaration from an expert in modeling risk for infectious diseases, Dr. Nina Fefferman. Dkts. 47-2–10. The defendants filed a response in opposition with updated declarations from FCC Terre Haute warden T.J. Watson and BOP Regional Counsel Rick Winter. Dkts. 51, 51-1, 51-2. The plaintiffs filed a reply, dkt. 54, and the motion is now ripe for ruling.

As discussed at length in the Court's December 8, 2020 Order, the novel coronavirus, or COVID-19, is killing hundreds of Americans each day, and prisoners are particularly vulnerable.

---

[1] Federal Bureau of Prisons, *Historical Information: Capital Punishment*, https://www.bop.gov/about/history/federal_executions.jsp (last visited Jan. 7, 2021).
[2] Federal Bureau of Prisons, *Scheduled Executions*, https://www.bop.gov/resources/federal_executions_info.jsp (last visited Jan. 7, 2021).

December 2020 was the deadliest and most infectious month in the United States since the start of the pandemic, with over 77,000 deaths and 6.4 million new cases.[3]

When the Court issued its December 8, 2020, Order, 264 FCC Terre Haute inmates and 21 staff members were COVID-19 positive, 3 inmates had died, and 301 inmates and 38 staff members had recovered. Dkt. 37 at 5. As of January 7, 2021, 108 FCC Terre Haute inmates and 24 staff members are positive, and 1117 inmates and 105 staff members have recovered.[4] Put differently, between those two dates, 657 inmates and 70 staff members tested positive for the virus. On December 7, 2020, an FCI inmate died in an area hospital after testing positive for COVID-19 at the prison on November 17, 2020.[5] Both Mr. Johnson and Mr. Higgs tested positive in December, as did other inmates on death row.[6]

Each execution brings approximately 50 to 125 individuals to FCC Terre Haute. The execution team consists of approximately 40 BOP employees brought from out-of-state facilities. Dkt. 28-1 at ¶ 16. The execution team does not quarantine upon their arrival in Indiana. *Id.* at ¶ 17. The execution team works primarily in and near the execution facility; they generally do not enter FCI or USP or interact with inmates other than the condemned. Dkt. 28-1 at ¶ 17. The team does,

---

[3] Nicole Acevedo, *December was the deadliest, most infectious month since the start of the pandemic*, NBC NEWS, https://www.nbcnews.com/news/us-news/december-was-deadliest-most-infectious-month-start-pandemic-n1252645 (last updated Jan. 2, 2021). Further, a new, more transmissible COVID-19 variant was identified in the United States in December, and experts are confident that variant is now everywhere. Phil Helsel, *Covid variant found in Florida, more cases identified in California,* NBC NEWS (Dec. 31, 2020), https://www.nbcnews.com/us-news/covid-variant-found-florida-more-cases-identified-california-n1252637 (explaining variant is believed to be more transmissible but not deadlier).

[4] Federal Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last updated Jan. 7, 2021).

[5] BOP Press Release (Dec. 8, 2020), *Inmate Death at FCI Terre Haute*, https://www.bop.gov/resources/news/pdfs/20201208_press_release_thx.pdf.

[6] Lisa Trigg, TRIBUNE-STAR (Dec. 22, 2020), *COVID-19 soars at Terre Haute federal prison complex*, https://www.tribstar.com/news/covid-19-soars-at-terre-haute-federal-prison-complex/article_57a3ad58-4464-11eb-b444-0702db9b765d.html.

however, interact with FCC Terre Haute personnel incident to their role assisting with the executions. *Id.* Approximately 70 FCC Terre Haute staff are removed from their regular duties to assist with the executions by managing check points and perimeter security, staffing the command center, and escorting witnesses and demonstrators. *Id.* Media witnesses, members of the defendants' legal team, and family members of the victims and inmates also assemble at the prison to witness the execution. *Id.* at ¶ 16.

At FCC Terre Haute, all staff, inmates, and visitors are supposed to wear masks inside the institution. *Id.* at ¶ 9. In accordance with CDC and BOP guidelines,[7] temperature checks and COVID-19 screening are conducted for everyone entering the grounds, and those with a temperature of 100.4 degrees or higher are denied entry. *Id.* Staff who transport witnesses and process witnesses through checkpoints are required to wear fit-tested N95 masks, face shields, gloves, and surgical gowns. Dkt. 33-1 at ¶¶ 8–9. For the December executions, all execution team members were supposed to wear N95 masks,[8] and they will be required to do so again for the January executions. Dkt. 51-2 at ¶ 6. Further, as of December 30, 2020, FCC Terre Haute received a shipment of COVID-19 vaccinations, and 206 staff and 355 high-risk inmates[9] have received the first round of vaccinations out of 709 staff members and 2228 inmates. Dkt. 51-1 at ¶¶ 8–9.

---

[7] *See* CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ("*CDC Interim Guidance*") (last updated Dec. 31, 2020); Federal Bureau of Prisons, *BOP Modified Operations*, https://www.bop.gov/coronavirus/covid19_status.jsp (last updated Nov. 25, 2020).

[8] N95 masks filter out 95% of air particles, making them more protective than cloth masks at preventing the spread of COVID-19. CDC, *Personal Protective Equipment: Questions and Answers*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/respirator-use-faq.html (last updated Aug. 8, 2020).

[9] According to Warden Watson, "The Plaintiffs were not among those inmates initially given the vaccination because they are not medically in a high risk category." *Id.*

COVID-19 tests for BOP employees are conducted on a voluntary basis. Dkt. 28-1 at ¶ 23. Eleven BOP employees are known to have tested positive contemporaneously with participating in executions: the FCC Terre Haute staff member disclosed in the *Hartkemeyer* case, the previously disclosed eight execution team members who participated in Orlando Hall's execution in November, dkt. 33-2 at ¶ 8, an additional execution team member who participated in the July executions, and an additional FCC Terre Haute employee who worked in the USP and FCI who assisted with executions in late September, dkt. 47-9. After the December executions, only three members of the execution team elected to be tested; all tested negative. Dkt. 51-2 at ¶ 5. None of the execution team members have reported a positive COVID-19 test since the December executions, but again only three chose to be tested. *Id.*

Because the contacts between those involved in the executions and FCC Terre Haute inmates are limited, the Plaintiffs enlisted Dr. Fefferman, a professor in both the Department of Ecology and Evolutionary Biology and the Department of Mathematics at the Professor at the University of Tennessee, Knoxville, to explain how conducting executions at this time could increase inmates' risk of contracting COVID-19. Dkt. 47-2 at ¶1. Dr. Fefferman is a researcher of the epidemiology, ecology, and evolution of infectious disease, pandemic preparedness, national biosecurity, and infrastructure protection. *Id.* at ¶ 2. She has been studying COVID-19 extensively since February 2020, with specific attention to modeling the risks of spread from and within carceral facilities. *Id.* at ¶ 4. Dr. Fefferman reviewed materials provided by the plaintiffs' counsel, including the execution plans and layout of FCC Terre Haute, Mr. Winter and Warden Watson's prior declarations, and discovery related to contact tracing and COVID-19 testing related to the executions. *Id.* at ¶ 7.

Based on her review of the materials, Dr. Fefferman opined that conducting the January executions poses a substantial risk of COVID-19 spread and illness to FCC Terre Haute prisoners. *Id.* at ¶ 8. The risk is due to the introduction of hundreds of individuals to the prison environment and the involvement of FCC Terre Haute staff members who are displaced from their normal duties, interact with the individuals involved in the executions, and then return to their duties. *Id.* The risk is higher when community spread is high, as it is now. *Id.* at ¶ 10. When community spread is high, it is "essential" to limit the number of contacts among individuals when other factors in the prison setting cannot necessarily be controlled, such as social distancing, improving ventilation systems, consistent use of masks, etc. *Id.* Dr. Fefferman acknowledged that she could not quantify the extent of the risk with the information available, but in her opinion the risk is substantial. *Id.* at ¶ 12. Dr. Fefferman explained a variety of factors that account for the increased risk:

- **Participants' Travel to FCC Terre Haute**: The 50 to 125 individuals traveling to the prison may be unknowingly infected or may contract the virus on account of their interstate travel because of increased risk of exposure from traveling by airplane, staying in hotels, taking taxis, and eating at restaurants. The potential for one infected person to infect a group of people is the basis for health directives issued by state and local public health officials discouraging holiday travel and gatherings, as well as the CDC's recommendations that prisons avoid all non-essential visitors when there is a COVID-19 outbreak inside the prison or in the community. *Id.* at ¶ 17;

- **FCC Terre Haute Staff Involvement**: Staff involvement in the executions increases the risk of exposing inmates to the virus due to the high number of staff

6

involved and their interaction with "potential new sources of infection," i.e. the individuals who would not be at the prison but for the executions. Because of the lag time between when one becomes infected and symptoms appear, the staff member may be infected by an individual involved in the execution and then several days later, having resumed his normal duties, may expose an inmate to the virus. *Id.* at ¶¶ 18–24;

- **Impact on COVID-19 Preventative Measures:** The precautions FCC Terre Haute normally takes to reduce the spread of COVID—quarantining new inmates, suspending visitation at FCI Terre Haute, assigning staff to the same posts to minimize their movement within the facility—are undermined by the executions because of the reassignment of many staff members to execution-related functions. Pulling staff from their regular duties and having other staff reassigned to the missing positions "increases the circles of exposure." Further, reduced staffing also causes a slower response time to individuals who are sick and potentially increases the exposure time of the virus to other inmates. *Id.* at ¶¶ 25–30;

- **Contact Tracing:** While contact tracing is an essential tool to slow the spread of the virus, disrupting staff's regular routines and assignments makes contact tracing more difficult by increasing the likelihood that the infected staff member will be unable to identify all of his contacts. Such was the case with the staff member who became infected before the July executions and was unable to remember his interactions. *Id.* at ¶ 33. The defendants did not do any contact tracing after learning a spiritual advisor tested positive after a November execution, despite his contacts with FCC Terre Haute staff. *Id.* at ¶ 38. Further, the defendants did not conduct

contact tracing for the members of the executions team members who tested positive, despite Warden Watson's prior sworn assertion that contact tracing would be conducted for any BOP employee who tested positive following an execution. Dkt. 28-1 at ¶ 24. The defendants stated that the lack of contact tracing of the execution team was to protect the confidentiality of its members, and because "some execution teams members who tested positive did not return to work at their home institution until meeting CDC guidelines; therefore negating the need for contact tracing at all." Dkt. 47-2 at ¶ 37 (quoting discovery response, dkt. 47-9 at 6). Because the purpose of contact tracing would be to identify potential contacts with FCC Terre Haute staff, the explanation that contact tracing was unnecessary because the execution team members isolated at home "suggests a basic and disturbing misunderstanding of the principles and purposes of contact tracing." *Id.*

Dr. Fefferman opined that the introduction of individuals to the facility for the executions and their interaction with FCC Terre Haute staff "is a likely explanation for waves of infection that have occurred in connection with prior executions." *Id.* at ¶ 35. That spikes in infections did not occur after every execution "does not negate the significance of instances in which spikes did occur, given the various factors that influence the spread of COVID," such as the rate of community spread. *Id.*

Dr. Fefferman identified safety measures that would reduce the risk of spreading COVID-19 to FCC Terre Haute inmates. First, the BOP could not conduct executions until the pandemic has ended. Second, the BOP could delay the executions until all staff and inmates have been vaccinated. Third, the BOP could institute heightened safety measures. The measures Dr. Fefferman states would be necessary include:

- Members of the execution team should quarantine for 14 days upon arrival to Indiana and test negative before participating in execution-related duties;

- Execution team members and FCC Terre Haute staff involved in the executions should undergo rapid testing each morning they enter the prison grounds;

- The BOP should restrict interaction between the execution team and FCC Terre Haute staff, impose strict social distancing requirements, strictly enforce mask mandates,[10] and implement policies prohibiting execution members and staff members from engaging in risky social behaviors such as drinking alcohol during the quarantine period.

- FCC Terre Haute staff members involved in execution-related activities should quarantine for 14 days and test negative for COVID-19 before returning to their normal assignments;

- If BOP or FCC Terre Haute identifies an infected team member, comprehensive contact tracing must take place.

In response to Dr. Fefferman's proposed safety measures, the defendants state that quarantining the execution team prior to the executions or FCC Terre Haute staff after the executions is not feasible. To require the execution team to quarantine upon arrival "would hamper staffing, productivity, and security at the home institutions of the team members, in addition to being financially very costly to the BOP (for example, requiring payment for lodging and meals and paying other staff overtime to cover quarantined staff duties at their home institutions.").

---

[10] In support of their second motion, the plaintiffs included the declaration of Charles Formosa, a mitigation investigator who was a member of Mr. Bernard's legal team and witnessed his execution. Dkt. 47-6. Mr. Formosa witnessed several instances where BOP staff did not wear masks, including a staff member in the execution chambers. *Id.* at ¶¶ 6, 14

Dkt. 51-2 at ¶ 8. According to Warden Watson, requiring FCC Terre Haute staff to quarantine for 14 days after the execution would hinder the ability to staff all necessary positions, potentially jeopardizing the safety and orderly operation of the institution. Dkt. 51-1 at ¶ 13. For example, many of the staff conducting temperature checks and symptom screening for individuals entering the grounds are medical staff at the institution; thus, any quarantine "would undermine the ability of the medical department to meet the health and safety needs of the inmate population." *Id.* The defendants also stated that contact tracing of execution team members is not always possible due to the "paramount need for confidentiality" of the identities of execution team members because "[c]ontact tracing would either provide the identities of team members, or information that would lead to the identities of team members, to individuals who would otherwise not have access to this information, and who could threaten the safety of the team member." Dkt. 51-2 at ¶¶ 11–14.

## II.    Factual Findings

### A.    Dr. Fefferman and Her Conclusions Are Credible.

The defendants do not put forth any expert testimony, but they do challenge Dr. Fefferman's conclusions and her status as an expert. *See* dkt. 51 at 15−17.

Dr. Fefferman's qualifications are unquestionable. She earned a PhD in mathematical biology from Tufts University in 2005. Dkt. 47-3 at 2. She is a professor at the University of Tennessee in both the Department of Ecology and Evolutionary Biology and the Department of Mathematics. And she has advised state and federal agencies on "how to manage and mitigate pandemic threats from H1N1 2009 flu, Ebola in West Africa, and Zika virus." Dkt. 47-2, ¶ 3. Dr. Fefferman appropriately relied on her review on the scientific evidence of how COVID-19 spreads, as well as declarations from BOP officials, data regarding FCC Terre Haute COVID-19 infections, and contact tracing information provided by the defendants. *Id.*, ¶¶ 7, 12.

**B.    The Defendants Have Deliberately Chosen Not to Implement CDC Guidance Regarding Contact Tracing and Testing.**

The CDC gives detailed guidance on when and how to implement contact tracing for individuals who test positive for COVID-19.[11] On December 4, 2020, defendant Warden Watson described the BOP's contact tracing procedures for a staff member who tested positive shortly before the July 2020 executions. Dkt. 28-1, ¶ 24. According to Warden Watson, "[t]he staff member's contacts were determined by the use of video as well as his personal recollection." *Id.* Warden Watson then declared under penalty of perjury that the "BOP will continue to conduct the same contact tracing procedures if additional staff members test positive in the future." *Id.* This declaration has proven to be wholly false.

The most recent execution for which the defendants have provided testing data was November 19. Within a week of that execution, six members of the execution team tested positive for COVID-19. The BOP conducted contact tracing for, at most, *one* of them. *See* dkt. 47-8 at 4–5, 20; Now the defendants, without acknowledging their prior misrepresentation, assert that contact tracing "is not always possible for members of the execution team, given the paramount need for their confidentiality due to the sensitivity of their occupation and their unique mission." Dkt. 51 at 7. The Court emphatically rejects this assertion. Nothing prevents execution team members from logging their close contacts during their time at FCC Terre Haute and reporting them to proper personnel if they later test positive for COVID-19. And nothing requires that the identity of the COVID-19 positive employee be shared with an individual who is advised through proper tracing that s/he has had close personal contact with such COVID-19 positive individual. It is the fact of the contact, not the identity of the COVID-19 positive person that is significant.

---

[11] "Contact Tracing," *CDC Interim Guidance*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

But even in situations where contract tracing is not feasible—though it is here—the CDC guidelines offer an alternative: broad-based testing. Instead, the defendants have made testing voluntary for execution team members. After the most recent round of executions, only three of the more than forty execution team members chose to be tested. Dkt. 51 at 10. Lack of resources cannot explain the failure to implement broad-based testing, as "FCC Terre Haute has multiple rapid Abbot[t] test machines, and uses them to immediately test symptomatic inmates in order to isolate and quarantine them more quickly." Dkt. 28-1, ¶ 12 (Watson 12/4/20 Declaration).

As Dr. Fefferman concludes, because of the BOP's failure to perform contact tracing and testing for execution team members, their "attempts, if any, to identify FCC Terre Haute staff who may have been infected [will be] hamstrung and incomplete." Dkt. 47-2, ¶ 37.

### C. Performing Further Executions as Planned, Without Additional Precautions, Substantially Increases the Risk of the Plaintiffs Contracting COVID-19.

The Court credits Dr. Fefferman's conclusion that "inmates from all three facilities within FCC Terre Haute would face a substantially increased risk of contracting COVID-19, and suffering serious health problems as a result, if executions continue at FCC Terre Haute at the current time and in the manner in which executions have been held earlier this year at the prison." Dkt. 47-2, ¶ 12.

The defendants note that COVID-19 infections have not spiked following every round of executions. Dr. Fefferman convincingly explains that the lack of consistent post-execution spikes is due to the nature of COVID-19 spread. *See id.*, ¶ 35 (describing the probabilistic nature of predicting COVID-19 spread and analogizing to weather prediction). Even in large groups, transmission does not always occur; but when it does, it can spread widely and quickly. *See id.*, ¶¶ 13−14.

Indeed, the spread of COVID-19 at USP Terre Haute following Orlando Hall's execution on November 19, 2020—after which several members of the execution team tested positive for COVID-19—exemplifies this type of spread. The following table summarizes confirmed active COVID-19 cases among inmates at USP Terre Haute in the weeks following the November 19 execution:[12]

| Date | USP Active Cases |
|---|---|
| 11/23/2020 | 4 |
| 11/30/2020 | 6 |
| 12/ 7/2020 | 84 |
| 12/14/2020 | 170 |
| 12/21/2020 | 252 |
| 12/28/2020 | 410 |
| 1/3/2021 | 344 |

Less than two weeks after the November 19 execution, confirmed active cases at the USP began rising. Within a month, the USP had added 400 new active cases—the most active cases among any BOP facility at the time. The defendants emphasize that the number of active cases "stay[ed] steady for the ten days" after the November execution. Dkt. 51 at 17. But this 10-day lag supports Dr. Fefferman's conclusions about execution-related spread: execution team members and visitors pass the virus to FCC staff, who in turn pass it to FCC inmates. Dkt. 47-2, ¶ 8.

As noted in the Court's order denying the plaintiffs' first motion for preliminary injunction, "the evidence shows—and common sense dictates—that carrying out executions on prison property with prison staff involved creates *some* additional risk of COVID-19 infection for

---

[12] Data from "Facility Case Trends" page at "Dashboards of BOP COVID-19 Cases," available at oig.justice.gov/coronavirus (last accessed January 6, 2021).

prisoners, including the plaintiffs." Dkt. 37 at 14. Dr. Fefferman could not quantify the increased risk, no doubt in part due to the defendants' failure to implement widespread testing or contact tracing for execution team members. Dkt. 47-2, ¶ 11 (noting that the "relevant data and contact tracing information are extremely limited"). But the Court credits her conclusion, based upon the available scientific evidence, the data from FCC Terre Haute, and the lack of precautions taken during and following executions, that carrying out further executions without additional safeguards will "substantially increase[]" the plaintiffs' risk.

### III.    Standing

The plaintiffs have demonstrated standing to bring this action. The defendants argue that the plaintiffs' alleged injury is speculative. Dkt. 51 at 2. But the Court finds that the plaintiffs have demonstrated injury in the form of a substantially increased risk of contracting COVID-19 due to the defendants' actions and inadequate preventative measures. This threat of future harm is sufficient injury for standing purposes. *Booker-El v. Superintendent, Indiana State Prison*, 668 F.3d 896, 899 (7th Cir. 2012).

### IV.    Discussion

"To obtain a preliminary injunction, a plaintiff must show that: (1) without this relief, it will suffer irreparable harm; (2) traditional legal remedies would be inadequate; and (3) it has some likelihood of prevailing on the merits of its claims." *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (citation and quotation marks omitted). The burden to show "likely" success is lightest when the prospect of irreparable injury is greatest, and vice versa. *Id.* at 822. If the plaintiff meets these three factors, the court must balance "the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Id.* at 818.

A. **Likelihood of Success**

The Eighth Amendment prohibits cruel and unusual punishment. Corollary to this prohibition is a duty upon prison officials, who must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526−27 (1984)). The Eighth Amendment's deliberate indifference framework includes an objective prong and subjective prong. *Id.* at 834. To prove the objective prong, the plaintiffs must show that conducting executions during the COVID-19 pandemic creates a "substantial risk of serious harm" to their health. *Id.* For the subjective prong, the plaintiffs must show that the defendants knew of and disregarded the excessive risk of harm to the plaintiffs' health. *Id.* at 837; *see also Goodloe v. Sood*, 947 F.3d 1026, 1030−31 (7th Cir. 2020) (citing *Farmer* standard). The level of disregard required is roughly equivalent to criminal recklessness. *Davis v. Kayira*, 938 F.3d 910, 915 (7th Cir. 2019).

The plaintiffs' first motion for preliminary injunction failed on the objective prong because they failed to provide evidentiary support of a correlation between conducting the executions and exposing inmates at FCC Terre Haute to COVID-19. The defendants maintain that none of the new evidence proffered by the plaintiffs casts doubt on the Court's prior conclusion.

The Court disagrees. Dr. Fefferman provides compelling evidence that the manner in which the defendants have conducted the last ten executions has created a substantial risk that the plaintiffs will contract COVID-19 and suffer serious health consequences. The executions introduce a large number of outsiders to the prison complex. These individuals interact with FCC Terre Haute staff who have been displaced from their regular duties to assist with the execution. The CDC recommends assigning staff to the same posts to reduce the spread of the virus.

Dkt. 13-12 at 2; dkt. 47-2 at ¶ 25. By shuffling staff assignments and exposing FCC Terre Haute staff to outsiders, the defendants increase the number of contacts all prison staff have with the inmates. Dkt. 47-2 at ¶ 30. This is especially risky when community rates are high. Staff displacement also complicates contact tracing once a staff member has tested positive for COVID-19. *Id.* at ¶ 31. As discussed in the factual findings, the Court credits Dr. Fefferman's conclusion that that "inmates from all three facilities within FCC Terre Haute would face a substantially increased risk of contracting COVID-19, and suffering serious health problems as a result, if executions continue at FCC Terre Haute at the current time and *in the manner in which executions have been held* earlier this year at the prison." Dkt. 47-2, ¶ 12 (emphasis added).[13]

Moving to the subjective prong, there is compelling circumstantial evidence that the defendants are knowingly disregarding a risk to inmates' health if they proceed with the January executions in the same manner as the earlier executions. *See Farmer*, 511 U.S. at 842 (noting factfinder may rely on "inference from circumstantial evidence" to find requisite knowledge of a substantial risk.). The defendants cite to cases in which prison administrators were not found to be deliberately indifferent due to the efforts they undertook to reduce the spread of COVID-19 during regular prison operations. Dkt. 51 at 18, n.5, citing, *e.g. Wilson v. Williams*, 961 F.3d 829, 840–41

---

[13] The plaintiffs argue that the Court may consider members of the putative class—all inmates at FCC Terre Haute—when evaluating the likelihood of success and the risk of irreparable harm, but they have not yet moved to certify the class. The Court need not address whether it may consider the putative class absent a motion for class certification, because the Court finds that the named plaintiffs have presented sufficient evidence of a risk of future harm to them. *See Delaney v. DeTella*, 256 F.3d 679, 686 (7th Cir. 2019) ("Deliberate indifference is akin to criminal recklessness; thus, it is enough that defendants are aware that their action may cause injury without being able to divine the most likely victim."); *Byrd v. Hobart*, 761 Fed. App'x 621 (7th Cir. 2019) (holding that a reasonable jury could find that unsanitary kitchen conditions at prison created a risk of future harm that violated the Eighth Amendment, even though the plaintiff had eaten there for years without becoming ill).

(6th Cir 2020) (finding BOP responded reasonably to risks by screening inmates, limiting group gatherings, staff, and visitors, providing inmates masks and soap, etc.); *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020) (finding plaintiffs were unlikely to establish deliberate indifference when prison officials were taking measures "informed by guidance from the CDC and medical professionals"). But conducting executions at this time is not part of regular prison operations. As the defendants have insisted throughout this and other litigation, the BOP has discretion to set the place and date for executions. The defendants have exercised that discretion by choosing to carry out executions during the height (so far) of the COVID-19 pandemic that has killed more than 350,000 Americans. The defendants therefore must ensure that the consequences of these executions reflect due regard for the safety of non-condemned prisoners in their custody.

When the BOP "is aware of the need to undertake a specific task and fails to do so, the case for deliberate indifference is particularly strong." *Goodloe*, 947 F.3d at 1031. The defendants know what safety measures are necessary to reduce the spread of COVID-19 within the prison, and claimed they would follow many of them, but their conduct instead demonstrates willful disregard of the risks posed when the measures aren't implemented. The defendants claim to have implemented mask-wearing but have failed to enforce compliance. The defendants have touted the availability of testing but have chosen not to utilize rapid testing of staff and visitors who enter prison grounds. It is telling that Warden Watson acknowledged that one of the reasons visitors are not tested is because "[s]ome visitors are legal or spiritual advisors, as well as members of the media and witnesses whose presence is authorized by 28 C.F.R. § 26.4." Dkt. 51-1 at ¶ 15. His statement reveals a concern that denying entrance to one of these visitors could create a legal impediment to the execution, so the defendants prefer not to know if they are COVID-19 positive. Testing is not required for any staff. The defendants' observation that none of the December

17

execution team members received positive test results is not reassuring when less than 10% of the execution team chose to be tested. The defendants ignore the fact that individuals "with asymptomatic and presymptomatic infection are significant contributors" to the transmission and spread of COVID-19.[14] Most disconcerting, the defendants represented to the Court that contact tracing would occur after any BOP staff member involved in the executions tested positive. This has not been the case— and the Court finds the failure was not by accident but by design.

### B.   Irreparable Harm, Inadequate Legal Remedy, and Balancing the Parties' Interests

In its order denying the plaintiffs' first motion for preliminary injunction, the Court found that "the plaintiffs have not shown that they are likely to be infected with COVID-19 because of the scheduled executions, and thus have not demonstrated an irreparable injury." Dkt. 37 at 15. That has now changed. As discussed in Sections II.C, III, and IV.A, the Court now finds that plaintiffs have presented credible, compelling evidence that they face a substantially increased risk of contracting COVID-19 absent an injunction. Traditional legal remedies are inadequate to remedy that injury.

The defendants have a substantial legal interest in timely enforcement of criminal defendants' sentences. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1133 (2019) ("Both the [government] and the victims of crime have an important interest in the timely enforcement of a sentence."). But the plaintiffs do not seek relief that would necessarily prevent the government from timely carrying out executions. Indeed, by taking additional precautions discussed below in Section V, the defendants may carry out executions in January as scheduled without violating the plaintiffs' Eighth Amendment rights. These additional precautions would not be costless, but any costs to the

---

[14] CDC, *Guidance for Expanded Screening Testing to Reduce Silent Spread of SARS-CoV-2,* https://www.cdc.gov/coronavirus/2019-ncov/php/open-america/expanded-screening-testing.html (last updated Dec. 3, 2020).

defendants do not outweigh the risk to the plaintiffs of contracting COVID-19 if executions go forward as scheduled without additional precautions.

Taken together, the parties' competing interests weigh in favor of a preliminary injunction prohibiting the defendants from carrying out the January executions as scheduled without additional precautions. The constitutional right of plaintiffs and/or the putative class members to be free from unreasonable risk of exposure to COVID-19 is a significant public interest. *See Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (quotation marks and citation omitted)). Former Attorney General Barr has suggested as much: "Executing [the BOP's] mission imposes on us a profound obligation to protect the health and safety of all inmates."[15] Not only the BOP's mission, but the Eighth Amendment to the United States Constitution requires no less.

## V.    The Preliminary Injunction

Where, as here, a court enters a preliminary injunction in a civil case regarding prison conditions, the injunction "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2).

The plaintiffs seek an injunction prohibiting "further executions at FCC Terre Haute until inmates no longer face an unreasonable risk of contracting COVID-19 because of the executions." Dkt. 48 at 8. They propose two paths by which the risk of COVID-19 could be sufficiently mitigated. First, the defendants could "administer an FDA-approved vaccine to the inmate population." Second, the defendants could implement a series of testing and quarantine measures

---

[15] Mem. for Director of BOP re Increasing Use of Home Confinement at Institutions Most Affected by COVID-19, at 1, 3 (April 3, 2020), https://www.justice.gov/file/1266661/download.

to minimize the risk of COVID-19 transmission to inmates from execution activities. These proposed measure include (1) a 14-day quarantine for execution team members upon arriving in Terre Haute, (2) a negative COVID-19 test before each team member is allowed to begin execution duties, (3) daily testing for execution team members throughout their post-execution time in Terre Haute, (4) a 14-day quarantine for FCC staff after any involvement in execution-related duties, (6) a negative COVID-19 test before any such staff member is allowed to return to normal duties, and (7) comprehensive contact tracing for any BOP or FCC staff member who tests positive for COVID-19.

These extensive precautions (or a vaccination of the full inmate population) might constitute best practices from an epidemiological perspective, but the Eighth Amendment does not require defendants to eliminate *all* additional risk. *See Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006) ("A defendant with knowledge of a risk need not take perfect action or even reasonable action" to avoid Eighth Amendment liability) (quotation marks omitted). The Court concludes that defendants can avoid violating the plaintiffs' Eighth Amendment rights by implementing a less onerous set of precautions than those the plaintiffs propose:

1. Enforce mask requirements for all staff participants in the executions.

2. Maintain contact logs for all FCC Terre Haute staff members involved in any execution who have close contact—within 6 feet for a total of 15 minutes over the course of a 24-hour period—with any other person during execution preparation, during an execution, or during the post-execution process.

3. For 14 days following any such close contact, require all impacted FCC Terre Haute staff members to produce a negative COVID-19 result using one of the complex's

rapid testing machines each day before beginning ordinary duties that involve interaction with FCC inmates.

4.      Conduct thorough contract tracing for any such FCC staff member who tests positive for COVID-19 during this 14-day period.

The Court will therefore issue a preliminary injunction prohibiting the defendants from carrying out executions unless and until the defendants have implemented the above precautionary measures.

## VI.   Conclusion

The plaintiffs' second motion for preliminary injunction, dkt. [47], is **granted in part and denied in part**. A separate order for preliminary injunction shall issue.

**IT IS SO ORDERED.**

Date: 1/7/2021

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

21

Distribution:

Robert A. Burgoyne
PERKINS COIE LLP
rburgoyne@perkinscoie.com

Sarah Howland
PERKINS COIE LLP
showland@perkinscoie.com

John R. Maley
BARNES & THORNBURG, LLP (Indianapolis)
jmaley@btlaw.com

Caroline M. Mew
PERKINS COIE LLP
cmew@perkinscoie.com

Lisa A. Olson
U.S. DEPARTMENT OF JUSTICE (Washington DC)
lisa.olson@usdoj.gov

Jordan L. Von Bokern
U.S. DEPARTMENT OF JUSTICE (Washington DC)
jordan.l.von.bokern2@usdoj.gov

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
shelese.woods@usdoj.gov